DEPOSITION OF ANDREA BRENT

Page 1

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF OHIO

WESTERN DIVISION

MIDLAND FUNDING, LLC,

     Plaintiff,

  vs.                  Case No. 3:08-CV-1434

ANDREA L. BRENT,          Judge David A. Katz

     Defendant and

     Third-Party Plaintiff,

  vs.

MIDLAND CREDIT MANAGEMENT, INC.,

     Third-Party Defendant.

- - - - -

DEPOSITION OF ANDREA BRENT

Taken on Wednesday, November 12, 2008 at 12:53 p.m.

At the law offices of:

Murray & Murray Co., L.P.A.

111 East Shoreline Drive

Sandusky, Ohio  44870

Before Nancy Geiger, a Registered Professional Reporter

and Notary Public in and for the State of Ohio

DEPOSITION OF ANDREA BRENT

Page 2

1  APPEARANCES:
2   .
3    On behalf of the Defendant/
4    Third-Party Plaintiff:
5      Murray & Murray Co., L.P.A., by
6      DONNA JEAN A. EVANS, ESQ.
7      111 East Shoreline Drive
8      P.O. Box 19
9      Sandusky, Ohio 44870
10     419-624-3000
11     dee@murrayandmurray.com
12  .
13    On behalf of the Plaintiff/
14    Third-Party Defendant:
15      Javitch, Block & Rathbone, by
16      R. GLENN KNIRSCH, ESQ.
17      1100 Superior Avenue
18      19th Floor
19      Cleveland, Ohio 44114
20      216-623-0000
21      gknirsch@jbandr.com
22           ----
23  .
24  .
25  .

Page 3

1       ANDREA BRENT, of lawful age,
2  called for examination, as provided by
3  the Federal Rules of Civil Procedure,
4  being by me first duly sworn, as
5  hereinafter certified, deposed and said
6  as follows:
7       EXAMINATION OF ANDREA BRENT
8  BY-MR.KNIRSCH:
9       Q. Good morning, Ms. Brent.
10      A. Morning.
11      Q. My name is Glenn Knirsch and
12  I represent Midland Credit Management
13  and Midland Funding in this action.
14      Have you ever had your deposition
15  taken before?
16      A. No.
17      Q. Okay. A deposition is
18  basically a tool we attorneys use to
19  learn a little bit more about the case.
20  I'll ask you a series of questions. As
21  you know, you're under oath, so you're
22  expected to answer as truthfully and to
23  the best of your knowledge.
24      If you don't remember, I don't
25  remember is a perfectly acceptable

Page 4

1  answer. I don't know is a perfectly
2  acceptable answer, okay?
3      A. Okay.
4      Q. Along those lines, please
5  answer your questions out loud, yes, no,
6  I don't know. The court reporter is
7  trying to take down everything we have
8  to say. If I remind you, I'm not being
9  rude, I'm just trying to keep the record
10  clear. Okay?
11      A. Right.
12      Q. Yes?
13      A. Yes. Right.
14      Q. Also, please try not to
15  speak over me and I'll try not to speak
16  over you. We tend to anticipate answers
17  and maybe you anticipate a question, but
18  again, we need to keep the record as
19  clear as possible, okay?
20      A. Okay.
21      Q. Another rule, if you don't
22  understand a question I ask, obviously,
23  I know what I'm trying to ask, but
24  maybe it didn't come out clearly, please
25  ask me to rephrase and I'll do my best

Page 5

1  to do so, okay?
2      A. Okay.
3      Q. And finally, if you want to
4  take a break for whatever reason, we'll
5  take a break. Just ask me, but if
6  there's a question pending, first answer
7  that question and then we'll take a
8  break for whatever needs you have, okay?
9      A. Okay.
10      Q. Does that sound okay?
11      A. Yes.
12      Q. Can you please state your
13  name for the record.
14      A. Andrea Brent.
15      Q. Okay. Where do you
16  presently live, Ms. Brent?
17      A. I live in Sandusky, Ohio.
18      Q. Is it a 3902 address?
19      A. That's correct.
20      Q. 3902 Donair Drive?
21      A. That's correct.
22      Q. How long have you lived at
23  3902 Donair Drive?
24      A. Approximately a year and four
25  months.

DEPOSITION OF ANDREA BRENT

Page 6

1    Q. A year and four months. And
2 is that a home?
3    A. Yes, it is.
4    Q. Okay. And you own that
5 home?
6    A. Correct.
7    Q. Do you live at that home
8 with anybody else?
9    A. Yes.
10    Q. Whom do you live with?
11    A. My fiancé.
12    Q. Your fiancé. And that
13 gentleman's name is?
14    A. John Schwardentraub.
15    Q. Schwardentraub.
16    A. S C H W A R D E N T R A U B.
17    Q. Can I call him John from
18 here on out?
19    A. You can, yes.
20    Q. Okay. And is that the same
21 that John you mentioned in your initial
22 discovery?
23    A. That's correct.
24    Q. Okay. Where did you live
25 before the 3902 Donair Drive?

Page 7

1    A. I lived at 5803 East Dennis
2 Drive, in Marblehead, Ohio.
3    Q. Okay. How long did you live
4 there?
5    A. A year, approximately.
6    Q. And just for my
7 understanding, what -- is it Marblehead,
8 Ohio?
9    A. That's correct.
10    Q. Where is that exactly?
11    A. It's just a little east of
12 Port Clinton --
13    Q. Okay.
14    A. -- area.
15    Q. I know where Port Clinton
16 is. And prior to that, did you live
17 anywhere?
18    A. Yes, I did.
19    Q. Where did you live prior to
20 that?
21    A. Prior to that, I lived at 73
22 Sandy Trail, Willard.
23    Q. Okay. Are these all
24 apartments, prior to the 3902?
25    A. The 5803 was an apartment,

Page 8

1 home to me. And then also the Dennis,
2 I'm sorry, the 73 Sandy Trail was a
3 home.
4    Q. Okay. Did you ever -- we'll
5 get to that.
6    Whom did you speak with about
7 this deposition, prior to coming here
8 today?
9    Did you speak with anybody about
10 this?
11    A. No, no.
12    Q. No. Okay. Did you look at
13 any documents prior to today, in
14 preparation for your deposition?
15    A. I received a certified letter
16 in the mail. And that's the only
17 document that I received.
18    Q. And that was from your
19 attorney?
20    A. No, Javitch.
21    Q. Oh, okay. So in preparation
22 for today's deposition, you did not
23 review any documents?
24    A. No, I'm not sure --
25    MS. EVANS: I don't think she

Page 9

1 understands the question.
2    Q. Okay. Did you do anything
3 to prepare for today? Did you meet
4 with your attorney --
5    A. Yes.
6    Q. -- to prepare for today?
7    A. Yes, I did.
8    Q. Did your attorney show you
9 any documents, prior to being deposed
10 today?
11    A. Yes.
12    Q. Okay. What did she show
13 you?
14    A. I am not sure exactly what
15 the documents are termed or called.
16    Q. Okay. Did she show you the
17 complaint that was filed against you, by
18 Javitch, Block & Rathbone?
19    A. I believe I had that
20 information.
21    Q. Okay. If you come to
22 remember anything that you looked at
23 previous to this deposition today, if
24 you could please let me know.
25    Okay. Let's talk about where you

DEPOSITION OF ANDREA BRENT

**Page 10**

1  work. Where do you work?
2      A. Fenner, F E N N E R, Dunlop
3  in Brooklyn, Ohio.
4      Q. Okay. What is Fenner
5  Dunlop?
6      A. They make conveyer belting.
7      Q. They make conveyer belting.
8  And how long have you worked at Fenner
9  Dunlop?
10      A. Approximately four years.
11      Q. Approximately four years.
12  And prior to that, what did you do?
13      A. Prior to that, I worked at
14  Central Soya.
15      Q. And Central Soya is what
16  exactly?
17      A. A grain elevator.
18      Q. A grain elevator. Did you
19  go to college?
20      A. Yes, I did.
21      Q. Where do you go to college?
22      A. University of Toledo.
23      Q. And what did you study at
24  University of Toledo?
25      A. I studied elementary

**Page 11**

1  education.
2      Q. Elementary education. And
3  are you not a teacher now?
4      A. That's correct.
5      Q. Okay. Is it just because
6  it's hard to find a job in teaching?
7      A. No.
8      Q. Why are you not a teacher?
9      A. I am currently not a
10  teacher.
11      Q. And what do you do at the --
12  what's it called, Dunlop?
13      A. Fenner?
14      Q. Fenner Dunlop. What exactly
15  do you do at Fenner Dunlop.
16      A. I'm a receiving supervisor.
17      Q. Okay. And you're a manager?
18      A. We call them supervisors/
19  coordinators.
20      Q. Okay. When did you go to
21  college?
22      A. I started off just part-time
23  college at Firelands in Huron, Ohio.
24  The dates I'm not 100 percent sure on.
25      Q. Okay. The years, when did

**Page 12**

1  you graduate from high school?
2      A. 1995.
3      Q. 1995. Did you start college
4  immediately or did you work for a while
5  and then go to college?
6      A. I worked for a while and
7  then went to college.
8      Q. Okay. In '96, do you
9  remember if you were in college?
10      A. I would say maybe '97.
11      Q. Probably '97?
12      A. I'm not 100 percent sure.
13      Q. Fair enough. Any post --
14  anything after college?
15      A. Work.
16      Q. Just work, no school
17  afterwards?
18      A. No.
19      Q. Okay. How many -- and you
20  say you live with your fiancé?
21      A. That's correct.
22      Q. Okay. And is the home owned
23  by you primarily --
24      A. Correct.
25      Q. -- or just you primarily?

