IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF OHIO

WESTERN DIVISION


MIDLAND FUNDING, LLC,

    Plaintiff,

vs.                 Case No. 3:08-CV-1434

ANDREA L. BRENT,         Judge Katz

    Defendant/Third-Party Plaintiff,

vs.

MIDLAND CREDIT MANAGEMENT, INC.,

    Third-Party Defendant.

- - - - -


DEPOSITION OF JON SCHWARZENTRAUB


Taken on Tuesday, December 2, 2008 at 3:05 p.m.

    At the law offices of:

    Murray & Murray Co., L.P.A.

    111 East Shoreline Drive

    Sandusky, Ohio 44870

Before Nancy Geiger, a Registered Professional Reporter

and Notary Public in and for the State of Ohio

# DEPOSITION OF JON SCHWARZENTRAUB

## Page 2

1  APPEARANCES:
2  .
3      On behalf of the Defendant/
4      Third-Party Plaintiff:
5          Murray & Murray Co., L.P.A., by
6          DONNA JEAN A. EVANS, ESQ.
7          111 East Shoreline Drive
8          P.O. Box 19
9          Sandusky, Ohio 44870
10         419-624-3000
11         dee@murrayandmurray.com
12 .
13     On behalf of the Plaintiff/
14     Third-Party Defendant:
15         Javitch, Block & Rathbone, by
16         R. GLENN KNIRSCH, ESQ.
17         1100 Superior Avenue
18         19th Floor
19         Cleveland, Ohio 44114
20         216-623-0000
21         gknirsch@jbandr.com
22         ----
23 ALSO PRESENT:
24     Andrea Brent
25         ----

## Page 3

1       JON SCHWARZENTRAUB, of lawful
2  age, called for examination, as provided
3  by the Federal Rules of Civil Procedure,
4  being by me first duly sworn, as
5  hereinafter certified, deposed and said
6  as follows:
7       EXAMINATION OF JON SCHWARZENTRAUB
8  BY-MR. KNIRSCH:
9       Q. Good morning, Jon. First,
10 let me thank you for appearing here
11 voluntarily today. That was very kind
12 of you.
13      Have you ever had your deposition
14 taken before?
15      A. Not here, no. I have been
16 in depositions before, though.
17      Q. You have, so you've had your
18 deposition taken before?
19      A. Yeah, one of my former jobs,
20 I've been in depositions before.
21      Q. Okay. Was that for some
22 sort of employment-related case?
23      A. Yeah, information based.
24      Q. Okay. Well, let's assume
25 you don't know much about them. A

## Page 4

1  deposition more or less is an
2  opportunity for me to learn a little bit
3  more about the case that's pending right
4  now.
5       I represent Midland Credit
6  Management and Midland Funding in a case
7  called Midland Funding versus Andrea
8  Brent versus Midland Credit Management,
9  Case Number 3:08CV1434.
10      You've been named as somebody who
11 might have some relevant information
12 about this case, so I just need to find
13 out what information that might be.
14      A. All right.
15      Q. As you know, you're under
16 oath, you're expected to answer as
17 truthfully as you can, but this is not
18 a memory test. If you don't remember
19 something, I don't know is perfectly
20 acceptable, okay?
21      Along those lines, please answer
22 questions yes, no out loud. Sometimes
23 we have a tendency to shake our head,
24 nod our head, shrug our shoulders. She
25 has to take down everything we're

## Page 5

1  saying, so I'd ask that you answer yes,
2  no out loud, okay?
3       A. Okay.
4       Q. If you don't understand a
5  question I'm asking, please ask me to
6  rephrase it and I will be happy to do
7  so; otherwise, I will have to assume
8  that you understood the question that
9  I've asked, okay?
10      A. Okay.
11      Q. And finally, if you need to
12 take a break, we'll take a break for
13 whatever need you have. I don't
14 anticipate this lasting very long today,
15 but if you need to take a break for
16 whatever reason, I don't really care
17 what that reason is, just go ahead and
18 ask, but if there's a question pending,
19 please answer that question first and
20 then we'll move ahead, okay?
21      A. Okay.
22      Q. Okay. Can you please state
23 your name for the record.
24      A. Jon M. Schwarzentraub.
25      Q. Schwarzentraub. Do you mind

# DEPOSITION OF JON SCHWARZENTRAUB

## Page 6

1  if I call you Jon today?
2  A. That's fine.
3  Q. Okay. Jon, do you currently
4  live with Andrea Brent?
5  A. Yes, I do.
6  Q. 3902 Donair Drive; is that
7  correct?
8  A. That's correct.
9  Q. Okay. How long have you
10 lived with Ms. Brent at that address?
11 A. Since last year, September.
12 Q. September of last year?
13 A. Yeah. September, right
14 around September.
15 Q. Okay. And I understand
16 you're engaged to be married?
17 A. That's correct.
18 Q. How long has that -- how
19 long has that been?
20 A. I don't know. Two months.
21 Q. Two months prior -- oh, two
22 months from today?
23 A. Some -- yeah, I don't know.
24 I don't remember right offhand when I
25 asked her. I think it was September