**Page 13**

1      A. Yes.
2      Q. Okay. And he lives there,
3  as well?
4      A. Yes.
5      Q. Okay. How many cars do you
6  own?
7      A. One.
8      Q. Just one. Is that a
9  Cadillac?
10      A. No.
11      Q. What do you own?
12      A. A Hummer.
13      Q. A Hummer. Have you ever
14  owned Cadillac?
15      A. Yes, I have.
16      Q. And that was a 2003
17  Cadillac?
18      A. That's correct.
19      Q. Have you ever been married
20  before?
21      A. No.
22      Q. So you've -- this is your
23  first dive into those waters, so to
24  speak?
25      A. That would be correct.

DEPOSITION OF ANDREA BRENT

**Page 14**

1    Q. Okay. So obviously, you've
2  never been divorced?
3    A. No.
4    Q. Okay. Any children?
5    A. None.
6    Q. Just to learn a little bit
7  more about you, do you have any hobbies?
8    A. Work.
9    Q. Work. Nothing beyond work?
10   A. No.
11   Q. How much do you work per
12  week?
13   A. 40 plus hours.
14   Q. 40 plus hours?
15   A. Whatever it takes.
16   Q. Is it a salary job?
17   A. Yes.
18   Q. So beyond work, you don't do
19  much else?
20   A. That's correct.
21   Q. Except hang out with your
22  man to be?
23   A. That's correct.
24   Q. Okay. No interests that you
25  -- do you go out to restaurants, et

**Page 15**

1  cetera?
2    A. No.
3    Q. No. Okay. And you've
4  worked at your employment for four
5  years --
6    A. Correct.
7    Q. -- four plus? Have you had
8  your present job there since then or has
9  there been promotions?
10   A. Promotions.
11   Q. Any demotions since you've
12  been there?
13   A. No.
14   Q. What did you start off as
15  there?
16   A. I started off as a shipping
17  clerk.
18   Q. As a shipping -- was that
19  basically working on the floor?
20   A. That's basically paperwork.
21  Just paperwork.
22   Q. Just paperwork. And through
23  there, you've moved up in stature --
24   A. Correct.
25   Q. -- so to speak? Okay.

**Page 16**

1    How would you describe your
2  present finances, good, moderate?
3    Do you have student loans that
4  you're paying?
5    A. Yes, I do.
6    Q. Okay. Do you have any
7  outstanding credit card balances that
8  you're paying off?
9    A. I may have.
10   Q. You may have?
11   A. Yeah. I have current credit
12  cards, if that's what you're asking.
13   Q. Sure. How many current
14  credit cards would you say you have?
15   A. Current?
16   Q. Yes.
17   A. One.
18   Q. Just one. And you try to
19  pay that off every month?
20   A. Um-hum.
21   Q. Yes?
22   A. Yes. I'm sorry.
23   Q. That's okay. And did we go
24  through your entire work history through
25  -- after college, where did you say you

**Page 17**

1  worked right after college?
2    A. This is -- I have had
3  several employments. So I did work at
4  Homes Casas in Fremont, Ohio. And then
5  I went to Central Soya, which I
6  mentioned earlier.
7    Q. Okay. And then where you
8  are currently now?
9    A. Correct.
10   Q. And have you lived in the
11  Ohio area your entire life?
12   A. Yes.
13   Q. Okay. What is your present
14  telephone number?
15   A. It is 419-202-5179.
16   Q. Just so you know, this won't
17  be public record or anything.
18   Have you ever lived at 129 ½
19  Washington Street in Port Clinton?
20   A. Yes.
21   Q. When did you live there?
22   A. I do not know the dates.
23   Q. That's fine. That's all
24  right.
25   How long would you say you lived

DEPOSITION OF ANDREA BRENT

Page 18

1 there, a year, two years, just a few
2 months?
3     A. Less than a year.
4     Q. Less than a year, that's
5 fine. What of the telephone number --
6 does the telephone number 531-9998 ring
7 a bell to you?
8     A. Yes.
9     Q. Okay. Was that a home
10 telephone number?
11     A. That was my mother's phone
12 number.
13     Q. That was your mother's
14 telephone number, okay. How about the
15 number 734-5558, does that ring a bell?
16     A. I do not recall.
17     Q. Okay. When you move from
18 location to location as we do when we're
19 younger, I know I certainly have, do you
20 generally put a U.S. mail forwarding
21 order on or do you just -- how do you
22 make that work?
23     A. I don't recall what I've
24 done in the past, as far as that's
25 concerned.

Page 19

1     Q. Okay. Andrea, I'm going to
2 hand the court reporter a document which
3 she'll mark as Plaintiff's Exhibit A.
4     - - - - -
5     (Thereupon, Plaintiff's
6     Deposition Exhibit-A
7     was marked for purposes
8     of identification.)
9     - - - - -
10     Q. Do you recognize that? I
11 know it's not a great copy, but do you
12 recognize what that is?
13     A. Yes.
14     Q. Okay. What is that exactly,
15 Exhibit A?
16     A. This is a certified letter
17 that I received in the mail.
18     Q. Okay. Did you receive a
19 letter or did you receive a card in the
20 mail that you had to go to the post
21 office and pick it up?
22     A. I received a card because I
23 was not home at the time when they
24 tried to deliver it.
25     Q. Okay. And did that occur on

Page 20

1 or about April 17th, 2008, if you
2 remember?
3     A. I don't know the exact date.
4     Q. That's fine. When you
5 received this letter in the mail, what
6 did you do first or what was your
7 reaction to it?
8     A. I cried, I was very
9 disturbed, didn't know what it was all
10 about, read through it and completely
11 confused.
12     Q. Okay. Did you understand at
13 that point that you were being sued?
14     A. Yes.
15     Q. Okay. How soon after you
16 received this, and I understand you
17 received this on a Saturday?
18     A. That's correct.
19     Q. How soon after you received
20 this did you seek help from an attorney?
21     A. I don't know the exact date.
22     Q. Okay. Did you wait weeks,
23 was it fairly soon?
24     A. Fairly soon.
25     Q. Fairly soon. Did you

Page 21

1 attempt to call anybody from Midland
2 Funding to ask what this was all about?
3     A. That Saturday that I received
4 it, I tried calling Javitch.
5     Q. Okay. And they were closed?
6     A. No one answered.
7     Q. Or no one answered. Did you
8 try to call on Monday, the following
9 Monday?
10     A. No.
11     Q. So when you received this,
12 if I know this correctly, you knew
13 essentially that you were being sued for
14 something?
15     A. That's correct.
16     Q. And you didn't exactly know
17 what you were being sued for?
18     A. That's correct.
19     Q. Okay. Is there anything in
20 this first page that -- besides the fact
21 that you didn't know you were being --
22 what you were being sued for, is there
23 anything on this first page that you
24 found confusing?
25     A. What do you mean by

DEPOSITION OF ANDREA BRENT

Page 22

1   confusing?
2        Q. Well, let's take it line by
3   line. The first line, and just for the
4   record, the first page of Exhibit A is
5   the cover sheet provided by the Clerk of
6   Courts. The first line says you've been
7   named a defendant in a complaint filed
8   in the above-named court by the above-
9   named plaintiff.
10       Did you understand what that was
11  telling you?
12       A. I did not know -- I
13  understand when they say plaintiff. I
14  did not know who Midland Funding was.
15       Q. Okay. But you essentially
16  knew that you were being sued by Midland
17  Funding --
18       A. Correct.
19       Q. -- for some reason? Okay.
20       Have you ever been sued before?
21       A. No.
22       Q. Okay. You are hereby
23  summoned and required, and I'm looking
24  at the next line, to serve upon the
25  plaintiff's attorney, or if there is no

Page 23

1   attorney of record, a copy of your
2   answer within 28 days after the service
3   of the summons.
4        Did anything in that -- did you
5   know what to do when you saw that?
6        A. My interpretation of that was
7   that I needed to respond within 28 days.
8        Q. And we'll go on to the next
9   line. Failure to appear and present a
10  defense will result in a judgment by
11  default being rendered against you for
12  the relief demanded in the complaint.
13       Was it your understanding that if
14  you did not -- what was your
15  understanding of that, let me say?
16       A. Basically, what it states
17  here. If you do not respond within
18  three days after this service of the
19  copy of the answer on the plaintiff's
20  attorney.
21       Q. Sure. That they might enter
22  judgment against you?
23       A. Correct.
24       Q. Okay. Have you ever spoken
25  with anybody from Javitch, Block &

Page 24

1   Rathbone outside of today?
2        A. No.
3        Q. Do you remember ever
4   receiving a letter from Javitch, Block &
5   Rathbone?
6        A. No.
7        Q. I'll ask the same questions
8   about Midland Funding. Did you ever
9   speak with anybody from Midland Funding?
10       A. No.
11       Q. Ever receive a letter from
12  Midland Funding that you remember?
13       A. No.
14       Q. So nobody ever told you that
15  this was not important to respond to
16  from Javitch, Block & Rathbone?
17       A. I'm sorry, say that again,
18  please.
19       Q. Sure. Did anybody from
20  Javitch, Block & Rathbone ever tell you
21  or imply that this was not important?
22       A. No.
23       Q. Okay. I'll ask the same
24  about Midland Funding.
25       Did anybody from Midland Funding

Page 25

1   ever imply or tell you that this was
2   not important?
3        A. No.
4        Q. Okay. So when you saw this,
5   you understood that for some reason you
6   were being sued by a company called
7   Midland Funding, correct?
8        A. Yes.
9        Q. But you really didn't know
10  who Midland Funding was?
11       A. That's correct.
12       Q. Okay. And Javitch, Block &
13  Rathbone, is this the first interaction
14  you've had with Javitch, Block &
15  Rathbone?
16       A. This letter.
17       Q. This letter was the first.
18  Have you ever had any since, other than
19  today?
20       A. No.
21       Q. Okay. I'm looking at the
22  second page of Exhibit A. And you
23  testified earlier that you never heard
24  of Midland Funding, correct?
25       A. That's correct.