## Page 7

1  30th, I think.
2  Q. I might recommend you find
3  that out. That will help you in the
4  future, I'm sure.
5  Do you presently have a job?
6  A. Yes, I do.
7  Q. Where do you work at?
8  A. I work at Jonotta & Herner.
9  It's a construction business.
10 Q. And do you do construction
11 work?
12 A. Yes, I do, in the field.
13 Q. In the field.
14 A. Yeah.
15 Q. Like what sort of
16 construction work?
17 A. Concrete, that's my
18 specialty.
19 Q. Concrete?
20 A. Yeah.
21 Q. Okay. How long ago did you
22 meet Donna -- I did it again. How long
23 ago did you meet Andrea?
24 A. It was July 3rd, 2007.
25 Q. 2007. So I just need to ask

## Page 8

1  a question. Did you know Ms. Brent
2  between the years of 1996 and 2000?
3  A. No, I did not.
4  Q. So how long have you known
5  Ms. Brent?
6  A. I said, we met around July
7  3rd.
8  Q. I'm sorry. That's what you
9  met and you've been engaged for about
10 two months?
11 A. That's correct.
12 Q. Okay. And I understand you
13 have children?
14 A. I do.
15 Q. Okay. How many children do
16 you have, by any chance?
17 A. I have four.
18 Q. You have four children?
19 A. Um-hum.
20 Q. What range of ages are they?
21 A. What is today? My oldest
22 daughter is 20 years old, my oldest son
23 is 18 and then I have a 13-year-old
24 daughter and a 7-year-old boy.
25 Q. How old are you?

## Page 9

1  A. I am 41.
2  Q. Really. I don't believe
3  that for a second.
4  Were those from a previous
5  marriage?
6  A. The three youngest ones were.
7  Q. Okay. Have you ever gone to
8  college?
9  A. Yeah, physically, I went for
10 about six months.
11 Q. So I assume you did not
12 finish?
13 A. Chose not to continue to go.
14 Q. Okay. What years did you go
15 or what year did you go?
16 A. It would have been '87.
17 Q. '87. Okay. And by any
18 chance, what college was that?
19 A. It was the Bowling Green
20 branch here in Huron.
21 Q. So the Huron branch of
22 Bowling Green State University?
23 A. Yeah.
24 Q. And you say you moved in
25 with Andrea in about September of 2007?

**Page 10**

1        A. That's correct.
2        Q. Do you have joint checking
3 accounts or anything like that yet?
4        A. No.
5        Q. Do you have any credit cards
6 together, any bills that you pay
7 together?
8        A. No credit cards, no bills we
9 pay together. She takes care of her
10 finances. I take care of mine.
11        Q. Okay. Do you by any chance
12 keep important documents or do you sort
13 of pay the bill and then forget about
14 it or somewhere in between?
15        A. I'd say somewhere some
16 between.
17        MR. KNIRSCH: Can we go off the
18 record real quick?
19        (Discussion had off the record.)
20        Q. Now, do you know if Andrea
21 retains any important documents, such as
22 that, or is she about the same as you?
23        A. Like I said, her finances
24 are her finances. I know she does not
25 throw anything away. As far as if the

**Page 11**

1 mail comes in and it's got her name on
2 it, she does not throw it away and she
3 -- one of the rooms in the house has
4 her -- we don't use. It's pretty much
5 her room and that's where she keeps her
6 paperwork.
7        Q. So sort of like an office?
8        A. Yeah.
9        Q. Okay. Thank you. I'm going
10 to show you, can you please mark that
11 as A.
12        - - - - -
13        (Thereupon, Plaintiff's
14        Deposition Exhibit-A
15        was marked for purposes
16        of identification.)
17        - - - - -
18        Q. Just for the record, have
19 you ever seen this before --
20        A. No.
21        Q. -- what's been marked as
22 Exhibit A? Okay.
23        For the record, this is
24 essentially -- they're called initial
25 disclosures and basically, it gives us

**Page 12**

1 very, very general information about the
2 case and who might have information
3 about the litigation.
4        If you turn to page 2 of this
5 document, at the very top you'll see
6 your name, which is why you're here
7 today. Ms. Brent has said that you
8 might have information about the case
9 and I'm really trying to find out what
10 information that might be.
11        So in the most general sense,
12 what is your understanding of this case?
13        A. Well, I see you spelled my
14 name wrong, but -- do you want to
15 repeat the question?
16        Q. Sure. Sure. This document
17 states that you have information that is
18 relevant to the litigation. And in the
19 most general sense, my question is what
20 information or what do you know about
21 this case?
22        A. What do I know about it?
23        Q. Yes.
24        A. I know that you're trying to
25 collect a debt that is not Andrea's.