DEPOSITION OF ANDREA BRENT

Page 26

1    Q. Okay. Under there where it
2  says defendant and Andrea Brent,
3  defendant, that's your current address,
4  correct, the 3909 Donair Drive?
5    A. 3902.
6    Q. I'm sorry, 3902. And that
7  is your present address?
8    A. That's correct.
9    Q. And was that your current
10  address in April of 2008?
11    A. That's correct.
12    Q. Okay. Besides the fact that
13  you -- well, let's go through this line
14  by line, as well.
15    Plaintiff acquired, for valuable
16  consideration, all right, title and
17  interest in and to the claims set forth
18  below originally owed by defendant to
19  CitiBank USA.
20    It's my understanding that you
21  don't remember having a credit card with
22  CitiBank USA; is that correct?
23    A. To my knowledge, I've never
24  had a CitiBank USA.
25    Q. What kind of credit card do

Page 27

1  you have now?
2    A. Lowe's.
3    Q. A Lowe's, as in the home
4  improvement store?
5    A. That's correct.
6    Q. Do you know if that credit
7  card is financed by another bank?
8    A. That I do not know.
9    Q. Okay. But you make your
10  checks out to Lowe's?
11    A. That is correct.
12    Q. Besides the fact that you
13  don't recall having a credit card with
14  CitiBank, is there anything in paragraph
15  1 that is confusing to you?
16    Do you understand what that is
17  alleging?
18    A. Yes.
19    Q. Okay. So it's your
20  understanding that plaintiff, being
21  Midland Funding, is asserting that it
22  now is the rightful owner of a credit
23  card debt originally owed by CitiBank;
24  is that your understanding?
25    A. You said rightful owner.

Page 28

1  When I read that I do not interpret it
2  that way.
3    Q. Okay. What do you interpret
4  it as?
5    A. I read it and that's the way
6  I take it, plaintiff acquired, for
7  valuable consideration, all right and
8  title. It does not state that Midland
9  owns.
10    Q. Is the rightful owner, maybe
11  I should -- if I got rid of that?
12    A. Yes.
13    Q. Okay. Have you ever had a
14  credit card go into default?
15    A. Yes.
16    Q. Okay. When abouts did that
17  happen?
18    A. I cannot recall the date.
19    Q. Okay. Might it have been in
20  2000?
21    A. I cannot recall the date.
22    Q. Okay. Where were you
23  working in the year 2000, do you
24  remember? I understand it was eight
25  years ago.

Page 29

1    A. I honestly cannot answer
2  which employer I was in at in 2000.
3    Q. Okay. Is it possible you
4  were still -- when you went to school,
5  were you part time or full time?
6    A. I was full time.
7    Q. Is it possible you were in
8  school in 2000?
9    A. Possible, yes.
10    Q. What year did you graduate
11  from college?
12    A. I did not graduate.
13    Q. Oh, you did not graduate. I
14  got you. Okay. Do you remember what
15  year you stopped going?
16    A. No.
17    Q. Paragraph No. 2, I'll ask
18  the same question, though you may not
19  agree with the allegation contained in
20  paragraph 2, is there anything about
21  paragraph 2 that you don't understand?
22    A. Restate your question.
23    Q. Sure. Do you understand the
24  allegation of paragraph 2?
25    A. Yes.

DEPOSITION OF ANDREA BRENT

Page 30

1    Q. Okay. Does anything in here
2  besides the fact that you disagree with
3  the assertions, does anything in that
4  paragraph confuse you?
5    A. It basically says a copy of
6  which is attached as Exhibit A, and as
7  you turn back to Exhibit A, I'm not
8  exactly sure why A is attached.
9    Q. Okay. Can you explain that
10  further -- excuse me, you don't
11  understand why A was attached.
12    Does that mean you were
13  unfamiliar with Exhibit A?
14    A. Exhibit A -- yeah, I'm not
15  sure why it is attached. It doesn't
16  show me anything. I mean, I look at it
17  and I just see a series of pages.
18    Q. Okay. So that it doesn't
19  look familiar to you?
20    A. No, it does not.
21    Q. Do you generally understand
22  the way a credit card works? Do you
23  want me to ask a different -- okay.
24    Do you understand that your use
25  of a credit card binds you to paying it

Page 31

1  back?
2    A. Yes.
3    Q. Okay. Do you ever read at
4  the bottom of the -- you've used a
5  credit card before, correct?
6    A. I stated earlier that I have
7  one, yes.
8    Q. Okay. And when you use that
9  credit card, you're familiar they make
10  you sign a slip, correct, the merchant
11  prints out a slip and you sign the
12  slip, more or less?
13    A. The merchant?
14    Q. Where you're purchasing an
15  item, a good?
16    A. Like a sales receipt?
17    Q. Sure. Okay. So have you
18  ever seen the bottom of that slip where
19  it says, I agree to the terms and
20  conditions; did you ever read that?
21    A. I have.
22    Q. Okay. So you're aware that
23  there's language there?
24    A. Yes.
25    Q. Okay. And just to clarify,

Page 32

1  on your present credit card with Lowe's,
2  you're not exactly sure who the
3  financing bank is; is that correct?
4    A. That is correct.
5    Q. Okay. And just to clarify,
6  you stated earlier that you've never
7  spoken with anybody from Midland,
8  Midland Credit Management or Javitch,
9  Block & Rathbone, prior to today?
10    A. To my knowledge, that is
11  correct.
12    Q. And to your knowledge, you
13  never received a letter either, correct?
14    A. That is correct.
15    Q. Okay.
16    A. Can I take a five-minute
17  break?
18    Q. Sure can.
19    (Recess taken.)
20    Q. Have you ever heard of
21  statutory interest before?
22    A. Can you rephrase that?
23    Q. Sure. The term statutory
24  interest, is that a term that is
25  familiar to you?

Page 33

1    A. No.
2    Q. The term custodian of
3  records, does that term sound familiar
4  to you?
5    A. I'm sorry, one more time.
6    Q. Sure. The term custodian of
7  records?
8    A. No.
9    Q. We're done with that exhibit
10  for now.
11    MR. KNIRSCH: Can you please mark
12  that as Exhibit B.
13    - - - - -
14    (Thereupon, Plaintiff's
15    Deposition Exhibit-B
16    was marked for purposes
17    of identification.)
18    - - - - -
19    Q. MS. Brent, does that look
20  familiar to you?
21    A. Yes.
22    Q. Okay. What is that?
23    A. Rephrase your question.
24    Q. Sure. What's been marked in
25  Exhibit B, you said you know what that

DEPOSITION OF ANDREA BRENT

Page 34

1 is.
2 What exactly is that?
3 A. This is something that I
4 have seen with my attorney.
5 Q. Okay. So prior to her
6 filing this with the courts, she showed
7 you this?
8 A. That's correct.
9 Q. Did she ask you to go
10 through each -- strike that.
11 Did you verify that each one of
12 these paragraphs was accurate to the
13 best of your knowledge?
14 A. Yes, I did.
15 Q. Okay. And just for the
16 record, this is the answer that you
17 filed, in response to the complaint, as
18 well as a counterclaim and third-party
19 complaint; is that an accurate
20 description?
21 A. One more time, please.
22 Q. Sure. Just for the record,
23 this is indeed the answer you filed, as
24 well as the counterclaim that you filed
25 against Midland Funding with the court

Page 35

1 in Sandusky?
2 A. Yes.
3 Q. Okay. Why did you sue
4 Midland Funding, LLC?
5 A. What are you asking?
6 Q. I'm asking, what is it that
7 you are alleging Midland Funding did
8 wrong?
9 A. To the best of my knowledge,
10 I knew nothing about this prior to
11 receiving the certified letter.
12 Q. Okay. The same with -- I'll
13 ask the same question about Midland
14 Credit Management.
15 What is it that you think Midland
16 Credit Management did wrong?
17 A. The same answer that I gave
18 you before, I knew nothing prior to
19 receiving this in the mail.
20 Q. Okay. So you knew nothing
21 of CitiBank USA or that -- let me back
22 up.
23 So it was your belief that you
24 did not owe any money to CitiBank USA,
25 correct?