**Page 13**

1        Q. Okay. And you got that
2 information from Andrea?
3        A. That's correct.
4        Q. Okay. And it is her belief
5 that we, meaning Midland Funding, are
6 attempting to collect a debt that she
7 does not owe?
8        A. You are wrongfully trying to
9 collect a debt.
10        Q. Okay. Okay. Let's talk
11 about that. Let's show you the actual
12 lawsuit.
13        MR. KNIRSCH: Can you please mark
14 this as B.
15        - - - - -
16        (Thereupon, Plaintiff's
17        Deposition Exhibit-B
18        was marked for purposes
19        of identification.)
20        - - - - -
21        Q. Jon, do you recognize what's
22 been marked as Exhibit B? You can take
23 your time and look through it, if you
24 want.
25        A. Nope. Never seen it before.

**Page 14**

1     Q. Okay. Just for the record,
2 this is the lawsuit that was filed
3 against Andrea which essentially started
4 this entire matter.
5     Do you remember Ms. Brent getting
6 a card in the mail that said she had
7 certified mail? Do you remember when
8 she received this, the day?
9     A. Yes, I do.
10     Q. Okay. Let's walk through
11 that day. It's my understanding that
12 she received a card in the mail that
13 said you have certified mail, please
14 pick it up.
15     Is that your understanding, as
16 well?
17     A. That's how certified mail
18 comes, yes.
19     Q. Sure. And that was on a
20 Saturday?
21     A. No idea.
22     Q. No idea. Did you go with
23 her to pick up the letter at the mail,
24 at the mailbox -- let me back up. I
25 didn't say that very well.

**Page 15**

1     Did you go with Ms. Brent to the
2 post office to pick up this piece of
3 certified mail?
4     A. I don't remember.
5     Q. You don't remember. So
6 could have, you just don't remember?
7     A. I could have.
8     Q. Do you remember any
9 discussions you had about this?
10     A. When she -- when Andrea told
11 me that she was getting sued for
12 something that the paperwork, and she
13 basically told me she was getting sued
14 over something she didn't know what it
15 was. She didn't know what it was.
16     Q. Okay. So she explained to
17 you that she was a defendant in a
18 lawsuit and that she -- it was her
19 belief that she didn't owe anything.
20     Is that a fair characterization
21 of what you just said?
22     A. She told me she was getting
23 sued.
24     Q. Okay.
25     A. And she didn't know what

**Page 16**

1 about.
2     Q. Okay. Did she ever look
3 into or ask you to look into whether or
4 not -- well, let's turn real quick to
5 page 2, if we might, as what's been
6 marked as Exhibit B.
7     It's my understanding and she
8 stated that she never heard of Midland
9 Funding before. Have you ever heard of
10 Midland Funding before?
11     A. Not before.
12     Q. Not before this litigation,
13 correct?
14     A. Nope.
15     Q. Okay. Do you ever receive
16 -- do you ever remember receiving a bill
17 from CitiBank or Associates Bank in the
18 mail, by any chance?
19     A. No.
20     Q. Okay. Any telephone calls
21 related to, you know, you owe this
22 money, anything like that?
23     A. No. Why would they contact
24 me?
25     Q. Okay. Do you guys have a

**Page 17**

1 land line or do you have a personal
2 cell phone or do you have a phone at
3 home or both?
4     A. I have a cell phone, Andrea
5 has a cell phone. There is no land
6 line at the house.
7     Q. Okay. Neither do I.
8     Let's go back to that day. She
9 came back from the post office and said,
10 I'm getting sued by -- for a debt that
11 I don't owe, correct?
12     A. Yeah.
13     Q. What was her general
14 reaction? Was she upset? Was she
15 angry? Was she --
16     A. Yeah, she was upset.
17     Q. She was upset. In terms of
18 upset, was it anger or was it worry?
19 Was it --
20     A. When Andrea gets upset, she
21 -- it's not -- she'll cry, she won't
22 cry like balling crying, tears will come
23 and her teeth will chatter like she's
24 cold and she'll shake.
25     Q. Okay. And that's sort of

Page 18

1 what happened that day?
2 A. And that's exactly what
3 happened that day.
4 Q. And that's her general
5 reaction to bad news?
6 A. No. It's not a general
7 reaction. I've seen her do that about
8 three times in the past year. Three or
9 four times in the past year and-a-half.
10 Q. Do you mind me asking what
11 circumstances that might have happened
12 in the past?
13 A. I can't recall right offhand,
14 but it is not a general reaction at
15 all.
16 Q. So it's an elevated reaction
17 of --
18 A. Yes.
19 Q. -- being upset about
20 something bad that happened?
21 A. Yes.
22 Q. Okay. How long did that
23 last for, do you remember?
24 A. I'd say about ten minutes,
25 five, ten minutes.