Page 36

1 A. That is correct.
2 Q. Okay. And this is the first
3 time you had heard of Midland Funding as
4 -- this is the first time you had heard
5 of Midland Funding, correct?
6 A. That is correct.
7 Q. And the same with Midland
8 Credit Management, this is the first
9 time you heard of them, as well?
10 A. Correct.
11 Q. Does the term Verizon Calling
12 Card Classic sound familiar to you?
13 A. No, it does not.
14 Q. Are you aware that we've
15 subpoenaed CitiBank?
16 A. Yes.
17 Q. Assuming that CitiBank
18 responds with a monthly statement sent
19 to your address, would you be able to
20 explain that?
21 A. I'm sorry, assuming what?
22 Q. Assuming that CitiBank USA
23 responds to that subpoena with either
24 one account statement or several, is
25 there any way you could explain that?

Page 37

1 A. I don't feel comfortable
2 answering that question. I'm not
3 exactly -- assuming anything.
4 Q. Well, let's assume for the
5 sake of argument that they do return
6 something. Is there any way to explain
7 -- might it be that you just forgot
8 about this particular credit card; is
9 that a possibility?
10 MS. EVANS: Object to the form
11 of that.
12 MR. KNIRSCH: Is she going to
13 answer?
14 A. No.
15 MR. KNIRSCH: Are you instructing
16 her not to answer?
17 MS. EVANS: No, I'm not.
18 MR. KNIRSCH: Can you repeat that
19 question, please.
20 (Record read.)
21 A. I'm not assuming anything.
22 Q. Well, let's assume.
23 A. I don't feel comfortable
24 answering that question. I mean, I'm
25 not comfortable answering or assuming

DEPOSITION OF ANDREA BRENT

Page 38

1  anything at this point.
2      MR. KNIRSCH:  Can you instruct
3  the witness to answer that the question?
4      (Witness instructed by notary.)
5      A.  Repeat the question.
6      MS. EVANS:  Could you rephrase
7  the question?
8      Q.  If CitiBank provides me with
9  a single account statement regarding a
10  Verizon Classic credit card, might that
11  change your mind about the fact that
12  this was never owed by you?
13      A.  I've never had a Verizon
14  Classic credit card.
15      Q.  If CitiBank returns
16  information regarding conversations
17  you've had with CitiBank, would that
18  change your belief that you never had a
19  Verizon Classic credit card?
20      A.  I cannot accurately answer
21  that question until information has been
22  supplied.
23      Q.  Well, I'm asking
24  hypothetically.
25      A.  You're going to have to

Page 39

1  rephrase that.
2      Q.  Would you prefer I ask this
3  question when I receive a response from
4  CitiBank?
5      A.  Yes.
6      MR. KNIRSCH:  Can we continue
7  this for a later time?
8      MS. EVANS:  Absolutely.
9      MR. KNIRSCH:  For the record,
10  we'll continue this for a later time.
11  But I would like to go forward and get
12  as much done today.
13      MS. EVANS:  Sure.
14      MR. KNIRSCH:  Can we go off the
15  record real quick?
16      (Discussion had off the record.)
17      MR. KNIRSCH:  Just for the
18  record, I will be continuing this
19  deposition to a later date for purposes
20  of discovery, regarding damages and
21  class certification.
22      Q.  Okay.  So just for the
23  record, at this time you do not have
24  any recollection of a Verizon Calling
25  Classic Card?

Page 40

1      A.  That is correct.
2      Q.  Okay.  If you could please
3  turn to page 3 of this exhibit.  It
4  says, Facts common to all counts, do you
5  see where I'm looking?
6      A.  Yes.
7      Q.  Paragraph 4.  Going from
8  page 3 to page 4, it says, Upon
9  information and belief, Midland is and
10  has been a plaintiff in tens of
11  thousands of debt collection lawsuits.
12      Do you have any documents to
13  prove that, by any chance?
14      A.  My attorney has pulled some
15  cases here in Erie County.
16      Q.  Okay.  Let's talk about
17  paragraph 6 for a second on page 4.
18  Upon learning, defendant, meaning you,
19  upon learning that you had been sued for
20  a debt you knew nothing about became
21  extremely upset and distraught.
22      Can you describe that?  Can you
23  describe your reaction to me a little
24  bit?
25      A.  I received a letter on a

Page 41

1  Saturday and picked it up Saturday and
2  saw that I was being sued, didn't know
3  what I was being sued for.  Very
4  upsetting.  Like I said, I tried to
5  call Javitch that day, and being a
6  Saturday, I just thought I'd try.  And
7  it was on a Saturday, couldn't get a
8  hold of anybody to even discuss what I
9  had received in the mail.
10      Q.  Okay.  And you said soon
11  thereafter, and you can correct me if
12  I'm wrong, soon thereafter you sought
13  the assistance of counsel?
14      A.  Yes.
15      Q.  Did that quell your concerns
16  at all?
17      A.  Rephrase.
18      Q.  Did that -- you said you
19  were upset and distraught.
20      Did speaking with an attorney
21  lessen that level of being upset and
22  distraught?
23      A.  It helped.
24      Q.  Okay.  And you said you
25  cried a little bit when you got the

DEPOSITION OF ANDREA BRENT

Page 42

1 letter, correct?
2         A. That's correct.
3         Q. Okay. Did you throw up at
4 all?
5         A. No, I did not.
6         Q. Okay. Upset stomach?
7         A. Yes.
8         Q. Anything like that?
9         A. Yes.
10        Q. Upset stomach, okay. Any
11 other physical manifestations that you
12 are --
13        A. Constantly thinking about it.
14        Q. Okay. Where are you today
15 on that? Is it the same? Is it less?
16        A. It's the same.
17        Q. Same. Has your level of
18 social activity changed between --
19 before this happened and after?
20        A. It's very stressful.
21        Q. Okay. Have you gone out
22 less with friends because of it?
23        A. I don't go out much anyway.
24        Q. Okay. Did you go out much
25 before this happened?

Page 43

1         A. No, I did not.
2         Q. Okay. Are you -- well, let
3 me back up.
4         You said you own a home at
5 present. Are you able to keep up on
6 house chores?
7         A. Yes.
8         Q. So mowing the lawn, all that
9 stuff, that doesn't create a problem?
10        A. No.
11        MS. EVANS: Can we take a quick
12 break?
13        MR. KNIRSCH: Sure.
14        (Recess taken.)
15        Q. Have you ever lived in South
16 Dakota?
17        A. I have not.
18        Q. Any friends or family that
19 live in South Dakota?
20        A. No.
21        Q. Business contacts in South
22 Dakota?
23        A. No, not that I know of.
24        Q. If you could please look at
25 page 5 of this exhibit, paragraph 16.

Page 44

1 I'm sorry, the next page, paragraph 17,
2 if you could.
3         Now, you allege that MCM and
4 Midland have no intention to pursue the
5 claims if challenged, voluntarily
6 dismissing the suits, or failing to
7 appear.
8         Where did that come from?
9         A. My attorney had pulled cases
10 within Erie County.
11        Q. And you said you're still --
12 you're still experiencing an upset
13 stomach, things of that nature to this
14 day; is that correct?
15        A. I do.
16        Q. Okay. If this lawsuit ended
17 today, would that quell any of those
18 stomach issues, et cetera?
19        A. It would relieve a lot.
20        Q. Okay. Is there a specific
21 dollar amount you're looking for to end
22 this?
23        A. I object to that question.
24        MS. EVANS: You can answer the
25 question. Yes or no.

Page 45

1         A. Yes. A specific?
2         Q. What would that be?
3         A. I don't -- I don't have a
4 specific dollar amount.
5         Q. Okay. Any range?
6         A. I don't feel I can answer
7 that at this time.
8         Q. If you could turn, please,
9 to page 8, it starts with paragraph 30
10 and I believe we're still on Exhibit B.
11        Have you ever heard of the Fair
12 Debt Collection Practices Act, prior to
13 this case?
14        A. No.
15        Q. Okay. I just have a series
16 of questions about Fair Debt. I might
17 have asked these before, but I need to
18 go through them real quick again.
19        Has anybody from Midland Credit
20 Management, Midland Funding or Javitch,
21 Block & Rathbone told you that the
22 complaint filed against you was not
23 important?
24        A. No.
25        Q. Did any one of those three

DEPOSITION OF ANDREA BRENT

Page 46

1  entities that I asked -- referred to
2  before imply that they were from a
3  government agency?
4      A. Repeat the question.
5      Q. Sure. Did Midland Credit
6  Management, Midland Funding or Javitch,
7  Block & Rathbone ever imply that they
8  were a government agency?
9      A. Not to my knowledge.
10     Q. Did either one of those
11 three entities ever imply or suggest
12 that the complaint was not a legal
13 process?
14     A. Not to my knowledge.
15     Q. Okay. Did either one of
16 those three entities ever threaten to
17 report this on your credit report?
18     A. Not to my knowledge.
19     Q. Did either one of them ever
20 threaten criminal action against you, if
21 you fail to pay this debt?
22     A. Isn't this what this is?
23     Q. Are you referring to the --
24     A. What I received in the mail.
25     Q. Criminal action?