Page 19

1 Q. So after that, what happened
2 next? Did you decide to call somebody?
3 She said she tried to call on a
4 Saturday and she tried to call the law
5 firm and nobody answered. Is that your
6 recollection, as well?
7 A. Yeah, she tried getting
8 answers that day and nothing.
9 Q. Okay. Do you remember how
10 long after that Saturday you decided to
11 seek an attorney's help?
12 A. I didn't seek any attorneys,
13 any lawyer; I didn't.
14 Q. Okay. How about her? Do
15 you remember how long, she testified
16 that she didn't really remember how long
17 it was.
18 Do you remember how long it was?
19 A. No idea.
20 Q. Days?
21 A. Nope. No idea.
22 Q. You don't remember, okay.
23 Have you ever dealt with Murray & Murray
24 before?
25 A. No.

Page 20

1 Q. Have you ever had reason to
2 get a lawyer before other than perhaps
3 the times you've been deposed?
4 A. Oh, I've got divorced, yeah,
5 I've hired lawyers but not Murray &
6 Murray.
7 Q. Okay. How did she come to
8 come to Murray & Murray, do you
9 remember?
10 A. I do remember she talked to
11 her dad and her dad suggested it.
12 Q. Okay. So after she spoke
13 with the attorney about what was
14 happening to her, did that help her, you
15 know, her level of upsetness? That's
16 not a very good question.
17 You said she was upset after she
18 received this certified mail, after she
19 spoke with an attorney, did that help?
20 A. I would say -- I don't
21 really know. I would say no. I mean,
22 if it were me, no. You're still here.
23 We're still in this room, so no.
24 Q. Okay.
25 A. The problem's not solved.

Page 21

1 Q. Sure. So the continuation
2 of the problem you think is contributing
3 to a continuous level of being upset?
4 A. Yeah.
5 Q. Okay. And just so I am
6 sure, you say you've never seen this
7 before, this document which I've marked
8 as Exhibit B?
9 A. I told you earlier, her
10 finances are her finances, mine are
11 mine, and no, I have not seen this
12 before.
13 Q. Okay. Okay. I'm finished
14 with that one for now.
15 MR. KNIRSCH: Can you please mark
16 that as C.
17 - - - - -
18 (Thereupon, Plaintiff's
19 Deposition Exhibit-C
20 was marked for purposes
21 of identification.)
22 - - - - -
23 Q. I've marked as Exhibit C
24 what is the original answer,
25 counterclaim and third-party complaint

**Page 22**

1  that Ms. Brent filed.
2   Have you ever seen this before?
3   A. No.
4   Q. Okay. Do you remember any
5  discussions about what course of action
6  was going to be taken after this
7  complaint was filed against Andrea
8  Brent?
9   A. Say it again.
10   Q. Sure. I'll ask more
11  specifically. Do you remember any
12  discussions about, well, we'll file a
13  counterclaim?
14   A. No, she told me that she
15  hired, you know, Murray & Murray to
16  represent her in this case.
17   Q. And that that would -- that
18  they would be taking care of it from
19  here on out?
20   A. Yeah.
21   Q. Okay. So you don't remember
22  any discussion about a counterclaim, or
23  do you know what a counterclaim is?
24   A. No. Explain it to me.
25   Q. Sure. You know, it's

**Page 23**

1  basically where we sue somebody and then
2  that somebody sues us back, okay.
3   Do you ever remember any
4  discussions about this is what we talked
5  about doing?
6   A. Well, we didn't talk about
7  doing anything. Andrea and her lawyer
8  talked about from what I understand that
9  there was going to be a countersuit.
10   Q. Okay. Have you ever been
11  present, by any chance, at a meeting
12  between Andrea and her attorney?
13   A. One time.
14   Q. Okay. Do you remember what
15  the -- what was discussed at that
16  meeting?
17   A. No. I wasn't part of it. I
18  was in the room. I was reading the
19  paper.
20   Q. Okay. Did you do anything
21  to prepare for today, by any chance?
22   A. No.
23   Q. Did anybody tell you what to
24  expect today?
25   A. In general on the way up