Page 47

1      A. Elaborate.
2      Q. Sure. Do you know the
3  difference between a criminal lawsuit
4  and a civil lawsuit?
5      A. Yes.
6      Q. Okay. Do you think that
7  Exhibit A was a criminal action or a
8  civil action?
9      A. Civil. It states that here.
10     Q. Okay. Did anybody say --
11 did any one of those three entities,
12 again, referring to Midland Credit
13 Management, Midland Funding or Javitch,
14 Block & Rathbone imply or state that
15 failure to pay this debt was a crime?
16     A. No.
17     Q. Have you ever received phone
18 calls from these people?
19     A. Not to my knowledge, no.
20     Q. Do you know what a holder in
21 due course is?
22     A. I do not.
23     Q. Do you know what an innocent
24 purchaser of value is?
25     A. Repeat that.

Page 48

1      Q. The term innocent purchaser
2  of value, do you know what that is?
3      A. I do not.
4      Q. Okay. Prior to receiving
5  this complaint, I'm referring to the
6  complaint, Exhibit A filed against you
7  by Javitch, Block, you said you were --
8  well, let me back up.
9          You said that upon receiving that
10 complaint, it made you nervous, perhaps
11 fearful; is that correct?
12     A. Fearful?
13     Q. Why don't you --
14     A. I don't think I ever said
15 fearful.
16     Q. Okay. What would you say
17 your general emotions were about it?
18     A. I was stressed. I was
19 upset. Physically upset, mentally
20 upset, stressed. It's all I thought
21 about. Distraught.
22     Q. Okay. Were you experiencing
23 any of those emotions, prior to feeling
24 or prior to receiving that letter from
25 Javitch, Block?

Page 49

1      A. Not before I got the letter.
2      Q. Okay. And you say it
3  continues to this day?
4      A. It does.
5      Q. Just for my clarification,
6  were you able to go to work that next
7  Monday?
8      A. Yes.
9      Q. Okay. Have you ever been
10 spoken to by any employer that, you
11 know, your work product recently has
12 been less than par?
13     A. No.
14     Q. Any increased arguments with
15 your fiancé, anything like that?
16     A. No.
17     Q. Okay. But clearly, you're
18 distraught about this current action?
19     A. Upset.
20     Q. Upset, okay. I think I'm
21 done with that for now.
22     MR. KNIRSCH: If you could mark
23 that please.
24     - - - - -
25     (Thereupon, Plaintiff's

DEPOSITION OF ANDREA BRENT

Page 50

1    Deposition Exhibit-C
2    was marked for purposes
3    of identification.)
4    - - - - -
5    Q.  Andrea, this has been marked
6  as Exhibit C.  Do you recognize this?
7    A.  I don't recall this.
8    Q.  Okay.  Just for the record,
9  these Federal Rules are fairly
10  complicated and they require this, and
11  this is called a Rule 26 Initial
12  Disclosure and that's just for the
13  record.
14    On the second page of what's been
15  marked as Exhibit C, it has, John.  Is
16  that the same John we were talking about
17  before?
18    A.  That's correct.
19    Q.  Okay.  This category talks
20  about people likely to have information
21  related to this case.
22    What exactly, well, not exactly
23  because obviously, you can't say
24  exactly, but what information generally
25  do you think John has that you can't

Page 51

1  provide me today?
2    A.  He was there the day that I
3  received the certified letter.
4    Q.  And he might be able to talk
5  about how you reacted and things such as
6  that, what you did --
7    A.  That's correct.
8    Q.  -- when you received it?
9    And then paragraph C, do you have
10  any out-of-pocket expenses from this
11  lawsuit?
12    A.  Telephone calls.  Yes, I do.
13    Q.  Okay.  Such as telephone
14  calls, anything else?
15    A.  Missed work.
16    Q.  How many days do you think
17  you've missed work?
18    Would like today be one day that
19  you're missing work?
20    A.  Um-hum.
21    MS. EVANS:  Yes?
22    A.  Yes.  I'm sorry.
23    Q.  You caught me, sorry.  I
24  missed that, too.
25    Any other days besides today?

Page 52

1    A.  Yes.
2    Q.  How many would you estimate
3  or, if you know, how many have you
4  missed?
5    A.  I would estimate five.
6    Q.  And is that on account of
7  what, meeting with your attorney?
8    A.  Correct.
9    Q.  Anything else besides that?
10    A.  No.
11    Q.  Okay.  So you've missed
12  work.
13    Were you docked any pay, do you
14  know, by missing work?
15    A.  I missed work.  I have to
16  take -- you don't get paid if I'm not
17  there.  I have to take alternative days.
18    Q.  Like sick days --
19    A.  Yep.
20    Q.  -- personal days, things like
21  that?
22    A.  Correct.
23    Q.  Okay.  How many of those do
24  you get at work, like personal days,
25  sick days?

Page 53

1    A.  I actually don't have
2  personal days.  I have vacation days.
3    Q.  Okay.  How many of those do
4  you get a year?
5    A.  14, I'm sorry, 10 days, two
6  weeks.
7    Q.  Two weeks?
8    A.  Two weeks, sorry.
9    Q.  Ten working days?
10    A.  Correct.
11    Q.  Okay.  And I'll ask the same
12  about sick days.  You get sick days, as
13  well?
14    A.  Yes.
15    Q.  How many of those do you
16  get?
17    A.  That I'm not sure about.
18    Q.  Okay.  That would be
19  something your boss would know?
20    A.  I don't know that there's
21  necessarily a limit.  I don't know.
22    Q.  Okay.  But you've taken
23  vacation days --
24    A.  Yes.
25    Q.  -- because of this?  And

14  (Pages 50 to 53)

DEPOSITION OF ANDREA BRENT

Page 54

1   approximately five?
2        A. Yes.
3        Q. And you said anything beyond
4   ten vacation days, excluding sick days,
5   okay. If you take let's say 11
6   vacation days, they'll dock you a pay
7   for that 11th day?
8        A. You don't get paid.
9        Q. Okay. Do you know if that's
10  happened to you? Have you exceeded that
11  11 day?
12       A. No, it has not.
13       Q. Okay. Is that by calendar
14  year or is it just --
15       A. It's calendar year.
16       Q. Okay. And will that more or
17  less recycle at the end of this -- let
18  me just ask what I'm trying to ask.
19       I'm trying to ask if there's a
20  likelihood that you're going to encroach
21  that 11th day, if you might go past the
22  ten-day working day allowance, vacation
23  day allowance?
24       Do you understand what I'm
25  asking?

Page 55

1        A. What was your original
2   question?
3        Q. Sure. Let me ask this.
4        How many days have you taken,
5   vacation days this calendar year, do you
6   know?
7        A. I know that I have three
8   days left.
9        Q. You have three days left,
10  okay. And when does that start over?
11       A. At the first of next year,
12  January 1st.
13       Q. January 1st, okay. Perfect.
14  That's what I was trying to find out.
15       Besides missed days, is there
16  anything else you've -- I just realized
17  I'm getting into damages.
18       Besides working days, is there
19  any other expenses you've incurred?
20       A. Telephone calls.
21       Q. Okay.
22       A. Mileage here.
23       Q. Sure. Have you paid your
24  attorney a retainer?
25       A. No.

Page 56

1        Q. Okay. Do you have an
2   agreement between you and her?
3        A. Yes.
4        Q. Okay. Do you know if you're
5   getting billed for -- is she sending
6   bills for work done?
7        A. No.
8        Q. Okay. I'm done with that
9   one for the time being.
10       MR. KNIRSCH: Off the record real
11  quick.
12       (Discussion had off the record.)
13       - - - - -
14       (Thereupon, Plaintiff's
15       Deposition Exhibit-D
16       was marked for purposes
17       of identification.)
18       - - - - -
19       Q. Ms. Brent, does this look
20  familiar, this document which has been
21  marked as Exhibit D?
22       A. Yes.
23       Q. Okay. And just for the
24  record, back on page 9 of this document,
25  that's your signature above your name,

Page 57

1   Andrea Brent?
2        A. That's correct.
3        Q. Okay. And you said earlier
4   that that is still your address, 3902
5   Donair, correct?
6        A. Correct.
7        Q. And that's your Social
8   Security number and date of birth?
9        A. Yes.
10       Q. Okay. The second question
11  refers to, you know, people who might
12  have information about this case. We've
13  mentioned the gentleman we've called
14  John earlier.
15       Is there anybody else besides
16  that, as you sit here today, that might
17  have information about this case?
18       A. No.
19       Q. Okay. And you said you've
20  never been sued before, is that correct?
21       A. That's correct.
22       Q. Okay. I'm going to look at
23  paragraph 6 or what's been marked as No.
24  6 on page 2 of Exhibit D. Okay. We've
25  already talked about much of this, so

DEPOSITION OF ANDREA BRENT

Page 58

1  I'm not going to belabor the point, but
2  eventually -- basically, it says that
3  you didn't remember or recall any
4  CitiBank credit card debt, correct?
5      A. That's correct.
6      Q. Okay. And that caused you
7  worry and concern which manifested
8  itself in making you sick to your
9  stomach, crying on occasion, correct?
10     A. That's correct.
11     Q. Okay. And nothing else
12 other than that that you can think of?
13 Did you lose sleep?
14     A. Yes, I did.
15     Q. Okay. Loss of appetite?
16     A. Yes.
17     Q. And it says you were
18 prescribed a medication to help you
19 sleep; is that correct?
20     A. That's correct.
21     Q. Okay. Do you remember what
22 that was that they gave you?
23     A. Ambien.
24     Q. Ambien. Okay. What were
25 you worried about that might happen to