**Page 24**

1  here, you know, in general, yeah.
2   Q. Just that you'd been asked a
3  series of questions?
4   A. Yeah. She'd been present
5  and she'd be typing stuff down and I'd
6  have to be sworn in.
7   Q. All that good stuff?
8   A. And tell the truth, the
9  whole truth and nothing but the truth.
10   Q. Okay. Let me back up. You
11  said that you were present at one time
12  between a meeting with her and Donna
13  Brent -- sorry -- Andrea Brent and Donna
14  Evans.
15   How long ago was that, do you
16  remember?
17   A. Couple weeks, a month,
18  something like that.
19   Q. Do you remember any
20  discussion of them deciding to file a
21  new complaint or a new counterclaim
22  against my clients?
23   A. No. The only reason I was
24  in the room was because it was -- the
25  building was pretty much shut down for

**Page 25**

1  the day and all the lights were off,
2  and that was pretty much the only reason
3  I was in the room.
4   Q. Okay. And you said you
5  don't really remember, you weren't
6  really paying attention?
7   A. No. I had the paper with me
8  and I was reading the paper.
9   Q. Okay.
10    - - - - -
11   (Thereupon, Plaintiff's
12   Deposition Exhibit-D
13   was marked for purposes
14   of identification.)
15    - - - - -
16   Q. Does that look familiar at
17  all to you?
18   A. No, it does not.
19   Q. Okay. If you could turn to
20  page 4 of this, which is Exhibit D.
21  I'm looking at page 19, or excuse me,
22  paragraph 19 of page 4, where it says,
23  A deceptive and misleading affidavit.
24   Did you ever have a chance to
25  look at an affidavit? Do you know what

### Page 26

1 that paragraph's talking about, let me
2 ask?
3     A. I don't see where you're
4 talking about.
5     Q. Sure. Paragraph 19.
6     A. I'm looking at 19. Is that
7 the same?
8     Q. Yes.
9     A. Yes.
10     Q. Where it says, MCM and
11 Midland filed this suit in an attempt to
12 collect a debt using a deceptive and
13 misleading affidavit. Do you see that?
14     A. I see that.
15     Q. Do you know what that's
16 talking about, by any chance?
17     A. Well, you know more about
18 it, so I'm learning so why don't you
19 explain it.
20     Q. Well, if the term -- does
21 the term affidavit mean anything to you?
22     A. It's a legal definition of
23 something. You can tell me about it.
24     Q. I was wondering, do you have
25 any understanding as to how an affidavit

### Page 27

1 relates to this case?
2     A. No.
3     Q. Okay. That's all I need to
4 know.
5     If you could turn back, I'm
6 sorry, back to page 2, again, paragraph
7 6, do you see where I am?
8     It says, Brent, upon learning
9 that she had been sued for a debt that
10 she knew nothing about became extremely
11 upset and distraught. Do you see that?
12     A. I see that.
13     Q. Is that what we were talking
14 about before when she came back and she
15 was crying and she clenched her teeth,
16 et cetera, stuff like that?
17     A. Her teeth were chattering but
18 yes, that's what we were talking about.
19     Q. And you said that that
20 lasted for about ten minutes?
21     A. I'd say around that, yeah.
22     Q. Okay. Do you know anything
23 about her -- she claims to have had to
24 get sleeping pills and stuff, too.
25     Do you know anything about that?

### Page 28

1     A. She has seen a doctor about
2 sleeping, yes.
3     Q. Okay. Is that related to --
4 I understand she's experiencing
5 migraines, as well?
6     A. That's correct.
7     Q. Do you know how long that's
8 been going on for?
9     A. I took her to the emergency
10 room last winter when we had -- when we
11 had the big snow out here last winter.
12 And that's -- and she was seeing a
13 doctor probably about a month before
14 that, around a month. Now I'm not sure
15 on that, but she had been seeing a
16 doctor about complaining about her head
17 hurting, her ear, her head and not
18 sleeping.
19     Q. Okay. You said that started
20 sometime last winter during a big
21 snowstorm? Was that the --
22     A. No, it didn't start then.
23 That's when I took her to the emergency
24 room. It started probably about a month
25 or month-and-a-half, two months before

### Page 29

1 that.
2     Q. Okay. Was that by any
3 chance on Valentine's Day, is that the
4 snowstorm you're talking about or was it
5 in 2007?
6     A. No idea.
7     Q. You don't remember?
8     A. It was wintertime.
9     Q. What's that?
10     A. It was wintertime.
11     Q. Okay.
12     A. That's all I remember.
13     Q. And I understand it took
14 them a while to figure out exactly what
15 was wrong with her.
16     Is that your understanding, as
17 well?
18     A. Yeah.
19     Q. That they thought it was
20 allergies for a while?
21     A. Yeah. One doctor thought it
22 was her ear, and yeah.
23     Q. Okay. She also explained to
24 me how sometimes, you know, different
25 factors will bring on a headache.