Page 59

1  you financially?
2      A. I wasn't sure exactly what
3  was going to happen, so everything.
4      Q. Have you ever had your wages
5  garnished before?
6      A. I have not.
7      Q. I'll just ask, has your bank
8  attached, have you ever had that happen
9  before?
10     A. I'm sorry.
11     Q. Do you know what a bank
12 attachment is?
13     A. I do not.
14     Q. Okay. Then you probably
15 don't know -- you've probably never had
16 one happen to you before, if you don't
17 know what one is.
18     How soon after this happened did
19 you go see a physician, do you remember?
20     A. I don't remember the exact
21 date.
22     Q. Okay. Days, weeks, months?
23     A. I would say maybe possibly a
24 couple weeks.
25     Q. Okay. So he prescribed you

Page 60

1  Ambien for loss of sleep and anything
2  for the depression?
3      A. Yes.
4      Q. What was that?
5      A. I cannot pronounce it.
6      Q. Okay. Is it on those --
7  we'll get to that. We'll get to that.
8      Are you on those medications
9  still?
10     A. Yes.
11     Q. And that's basically because
12 of having to do things like appear here
13 today; is that correct?
14     A. Rephrase your question.
15     Q. Sure. You said these are
16 ongoing, this stress is ongoing,
17 correct? Okay. Yes?
18     A. Yes.
19     Q. And that all revolves around
20 this pending litigation?
21     A. I'm sorry, all?
22     Q. Sure. The stress here
23 you're feeling at the present, these
24 other feelings that you're having,
25 nausea, et cetera, all that is caused by

Page 61

1  the ongoing litigation?
2      A. I do not like the question.
3  All? All of?
4      Q. Sure. Let me back up. You
5  state that you're still feeling a
6  certain sense of -- I think you used a
7  great word before. You're presently
8  distraught and you're still experiencing
9  that today?
10     A. I do.
11     Q. And that is caused by what
12 exactly?
13     A. It contributes this here.
14     Q. Like appearing today
15 contributes?
16     A. Yes.
17     Q. Is anything else going on in
18 your life which might be causing this --
19 these feelings?
20     A. No.
21     Q. No. Do you know what a
22 statute of limitations is?
23     A. I've heard the term.
24     Q. Okay. Where have you heard
25 that term?

DEPOSITION OF ANDREA BRENT

Page 62

1      A. My attorney.
2      Q. Okay. And it relates to
3  this ongoing action, is that the
4  circumstance in which you heard this
5  term, in this litigation?
6      A. Yes.
7      Q. Okay. I'm going to put
8  those down for now.
9          - - - - -
10     (Thereupon, Plaintiff's
11     Deposition Exhibit-E
12     was marked for purposes
13     of identification.)
14         - - - - -
15     Q. Just for the record, this is
16  your responses to our Request for
17  Admissions that you provided me; and
18  again, for the record, page 6 of this
19  document, is that indeed your signature?
20     A. Yes.
21     Q. Okay. For the record, as we
22  sit here today, you don't recall having
23  a CitiBank USA credit card with the
24  account No. 4223980032739001?
25     A. That's correct.

Page 63

1      Q. Okay. Do you keep copies of
2  like bank account statements like in a
3  drawer anywhere?
4      A. No.
5      Q. So you get them, review them
6  and sort of toss them, is that a fair
7  -- how long do you keep them, if you do
8  keep them at all?
9      A. I usually don't.
10     Q. Okay. So if I were to ask
11  you for bank records from 2000, you
12  probably wouldn't have any?
13     A. That's correct.
14     Q. Okay. Does your present
15  Lowe's credit card have interest
16  accruing on it?
17     A. Yes.
18     Q. Okay. And you said you try
19  to pay that every -- I mean, you do pay
20  that every month?
21     A. That is correct.
22     Q. If you could turn to page 5
23  of this. Because of this lawsuit filed
24  against you, did you ever feel that your
25  safety was in peril?

Page 64

1      A. No.
2      Q. Okay. I'm done with that.
3          - - - - -
4      (Thereupon, Plaintiff's
5      Deposition Exhibit-F
6      was marked for purposes
7      of identification.)
8          - - - - -
9      Q. Ms. Brent, have you ever
10  seen this document before?
11     A. Yes.
12     Q. Okay. By your attorney, I
13  imagine?
14     A. Yes.
15     Q. Okay. Have you ever
16  received any other medical bills since
17  providing the ones attached to this to
18  the -- let me back up.
19     There's a few documents attached
20  to the very end. I count one, two,
21  three, four pages. Other than those
22  four pages, have you received anything
23  else regarding medical bills, medical
24  expenses, anything like that?
25     A. No.

Page 65

1      Q. No. So these four are it,
2  as of today?
3      A. As of today.
4      Q. Okay. Does that mean you're
5  expecting more in the future?
6      A. I do not know.
7      Q. Okay. You stated earlier
8  that you were concerned with how this
9  might -- this lawsuit I'm referring to
10  that was filed against you by Midland,
11  might affect you financially, correct?
12     A. Yes.
13     Q. Okay. Do you and your
14  fiancee share checking accounts?
15     A. No.
16     Q. Does he also have a car?
17     A. Yes.
18     Q. What kind of car does he
19  have?
20     A. A Ford, Mercury Tracer
21  station wagon.
22     Q. Station wagon, okay. Does
23  he have children?
24     A. Yes.
25     Q. Okay. It was obvious, after

DEPOSITION OF ANDREA BRENT

Page 66

1   you said station wagon.
2       Would you say it's difficult --
3   let me rephrase.
4       How would you generally describe
5   your finances at this point, good,
6   moderate, tight, can you quantify?
7       A.  What is the relevance of the
8   question?  What are you asking exactly?
9   I mean, could you rephrase that?
10      Q.  Sure.  You described earlier
11  your worry about how this might affect
12  your finances and I'm trying to get a
13  better understanding of how this would
14  affect your finances.
15      So the question, generally
16  speaking, is how would you rate your
17  finances?
18      A.  I think that's very vague,
19  how do I rate?  I don't know what
20  you're looking for.
21      Q.  When you pay off your Lowe's
22  credit card, was that generally to a
23  zero balance?
24      A.  No.
25      Q.  So there's something left

Page 67

1   afterwards?
2       A.  Um-hum, yes.
3       Q.  How much would you say is
4   currently on there now?
5       A.  400.
6       Q.  Oh, okay.  You have a
7   mortgage?
8       A.  Yes.
9       Q.  Do you find it difficult to
10  pay that or is that pretty easy for you
11  to pay?
12      A.  I pay my mortgage.
13      Q.  Have you ever been late?
14      A.  No.
15      Q.  Okay.  I'll ask the same
16  with your car payment.  Have you ever
17  been late with your car payment?
18      A.  No.
19      Q.  So generally speaking, it
20  sounds like your finances are pretty
21  good.  You're comfortable with -- do you
22  have worry about money, let me ask?
23      A.  That's very vague, I mean,
24  that's very general.
25      Q.  Do you worry about how

Page 68

1   you're going to pay your bills next
2   month?
3       A.  We all do.
4       Q.  So generally speaking?
5       A.  Everybody does.
6       Q.  So nothing out of the
7   ordinary, would you say?
8       A.  We all have worries.
9       Q.  Okay.  Is your fiance
10  employed?
11      A.  Yes.
12      Q.  Okay.  Full time?
13      A.  Yes.
14      Q.  Okay.  Do you receive any
15  money outside of your job and his job
16  from friends, family?
17      A.  Do not.
18      Q.  Do not.
19      A.  Five-minute break?
20      Q.  Sure.
21      (Recess taken.)
22      Q.  Now, the doctor you went to
23  go see, was that your general physician?
24      A.  No.
25      Q.  You went to go see a

Page 69

1   psychiatrist?
2       A.  No.
3       Q.  Who did you go -- is that
4   Dr. Hanna, is that who you went to go
5   see?
6       A.  Yes, a neurologist.
7       Q.  A neurologist.  And where is
8   he located?
9       A.  Cleveland MetroHealth.
10      Q.  Excuse my ignorance, is
11  MetroHealth like Cleveland Clinic or
12  MetroHealth is something other than --
13      A.  They may be affiliated with,
14  I'm not sure.
15      Q.  Okay.  And he's the one that
16  prescribes you, I believe the name of it
17  was Ambien, and he also prescribed you
18  something else, as well?
19      A.  My family physician
20  prescribed me with the Ambien.  Dr.
21  Hanna did not.
22      Q.  Did Dr. Hanna prescribe you
23  with anything?
24      A.  Yes.
25      Q.  Okay.  You're looking at

DEPOSITION OF ANDREA BRENT

Page 70

1  documents, they're on there. Are you
2  looking at the first page, after the
3  signature page, at the top it says
4  Discount Drug Mart?
5        A. Yes.
6        Q. Okay. Did he prescribe you
7  one of those --
8        A. Yes.
9        Q. -- drugs, which?
10       A. Amitriptyline.
11       Q. Amitriptyline. Is that the
12  one you referred to before which you
13  said you couldn't remember or pronounce?
14       A. That's correct.
15       Q. And just for the record,
16  that is the one on this page spelled
17  A M I T R I P T Y L I N E, is that the
18  one you're referring to?
19       A. Correct.
20       Q. Okay. And Dr. Hanna
21  prescribed you that?
22       A. Correct.
23       Q. Is there any other one that
24  he prescribed you?
25       A. Yes. The Butalbital.