**Page 30**

1 Do you know what factors those
2 might be?
3 A. Nope.
4 Q. Okay. Do you know if it's
5 elevated stress, things along that line?
6 A. I'd imagine. If I get
7 stressed out, I wind up getting a
8 headache sometimes, so I would imagine.
9 Q. Sure. Okay. If you can
10 turn real quick to page 8, paragraph 39.
11 Do you see where I'm at?
12 A. Um-hum.
13 Q. Okay. Again, this is along
14 the same lines of what we just spoke
15 of; she has suffered damages in the form
16 of anger, anxiety, emotionally distress,
17 fear, frustration, et cetera.
18 Is there anything else you can
19 tell me about these allegations that you
20 haven't already told me?
21 A. Yeah. Well, why did we only
22 read part of line 39?
23 Q. Sure. You can read through
24 the whole thing, if you want.
25 A. Yeah. Let's read the whole

**Page 31**

1 thing. It says as a direct -- can you
2 pronounce that word for me. Why don't
3 you read that for me?
4 Q. Sure. In the form of anger,
5 okay. As a direct and proximate result
6 of Midland and MCM's violation of Fair
7 Debt, Brent and the members of her class
8 have suffered damages in the form of
9 anger, anxiety, emotional distress,
10 fear, frustration, upset, humiliation,
11 embarrassment, amongst other harmful
12 emotions, as well as the cost of
13 defending unwarranted and illegal
14 collection lawsuits.
15 Is there anything else that you
16 can add to what you've already told me
17 about this paragraph?
18 A. That pretty much sums it up
19 right there.
20 Q. Okay. Do you know how much
21 money she spent to deal with these
22 issues today?
23 A. No idea. Her finances are
24 hers, mine are mine.
25 Q. Okay. Has she spoken with

**Page 32**

1 this issue with anybody, besides you and
2 her father?
3 A. Not that I know of.
4 Q. Okay.
5 A. Besides maybe her sister, she
6 talks to her sister on a daily basis.
7 Q. I am finished with that one,
8 as well.
9 MR. KNIRSCH: Can you please mark
10 that.
11 - - - - -
12 (Thereupon, Plaintiff's
13 Deposition Exhibit-E
14 was marked for purposes
15 of identification.)
16 - - - - -
17 Q. Have you ever seen this
18 before, Jon?
19 A. No.
20 Q. Okay. If you could look at
21 No. 6, or excuse me, page 2, No. 6 of
22 what's been marked as Exhibit E, if you
23 can read paragraph, or the answer under
24 paragraph 6 real quick for me and just
25 let me know when you're done.

**Page 33**

1 A. All right.
2 Q. Okay. Does that sound about
3 right, what you just read?
4 Is there anything else that you
5 want to add to that or that you can add
6 to it?
7 A. That pretty much sums it up.
8 Q. She speaks in that paragraph,
9 she said that she could not sleep and
10 suffered bouts of depression, she would
11 start crying whenever she thought about
12 what might happen to her financially.
13 If she were -- do you know the
14 value of the debt that Midland's trying
15 to seek from Ms. Brent?
16 A. In one of these things, I
17 saw a figure about $4,000.
18 Q. Yes, it was about $4,500.
19 A. Okay.
20 Q. Would that be -- let's
21 assume that she was forced to pay
22 $4,500.
23 Would that be something that
24 would be financially draining on her or
25 on you, as a family?

**DEPOSITION OF JON SCHWARZENTRAUB**

### Page 34

1      A. Her finances are hers, mine
2 are mine. I have no idea. It's not
3 her debt, so hell yeah.
4      Q. I asked Andrea a bit about
5 her social life and her ability to do
6 chores around the house and to watch
7 your kids to a certain extent. She
8 said that that really hasn't -- this
9 really hasn't affected those aspects of
10 her life much after this lawsuit was
11 filed.
12      Is that something you would agree
13 with?
14      A. What has affected? Say it.
15      Q. Oh, sure. Ms. Brent
16 testified that after this lawsuit was
17 filed in April of this year, comparing
18 before then and after then, that she
19 really -- it really hasn't affected her
20 ability to do her chores around the
21 house, her social life, et cetera.
22      Would you say that that's
23 accurate?
24      A. Andrea is a very strong
25 woman. She knows things got to get

### Page 35

1 done, so she'll get them done.
2      Q. And she's able to do those
3 types of things?
4      A. And she's very good with my
5 kids.
6      Q. Okay. Jon, I'm finished
7 with that document.
8      - - - - -
9      (Thereupon, Plaintiff's
10      Deposition Exhibit-F
11      was marked for purposes
12      of identification.)
13      - - - - -
14      Q. Jon, have you ever seen
15 this?
16      A. Nope.
17      Q. If you can look down to the
18 middle where it says, HP, BP, do you
19 see where that is in the gray?
20      A. Yes.
21      Q. Okay. Does the phone number
22 419-734-5558 mean anything to you?
23      A. Nope.
24      Q. How about the one above
25 that, 419-531-9998?