Page 71

1        Q. Butalbital. And there
2  appears to be six of those, spelled
3  B U T A L B I T A L.
4        Is that the one you're referring
5  to?
6        A. That's correct.
7        Q. There's his name next to it,
8  Joseph Hanna.
9        Are any of those other drugs on
10  this document prescribed to you, as a
11  result of this litigation? I understand
12  some of these are antihistamines and I
13  assume you have allergies?
14       A. Migraines.
15       Q. Migraines. Talk to me about
16  your migraines.
17       What is that caused by? Is that
18  a chronic issue?
19       A. It's caused by a variety of
20  factors.
21       Q. What are some of those
22  factors?
23       A. Some things you can't
24  explain. It could be a history. It
25  could be -- it can run in your family.

Page 72

1  It could be caused by the weather. It
2  could be caused by your cycle. It's a
3  variety of things. Could be caused by
4  stress, the amount of stress you're
5  under. It's a variety of different
6  things.
7        Q. You've had this for a long
8  time, migraines in general?
9        A. For a long time?
10       Q. Well, how long have you been
11  suffering from migraines?
12       A. Technically termed with
13  migraines in July, approximately.
14       Q. Okay. So those are the
15  first time you had the migraines?
16       A. I didn't -- they didn't know
17  what it was prior to.
18       Q. Oh, okay. So that's why you
19  went to go see Dr. Hanna was for --
20       A. I was referred to him.
21       Q. Okay. And you were referred
22  to him by your general practitioner?
23       A. Correct.
24       Q. And who is your general
25  practitioner?

Page 73

1        A. Dr. Rowe.
2        Q. Dr. Rowe. And looking at
3  that, that's Thomas Rowe?
4        A. That's correct.
5        Q. He's referred to here, as
6  well. And these other ones are
7  allergens, antihistamines?
8        A. No. The Relpax is for
9  migraines.
10       Q. But just to be clear, these,
11  as you know them now to be migraines,
12  how long have you been suffering from
13  those symptoms, major headaches, I
14  believe it's associated with nausea, as
15  well?
16       A. Sometimes it can lead to
17  that.
18       Q. Okay. How long has that
19  been going on, since you were little?
20       A. No.
21       Q. Okay.
22       A. Just recently. Like I said,
23  initially they did not know. I would
24  say February of '08.
25       Q. Okay. So you went to see

DEPOSITION OF ANDREA BRENT

Page 74

1  your practitioner, they didn't really
2  know what it was and they sent you to
3  Dr. Hanna to -- I believe he did a CT
4  scan?
5      A. I had gotten a CT scan prior
6  to Dr. Hanna and then had another one.
7      Q. Okay. So the Butalbital and
8  the Relpax are both associated with
9  migraines?
10      A. Correct.
11      Q. Are there any medications on
12  here, as well, that you would associate
13  with this litigation? How about the
14  Meclizine?
15      A. No. The Cyproheptadine helps
16  the migraines.
17      Q. Okay. That helps migraines,
18  as well. I don't see Ambien in here.
19      A. That was prescribed to me
20  before, which was an ongoing refill type
21  deal.
22      Q. Oh, refill, okay. What does
23  Ambien do, again? Is that a sleep
24  aide?
25      A. Help sleep. The

Page 75

1  Amitriptyline also helps the sleep.
2      Q. Okay. And how long have you
3  been suffering from sleeplessness?
4      A. I think I said right around
5  February of '08.
6      Q. February of '08. Do you
7  know what's causing that? Is that the
8  same as the migraines or is it --
9      A. It's a variety of different
10  things.
11      Q. Okay. Such as?
12      A. Stress, primarily stress with
13  the not being able to sleep.
14      Q. Okay. And you said that's
15  been going on since about February of
16  '08?
17      A. That's correct.
18      Q. Do you know what the Avelox
19  is?
20      A. Avelox.
21      Q. Avelox?
22      A. Initially, they tried a
23  variety of things. So I believe the
24  Avelox, to the best of my knowledge,
25  they initially thought that it was

Page 76

1  allergies and I was prescribed that.
2      Q. Do they know now what's
3  causing your migraines?
4      A. The migraines?
5      Q. That's a condition?
6      A. It's a condition.
7      Q. Okay. I did not know that.
8      Is that still ongoing or are
9  these medications doing what they're
10  supposed to do?
11      A. It's ongoing.
12      Q. Okay. And like you said,
13  they manifest themself, based on a
14  variety of factors?
15      A. That's correct.
16      Q. Stress, weather, et cetera?
17      A. Your body chemistry, it's a
18  variety of things and I'm not a doctor
19  so --
20      Q. No, I understand, I
21  understand.
22      A. Okay.
23      Q. Okay. If you could look at
24  the following page from MetroHealth
25  System, is this the office visit you're

Page 77

1  talking about with Dr. Hanna?
2      A. Yes.
3      Q. Okay. Do you know what that
4  high seve -- I'm looking at the center
5  under description, office consultation,
6  I imagine, high S E V E star, do you
7  know what that is referring to, by any
8  chance?
9      A. I do not.
10      Q. Do you have health insurance?
11      A. Yes.
12      Q. Okay. Did health insurance
13  pay for any of this? Let me back up.
14      Some health insurance, you only
15  pay a co-pay and then they cover the
16  rest of it. Others you pay and then
17  they pay you back.
18      A. No. Mine does not work that
19  way.
20      Q. How does your work?
21      A. Basically, you go to your
22  appointment, they submit to your
23  insurance company at that time, and then
24  you receive a bill for whatever your
25  insurance will not cover at that time.

DEPOSITION OF ANDREA BRENT

Page 78

1    Q. Okay. Is that what happened
2 here?
3    A. Yes.
4    Q. So they said you are
5 responsible for basically the entire
6 amount, 435?
7    THE COURT REPORTER: Please
8 answer out loud.
9    A. I'm sorry. Yes.
10    Q. I missed that, as well. Did
11 they say why, by any chance, that they
12 wouldn't cover this?
13    A. No.
14    Q. Is your insurance through
15 your employer?
16    A. Correct.
17    Q. I want to look at the next
18 page where it says, Precision Radiology
19 Inc. at the top, P.O. Box 74289,
20 Cleveland, Ohio.
21    Do you see where I'm looking at?
22    A. Um-hum.
23    Q. Okay. Do you remember what
24 that was?
25    A. Um-hum, that was the CT.

Page 79

1    Q. Okay. And is this still the
2 ongoing problem with what we now know as
3 migraines?
4    A. That's correct.
5    Q. Okay. And if I understand,
6 that's just a CT scan of your head?
7    A. This one, yes.
8    Q. Okay. And again, insurance
9 did not cover this?
10    A. No.
11    Q. Okay. And finally the last
12 page, do you remember what this one was
13 for?
14    A. Um-hum.
15    Q. Okay. What was this one
16 for?
17    A. I had very severe headache
18 pain and pain in the chest and went to
19 Firelands Emergency Room.
20    Q. And was this, as far as you
21 know now, associated with your
22 migraines?
23    A. That's correct.
24    Q. What, if you remember,
25 brought about this, I don't want to call

Page 80

1 it an attack, but were there any of
2 those factors we discussed before which
3 brought this one about?
4    A. What factors did we discuss
5 before?
6    Q. Like stress, weather, cycles,
7 et cetera.
8    A. It's not known. It just
9 happens and you're not -- you don't know
10 why.
11    Q. I guess I'm asking, did
12 anything out of the ordinary happen
13 right before this occurred?
14    A. No.
15    Q. Okay. So like no traumatic
16 event, nothing along those lines?
17    A. Not to my knowledge, no.
18    Q. Okay. And to your
19 knowledge, are these the only
20 prescriptions you've had filled since --
21 well, between what would that be, April
22 of 2008 and September of 2008?
23    A. Yes.
24    Q. Okay. So there wouldn't be
25 anything other than this?