### Page 36

1      A. Nope.
2      Q. How about down at the bottom
3 where it says Verizon Calling Card
4 Classic, have you ever heard of a
5 Verizon Calling Card Classic?
6      A. No. I didn't know that
7 Verizon had calling cards.
8      Q. Have you ever seen a bill
9 around the house for a Verizon anything?
10      A. No. Except mine, I got
11 Verizon.
12      Q. You got Verizon, that's your
13 cell phone?
14      A. Yeah.
15      Q. And you stated before that
16 you did not know Ms. Brent between 1996
17 and 2000, correct?
18      A. That's correct.
19      - - - - -
20      (Thereupon, Plaintiff's
21      Deposition Exhibit-G
22      was marked for purposes
23      of identification.)
24      - - - - -
25      Q. Jon, this is a form letter

### Page 37

1 which basically means that these crazy
2 symbols next to, such as contact
3 information at the top get filled in by
4 a computer. I'm just going to ask you
5 if you've ever seen anything that looks
6 familiar to this or if this rings any
7 sort of bell to you.
8      A. No.
9      Q. Okay. And you said
10 previously that you've never heard of
11 Midland Funding or Midland Credit
12 Management, prior to this whole
13 situation?
14      A. Only Midland I know is
15 Midland Title in Norwalk. So it's a
16 title company. That's all I know.
17      Q. Sure. And that's not my
18 client, so you've never heard of my
19 clients before?
20      A. No.
21      - - - - -
22      (Thereupon, Plaintiff's
23      Deposition Exhibit-H
24      was marked for purposes
25      of identification.)

### Page 38

```
 2    Q. Okay. I'm going to ask you
 3  the exact same question about this,
 4  which has been marked as Exhibit H.
 5    Have you ever seen, with the same
 6  caveats that this information gets
 7  filled in, does this at all look
 8  familiar to you or have you ever seen a
 9  document looking similar to this?
10    A. Nope.
11    Q. Okay.
12    MR. KNIRSCH: Donna, I think I'm
13  almost done. Can I have five minutes
14  real quick to make sure?
15    MS. EVANS: Sure.
16    (Recess taken.)
17    Q. Jon, I just have five, ten
18  minutes left and we'll get out of here,
19  okay.
20    You spoke earlier about a room in
21  your home that is used to collect old
22  important statements.
23    Do you recall that conversation?
24    A. Yeah, Andrea keeps her
25  paperwork in that room.
```

### Page 39

```
 1    Q. Okay. Do you know what type
 2  of paperwork she keeps in that room?
 3    A. No idea.
 4    Q. Do you know how long she
 5  retains documents, by any chance?
 6    A. No idea.
 7    Q. Have you ever discussed with
 8  Ms. Brent her expectations of this
 9  litigation?
10    A. We've talked.
11    Q. What have you talked about?
12    A. She just talks about not --
13  trying to figure out why you guys are
14  doing this. And why you're even here
15  and it would be a lot nicer if we could
16  just concentrate on our marriage,
17  upcoming marriage. And you know, she
18  just bought the house, and you know,
19  starting a new life together rather than
20  have -- rather than being sued,
21  wrongfully sued.
22    Q. Do you know what goals she
23  has out of this? Have you ever talked
24  about that?
25    A. Out of what?
```

### Page 40

```
 1    Q. The end goal out of this
 2  thing, when this thing ends, do you know
 3  what the goal is?
 4    A. This thing?
 5    Q. This litigation, this
 6  lawsuit.
 7    A. The wrongful lawsuit?
 8    Q. Sure.
 9    A. Yeah. She wants it over, I
10  know that. That's about all I know.
11    Q. Has there ever been
12  discussion about, you know, a monetary
13  figure or anything like that?
14    A. What's monetary?
15    Q. Sure. Let me just ask you
16  bluntly. Has she ever said, I expect
17  to make this amount of money out of
18  this lawsuit?
19    A. No.
20    Q. Okay. I just want to
21  clarify. She testified to trying to
22  call on a Saturday.
23    Do you remember that at all?
24    A. Yes.
25    Q. Okay. Do you remember if
```