Page 81

1    A. No.
2    Q. Okay. Has there been
3 anything since this document or just
4 refills?
5    A. Just refills.
6    Q. Okay. Butalbital and the
7 Relpax?
8    A. The Butalbital the
9 Cyproheptadine and Amitriptyline.
10    Q. Okay. Can allergens bring
11 on a headache?
12    A. I don't know, but I don't
13 have any particular allergies.
14    Q. Oh, they thought it might be
15 allergies.
16    A. That's correct.
17    Q. I understand. Okay. You've
18 had that allergy test, by any chance?
19    A. No.
20    Q. It's an awful experience.
21 We're finished with that for now.
22        - - - - -
23    (Thereupon, Plaintiff's
24    Deposition Exhibits-GandH
25    were marked for purposes

Page 82

1    of identification.)
2    - - - - -
3        Q. Ms. Brent, just for the
4    record, this is marked Exhibit G. This
5    is what's called a form letter.
6    Basically, the way this works is the
7    computer system at Midland enter
8    information into this. So this
9    particular document may not look
10   familiar to you, but does the form of
11   this document at all look familiar to
12   you?
13       A. Not to my knowledge, no.
14       Q. Okay. I'm finished with
15   that one. I'm going to ask you the
16   exact same question about this document,
17   which has been marked Exhibit H, with
18   the same, you know, preconditions, that
19   this is not a complete document, but
20   does this document at all look familiar?
21       A. Not to my knowledge, no.
22       Q. I didn't think they would.
23       - - - - -
24       (Thereupon, Plaintiff's
25       Deposition Exhibit-I

Page 83

1        was marked for purposes
2        of identification.)
3        - - - - -
4        Q. Donna --
5        MS. EVANS: Andrea.
6        MR. KNIRSCH: I caught myself.
7        Q. Ms. Brent, have you ever
8    seen this document before?
9        A. Yes.
10       Q. Was this in preparation of
11   today?
12       A. Yes.
13       Q. Okay. Other than that
14   preparation, have you seen this document
15   before?
16       A. No.
17       Q. Have you ever heard of
18   Associates Bank before?
19       A. No, not to my knowledge.
20       Q. So you don't remember?
21       A. No. Do not recall.
22       Q. Sure. Is that indeed your
23   Social Security number there, the fourth
24   line down?
25       A. Yes.

Page 84

1        Q. Okay. Just for the record,
2    do you remember what was occurring or
3    where you lived -- let me rephrase.
4        Do you remember where you lived
5    in March of 1996?
6        A. No.
7        Q. Okay. You said you went to
8    Toledo full time, correct?
9        A. Yes.
10       Q. Did you live on campus in a
11   dorm?
12       A. Just for one semester.
13       Q. Just for one semester. Do
14   you remember how many semesters you
15   went?
16       A. Honestly, no.
17       Q. Okay. I'll ask the same
18   question about April of 2000.
19       Do you remember where you were
20   living at that time?
21       A. I don't.
22       Q. Okay. Have you ever taken
23   out a cash advance on a credit card?
24       A. Not to my knowledge.
25       Q. So you've never done that to

Page 85

1    your knowledge with your Lowe's card
2    either?
3        A. No, not with my Lowe's card.
4        Q. Okay. Have you ever -- I
5    think I asked you this before.
6        Have you lived at 129 ½
7    Washington Street in Port Clinton, Ohio?
8        A. I have.
9        Q. Do you remember what type of
10   house that was, if it was indeed a
11   house?
12       A. It was a house.
13       Q. Like duplex or an apartment
14   arrangement?
15       A. Duplex.
16       Q. Was that during school, if
17   you remember?
18       A. I was going to school at the
19   time, I believe.
20       Q. When I went to college,
21   there were a bunch of people handing out
22   free T-shirts, free phone cards, free
23   whatever, in exchange for you signing up
24   for a credit card.
25       Do you recall ever doing that?

DEPOSITION OF ANDREA BRENT

Page 86

1    A. No.
2    Q. Okay. Has your name ever
3 changed for any particular reason?
4    A. No.
5    Q. Looking down this, as well,
6 next to HP, I'm about halfway down, do
7 you see where I'm looking?
8    A. Um-hum.
9    Q. Okay. You said that that
10 number there is that number your
11 parents' number?
12    A. It used to be my mother's.
13    Q. Used to be your mother's
14 number. Okay. And the next number
15 down, you said you don't really know if
16 that looks familiar?
17    A. I don't recall that number.
18    Q. Okay. And you don't recall
19 opening a Verizon Calling Card Classic
20 card; is that correct?
21    A. Do not.
22    Q. Do you know if your
23 Lowe's is a Visa or a MasterCard?
24    A. That I do not know.
25    Q. And you said that's your

Page 87

1 only one right now, correct?
2    A. That's correct.
3    Q. Okay. You've had others in
4 the past; is that accurate?
5    A. Yes.
6    Q. Okay. And right now you're
7 not exactly sure which?
8    A. Correct.
9    Q. Okay. Done with that.
10    Have you ever owned a post office
11 box?
12    A. Yes.
13    Q. Do you remember if it was
14 P.O. Box 23 in Port Clinton?
15    A. That's correct.
16    Q. For the record, you said you
17 don't exactly remember 419-734-5558,
18 that number?
19    A. That's correct.
20    Q. Okay. Not just personal but
21 business, as well?
22    A. I don't recall that number.
23    MR. KNIRSCH: Can we go off the
24 record real quick?
25    (Discussion had off the record.)

Page 88

1    Q. Ms. Brent, I just have a few
2 more questions and then we'll be done
3 today.
4    The phone number you gave me
5 earlier, is that your home telephone
6 number or is it a cellular phone?
7    A. Cell phone.
8    Q. Do you have a home telephone
9 number?
10    A. I do not.
11    Q. Okay. When you filled out
12 your home application, do you know if
13 they checked your credit score, your
14 credit report?
15    A. I'm sure they did.
16    Q. Do you keep a copy of your
17 loan application and all that stuff?
18    A. I would have to check.
19    Q. Okay. How long ago did you
20 buy that house?
21    A. It's been about a year and
22 four months.
23    Q. Congratulations. Do you keep
24 pay stubs?
25    A. Yes.

Page 89

1    Q. And you're still taking that
2 medication that we spoke of before?
3    A. Yes.
4    Q. Does that medication at all
5 have side effects?
6    A. All medications have side
7 effects, yes.
8    Q. Sure. Which ones would
9 these have?
10    A. Specifically --
11    Q. I'll just ask you, for the
12 record, if those medications would at
13 all affect your ability to testify
14 today?
15    A. No.
16    Q. Okay. When we spoke of --
17 you've missed work, due to this action,
18 and at this point, besides telephone
19 calls, what other damages have you
20 suffered out of pocket, if you can think
21 of any at this point?
22    A. I said mileage.
23    Q. Mileage, anything beyond
24 mileage, missed days and telephone
25 calls?

DEPOSITION OF ANDREA BRENT

Page 90

1        A. Suffering.
2        Q. Okay. And does that -- have
3    you had to pay any money to Murray &
4    Murray or your attorney?
5        A. No.
6        Q. Have you ever paid any money
7    to Midland, Midland Credit Management or
8    Javitch, Block & Rathbone?
9        A. To my knowledge, no.
10        MR. KNIRSCH: Ms. Brent, I want
11    to thank you for your time today. Do
12    you want to explain to her waiving
13    signature?
14        MS. EVANS: We'll read. You'll
15    have the opportunity to read and sign
16    and make any corrections to the
17    transcript that you need to or you can
18    waive it. I'm going to recommend that
19    you read it.
20        THE WITNESS: Read it.
21        MR. KNIRSCH: Thank you.
22        (Off the record at 2:56 p.m.)
23        - - - - -
24    .
25    .

Page 91

1    CEFARATTI GROUP FILE NO. 14002
2    CASE CAPTION: MIDLAND FUNDING, LLC VS.
3    ANDREA BRENT
4    DEPONENT: ANDREA BRENT
5    DEPOSITION DATE: NOVEMBER 12, 2008
6
7                (SIGN HERE)
8    The State of Ohio,        )
9    County of Cuyahoga,       ) SS:
10        Before me, a Notary Public in and
11    for said County and State, personally
12    appeared ANDREA BRENT, who acknowledged
13    that he/she did read his/her transcript
14    in the above-captioned matter, listed
15    any necessary corrections on the
16    accompanying errata sheet, and did sign
17    the foregoing sworn statement and that
18    the same is his/her free act and deed.
19        IN TESTIMONY WHEREOF, I have
20    hereunto affixed my name and official
21    seal at        , this
22    day of        , A.D. 2008.
23
24
25    Notary Public        Commission Expires

Page 92

1                ERRATA SHEET
2    PAGE LINE CORRECTION AND REASON
3    .
4    .
5    .
6    .
7    .
8    .
9    .
10    .
11    .
12    .
13    .
14    .
15    .
16    .
17    .
18    .
19    .
20    .
21    .
22    .
23    .
24    .
25    .

Page 93

1                CERTIFICATE
2    .
3    State of Ohio        )    SS.:
4    County of Cuyahoga )
5        I, Nancy Geiger, a Notary Public
6    within and for the State of Ohio, duly
7    commissioned and qualified, do hereby
8    certify that the within named witness,
9    was duly sworn to testify the truth, the
10    whole truth and nothing but the truth in
11    the cause aforesaid; that the testimony
12    then given by the witness was by me
13    reduced to stenotypy in the presence of
14    said witness; afterwards transcribed,
15    and that the foregoing is a true and
16    correct transcription of the testimony
17    so given by the witness.
18        I do further certify that this
19    deposition was taken at the time and
20    place in the foregoing caption
21    specified.
22        I do further certify that I am
23    not a relative, counsel or attorney for
24    either party, or otherwise interested in
25    the event of this action.

DEPOSITION OF ANDREA BRENT

Page 94

1       I am not, nor is the court
2   reporting firm with which I am
3   affiliated, under a contract as defined
4   in Civil Rule 28 (D).
5       IN WITNESS WHEREOF, I have
6   hereunto set my hand this      day of
7           , 2008.
8   .
9   .
10  .
11  .
12          Nancy Geiger, Notary Public
13          within and for the State of Ohio
14  .
15  .
16  .
17  .
18  My commission expires November 4, 20013.
19  .
20  .
21  .
22  .
23  .
24  .
25  .