### Page 41

```
 1  she tried calling any other day than
 2  Saturday?
 3    A. She talked about it, you
 4  know, Monday, I mean, like I said, when
 5  she got the certified letter, I don't
 6  remember what day it was. You're
 7  telling me it's a Saturday so she called
 8  on a Saturday. I know she called the
 9  day she got the letter. And I know she
10  kept calling until they got some answers
11  that -- well, they're not really
12  answers, just an explanation of the
13  lawsuit.
14    Q. Do you know who she spoke
15  with about that?
16    A. Absolutely not.
17    Q. Did you look at any
18  documents prior to today to prepare for
19  the deposition?
20    A. No.
21    Q. Okay. Just to clarify, the
22  day she received the lawsuit, you don't
23  exactly remember what day that was?
24    A. No.
25    Q. Okay. And did you go to the
```

### Page 42

post office with her or did she go alone?
A. I don't recall.
Q. Okay. You're aware that Andrea was deposed for this case, correct?
A. Explain.
Q. This is a deposition you're having today, right?
A. Um-hum.
Q. You're aware that Andrea went through the same thing, correct?
A. Yeah.
Q. Did you have any discussions about what transpired during that deposition with her?
A. She told me a little bit, I mean, general.
Q. Like what, do you remember?
A. Off the wall stupid questions that she was asked.
Q. Okay.
A. Irrelevant questions, stuff like that.
Q. Okay. Has she ever

### Page 43

discussed her concern that she might actually owe this money.
A. No.
MR. KNIRSCH: Jon, I am finished today. I want to thank you for coming here today and answering my questions.
Do you want me to explain waiver?
MS. EVANS: Yes.
MR. KNIRSCH: Jon, you have a right, an absolute right to review what she's taken down to make sure that what she took down is, in fact, what you said and what you meant to say. You have a right to review it or you can waive it, and it's really up to you.
THE WITNESS: Like review it when?
MR. KNIRSCH: It usually takes between seven to ten days to get the transcript. She'll send it to you and you have 30 days.
THE WITNESS: Absolutely.
MR. KNIRSCH: You want to review it?
THE WITNESS: Yeah, absolutely.

### Page 44

MR. KNIRSCH: So you will not waive?
THE WITNESS: I would like to -- I would like to read it.
MR. KNIRSCH: Very good. That's it.
(Off the record at 3:56 p.m.)
- - - - -

### Page 45

CEFARATTI GROUP FILE NO. 14002
CASE CAPTION: MIDLAND FUNDING, LLC VS. ANDREA BRENT
DEPONENT: JON SCHWARZENTRAUB
DEPOSITION DATE: DECEMBER 2, 2008

(SIGN HERE)
The State of Ohio,    )
County of Cuyahoga,   ) SS:
  Before me, a Notary Public in and for said County and State, personally appeared JON SCHWARZENTRAUB, who acknowledged that he/she did read his/her transcript in the above-captioned matter, listed any necessary corrections on the accompanying errata sheet, and did sign the foregoing sworn statement and that the same is his/her free act and deed.
  IN TESTIMONY WHEREOF, I have hereunto affixed my name and official seal at          , this
day of      , A.D. 2008.

Notary Public         Commission Expires

### Page 46

```
 1           ERRATA SHEET
 2   PAGE LINE CORRECTION AND REASON
 3   .
 4   .
 5   .
 6   .
 7   .
 8   .
 9   .
10   .
11   .
12   .
13   .
14   .
15   .
16   .
17   .
18   .
19   .
20   .
21   .
22   .
23   .
24   .
25   .
```

### Page 47

```
 1              CERTIFICATE
 2   .
 3   State of Ohio         ) SS.:
 4   County of Cuyahoga  )
 5        I, Nancy Geiger, a Notary Public
 6   within and for the State of Ohio, duly
 7   commissioned and qualified, do hereby
 8   certify that the within named witness,
 9   was duly sworn to testify the truth, the
10   whole truth and nothing but the truth in
11   the cause aforesaid; that the testimony
12   then given by the witness was by me
13   reduced to stenotypy in the presence of
14   said witness; afterwards transcribed,
15   and that the foregoing is a true and
16   correct transcription of the testimony
17   so given by the witness.
18        I do further certify that this
19   deposition was taken at the time and
20   place in the foregoing caption
21   specified.
22        I do further certify that I am
23   not a relative, counsel or attorney for
24   either party, or otherwise interested in
25   the event of this action.
```

### Page 48

```
 1            I am not, nor is the court
 2   reporting firm with which I am
 3   affiliated, under a contract as defined
 4   in Civil Rule 28 (D).
 5         IN WITNESS WHEREOF, I have
 6   hereunto set my hand this     day of
 7          , 2008.
 8   .
 9   .
10   .
11   .
12         Nancy Geiger, Notary Public
13         within and for the State of Ohio
14   .
15   .
16   .
17   .
18   My commission expires November 18, 2013.
19   .
20   .
21   .
22   .
23   .
24   .
25   .
```