# THE CONSUMER ADVOCATE

Vol. 15  ♦  No. 3 & 4                                July - December/ 2009

## Protecting the Public From Abusive Debt Buyers

*by Douglas L Rogers[1] and Elizabeth Grieser[2]*

### In This Issue

*Protecting the Public From Abusive Debt Buyers*
   Douglas L. Rogers
   Elizabeth Grieser . . . . . . . . . . Cover

*From the Editors* . . . . . . . . . . . . . . . . . . 2

*Lessons from Frank Lloyd Wright: Financial Foibles and Family Finances*
   Peter C. Alexander . . . . . . . . . . . . 11

*Preacquired Account Marketing*
   Prentiss Cox . . . . . . . . . . . . . . . . 15

*NACA Bestows Awards at Annual Meeting in Philadelphia* . . . . . . . . . . . . . . . . . . . . . . 17

*Home Pages*. . . . . . . . . . . . . . . . . . . . . . 18

*FrontLine News*. . . . . . . . . . . . . . . . . . . 20

*NACA's 2010 Board of Directors* . . . . . . . 21

*Rick Wagner: A Voice for the Poor is Silenced*
   Michael Powell . . . . . . . . . . . . . . 31

*NACA Continues To Grow* . . . . . . . . . . . 32

*Membership Renewal* . . . . . . . . . . . . . . . 33

*Legislative Update*. . . . . . . . . . . . . . . . . . 36



**National Association of Consumer Advocates**
1730 Rhode Island Ave., NW, Suite 710
Washington, D.C. 20036
202 452 1989   fax 202 452 0099
www.naca.net

Buying allegedly defaulted debts from a creditor to try to collect those debts is a big and growing business.  "The collection industry is … expanding quickly because small businesses are increasingly eager to wipe their hands of debt-collection practices….small business do not want to risk alienating potential repeat customers by aggressively pursuing them for repayment."[3]  In 2002, third-party debt collectors generated sales of about $8.5 billion, but by 2005, their total revenues were   $11.4 billion.[4]  As of 2007, debt buyers held "about $170 billion (face value) in uncollected credit card debt that is less than five years old."[5]  Even in the current recession, "some collection firms have managed to squeeze more revenue from bad debt this year, and have watched their shares surge in the process."[6]

The expanding debt-buying business has resulted in significant mistakes.  A company that loaned funds or extended credit (the "debt seller") sells to another company (the "debt buyer") for pennies on the dollar a large portfolio of debt listed as being in default.[7]  The debt seller, however, often does not transfer to the debt buyer the documents pertaining to the original loans/transactions.[8]  It is therefore not surprising that  "Debt Buyers *generally*  … do not know the component amounts of stated principal, unpaid accrued interest, late fees and other charges." [9]   Indeed, "When accounts are transferred to debt collectors, the accompanying information often is so deficient that the collectors seek payment from the wrong consumer or demand the wrong amount from the correct consumer."[10]

A debtor or alleged debtor represented by counsel may often be able to defeat the claims of a debt buyer since "To an astonishing degree, debt buyers do not produce credible evidence that they own the debt they are suing upon."[11]  One lawyer has said, "Debt buyers' lawsuits are, by and large, lawsuits the plaintiffs should not win."[12]  In fact, when the debtor has obtained counsel who contests the case, a common reaction of the debt buyer is to dismiss voluntarily the claims.[13]

Plaintiffs file the majority of debt collection cases, however, against unrepresented defendants who do not know what defenses to raise and who may let the case proceed to default judgment when in fact there are valid defenses.[14]  These "defaulting and insolvent Americans whom we overlook are the most disadvantaged members of our society."[15]  Haneman states, "The abuse of unrepresented consumers is made possible by a combination of factors – their disenfranchised statuses, the unregulated infancy of the debt industry, and failed assumptions at the

*Continued on Page 3*

## From the Editors

Dear NACA Members,

First, we must say it was a pleasure seeing many of you at the Consumer Rights Litigation Conference in Philadelphia this fall.  It was an outstanding conference, once again, and we returned with renewed vigor for our collective cause thanks to time spent with many of you.  Please find a recap of the NACA Awards from our Annual Meeting, honoring NACA member Janet Varnell, along with San Francisco City Attorney Dennis Herrera and The Hartford Courant's George Gombossy, on page 17.

Second, we are pleased to bring you this issue of The Consumer Advocate, which is full of ideas, inspiration, and cautionary tales.

● Douglas Rogers and Elizabeth Grieser, two legal services lawyers, start us off with a commendable piece about how we may help protect consumers from abusive debt buyers.

● Dean Peter Alexander brings us a story about one famous and brilliant American—Frank Lloyd Wright—who was also a life-long debtor, to provide an example that financial distress does not exclude the most successful in our country.

● Prentiss Cox discusses the preacquired account marketing scheme, and uses it as an example of why we need a powerful and effective Consumer Financial Protection Agency.

We hope you enjoy reading these articles, along with a summary of *In Re Tobacco II* provided by The Sturdevant Law Firm, a Front Lines feature on a big win in Missouri Supreme Court by NACA members John Campbell and Erich Vieth, and the ever-helpful insight of our leader Ira Rheingold and our Capitol Hill expert Cora Ganzglass.

Last, it is the season of both thanks and giving.  We remain encouraged by the work you do every day in your practices, and give you our utmost thanks for your dedication.  Please consider who you wish to extend thanks to at this time—your clients, your colleagues, your family.  All, in their own way, contribute to our mission here at NACA.  In addition, we urge you to reflect on what NACA gives you both as an individual professional and as a community.  The editors hope that you will think of what you can give back to NACA in the New Year.

Cheers!
The Assistant Editors





Kate Campbell          Cynthia Reddersen



**National Association of Consumer Advocates**
1730 Rhode Island Ave., NW, Suite 710
Washington, D.C. 20036
202 452 1989  fax 202 452 0099
www.naca.net

*Asst. Editor*          **Kate Campbell**

*Asst. Editor/Layout*          **Cynthia Reddersen**

**ROGERS/GRIESER: *Continued from Cover***

foundation of the adversarial system."[16] Another problem is that as one entity transfers debts to another, it can become more difficult for the debtor to hold the debt buyer responsible for any improper actions of the debt seller. [17]

This article examines two legal principles that should be able to help protect consumers from debt collection complaints that contain false statements as the result of the debt buyer not obtaining the underlying documents concerning the origination and history of the debt:

> (a) A company has an obligation to preserve documents relevant to the prospective plaintiff's and defendant's claims when it reasonably anticipates litigation (part B of this article); and

> (b) if a debt buyer does not obtain those documents when it purchases the debt and makes false claims that contradict the underlying documents, the debtor is likely to have an affirmative cause of action against the debt buyer under the federal Fair Debt Collection Practices Act (hereinafter "FDCPA")(part C of this article).

The application of these principles to debt buyers and debt collection actions should help protect the specific consumer and unrepresented consumers in the future from false claims, because the threat of liability for such claims would create an incentive for debt buyers to obtain the underlying documents from the debt sellers to lessen that risk of liability. At the same time, these principles would not prevent debt buyers from making legitimate claims against debtors.

**Debt Collection And The Obligation To Preserve Documents**

**1. The general obligation to preserve documents**

Both federal and state courts impose on individuals and companies a duty to preserve relevant documents, including electronically stored information, once litigation is reasonably likely.[18] In *Zubulake v. UBS Warburg LLC*,[19] Judge Scheindlin held, "A party or anticipated party must retain all relevant documents (but not multiple identical copies) in existence at the time the duty to preserve attaches, and any relevant documents

created thereafter."[20] In *Smith v. Howard Johnson Company, Inc.,* the Ohio Supreme Court recognized the tort of destruction of evidence against a person who willfully destroyed evidence relevant to existing or likely litigation.[21]

Threats, allegations, and fears that someone will sue a company have triggered a company's duty to **preserve all documents** reasonably anticipated to be **relevant to the claims or defenses** in the anticipated litigation.[22] As the District Court for the District of Kansas said in *Benton v. Dlorah, Inc*., "Such preservation may **not** be 'selective,' saving only the evidence supporting a theory of liability and impeding the examination of another theory."[23] The court in *Benton* added, "Once a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a litigation hold to ensure the preservation of relevant documents."[24]

If a company has violated its duty to preserve documents, a court can sanction the company in a number of ways, including dismissal of the suit – if the company is the plaintiff.[25] Courts may take action against a company that violates its duty to preserve (or that violates its discovery obligations in addition to its duty to preserve). Courts may fine the company and its counsel; preclude the introduction of certain evidence or consideration of certain legal issues; instruct that the jury can decide the evidence destroyed was harmful to the party destroying the evidence; and, if the party violating its discovery obligations is a defendant, grant a judgment in favor of the plaintiff.[26]

When a company has a duty to preserve documents, it must preserve not only relevant documents it physically holds, but must also preserve relevant documents it has the "right, authority or practical ability to obtain."[27] For instance, *In re NTL Securities Litigation*, the court sanctioned NTL Europe, because NTL Europe had not preserved documents held by another company that emerged out of a bankruptcy reorganization with NTL Europe. The court found that NTL Europe "had the practical ability to obtain any documents it needed" from the other company, and "it would be patently unfair for defendant NTL Europe to benefit from the artificial separation of entities that was created after the bankruptcy."[28]

The duty to preserve documents applies not just to prospective defendants, but to prospective plaintiffs as

*Continued on Page 4*

ROGERS/GRIESER: *Continued from Page 3*

well.  In *Sanchez v. Stanley-Bostich*,[29] the District Court for the Southern District of New York held that when, in anticipation of a product liability action, the prospective plaintiff took photographs of a product it claimed was defective, it had an obligation to attempt to preserve the allegedly defective product, even though a third party had custody of that product.  "Although Sanchez did not have possession of the [staple] gun or exercise control over it, Sanchez could have informed Stanley [the manufacturer of the product] or Russo [the company that had possession of the staple gun] of the possible lawsuit and asked that the gun be preserved for future inspection." [30]

The duty of a prospective plaintiff to preserve documents arises when a company reasonably anticipates suing, even if that company does not know which specific company it will sue.  In *Micron Technology, Inc. v. Rambus, Inc.*, the district court held that Rambus's duty to preserve relevant documents arose when it started to take steps to determine how it would best be able to enforce its patents against its competitors, years before the particular litigation started.[31]  The court ruled that once the duty to preserve arose, Rambus could not decide to keep the documents helpful to its patent litigation strategy and discard the rest.  Since it had discarded hundreds of boxes of documents intentionally after the duty to preserve had arisen, the court held that "the appropriate sanction for the conduct of record is to declare the patents in suit unenforceable against Micron."[32]

A prospective plaintiff can lose its case if it fails to take steps to preserve relevant evidence.  In *Silvestri v. General Motors Corp.*,[33] Silvestri filed a products liability action against General Motors, alleging that the airbag of the car he was driving failed to inflate properly when the car crashed into a utility pole.  The husband of the landlady of Silvestri owned the car, but the court nevertheless concluded that after the accident, Silvestri "had access to the vehicle, as [Silvestri's] attorney … and retained experts were given apparently unlimited access to the vehicle for inspection purposes."[34]  The Fourth Circuit affirmed the dismissal of the suit as a sanction for Silvestri's failure to take reasonable steps to attempt to preserve the car.  The court stated, "If a party cannot fulfill this duty to preserve because he does not own or control the evidence, he still has an obligation to give the opposing party notice of access to the evidence or of the possible destruction of the evidence if the party anticipates litigation involving that evidence." [35]

The duty to preserve can extend to documents held by the spouse of the party.  In *World Courier v. Barone*,[36] the District Court for the Northern District of California granted an adverse inference instruction,[37] because the defendant's husband had destroyed a hard drive containing information relating to the defendant's legal matters, even though the husband was not a party to the litigation.  The court ruled that through her husband, "Defendant Barone at least had access to or maintained indirect control over the hard drive, and therefore she had an affirmative duty to preserve it."[38]

The duty to preserve is consistent with the principle under the Federal Rules of Civil Procedure that in response to a document discovery request a party must produce not only documents on its premises, but also documents that it has the right to control or the practical ability to obtain.[39]  In *Bank of New York v. Meridien Biao Bank Tanzania Ltd.*,[40] for example, the court rejected the argument of defendant, an assignee, that defendant did not have to produce certain documents, because they were in the custody of the assignor.  The court held that "documents are considered to be under a party's control when that party has the right, [or] authority of practical ability to obtain the documents from a non-party," and added, "treatment of both assignor and assignee as parties for discovery … is proper when to do otherwise would frustrate discovery."[41]

Similarly, there would siilarly be no basis for a debt buyer to avoid its obligations to preserve documents by selectively obtaining documents from the assignor that the assignee thinks will help it in foreseeable litigation, but not asking for the documents that the debtor would want in the subsequent litigation.[42]  In fact, the FTC has reported:

> According to one workshop participant, it is industry practice to include in contracts between original creditors and initial, or 'primary,' debt buyers the right to receive from the creditor, upon request, documentation needed to address consumer disputes or to support a lawsuit 'for a particular amount of accounts in the portfolio and/or for a particular period of time.'[43]

In other words, debt buyers in fact could obtain and preserve the relevant documents if the debt buyers

Continued on Page 5

ROGERS/GRIESER: *Continued from Page 4*

wanted the documents, unless perhaps the debt seller had already destroyed documents before the obligation to preserve had arisen.  If the debt seller had destroyed documents before the obligation to preserve had arisen, then it would be prudent for the debt buyer not to purchase that debt.  If the debt buyer purchased that debt anyway and made misstatements in its pursuit of the debtor, the debt buyer could subject itself to an affirmative claim by the debtor under the FDCPA (discussed in part C of this article).

The exact documents that a debt buyer should preserve of course will vary from case to case.  The next three sections of this article summarize some of the relevant laws pertaining to the origination and maintenance of debt to show the types of documents debt buyers may have an obligation to preserve.

## 2.  What documents may be relevant under common law

Debt buyers often sue the alleged debtors and attach to the complaint what the debt buyers refer to as an "account."  In Ohio, attaching the "account is merely a pleading device used to consolidate several different claims" against one party,[44] and ultimately an action on an account is founded on an earlier contract.[45]  When the defendant denies the allegations, "the plaintiff is required to prove all the necessary elements of a contract action, and in addition, to prove that the contract involves a transaction or transactions that usually form the subject of a book account."[46]  In addition, the plaintiff may have to prove:

> (1) A beginning balance of zero, or a sum that can qualify as an account stated, or some other provable sum;
> (2) Listed items, or an item, dated and identifiable by number or otherwise, representing charges, or debits, and credits; and
> (3) Summarization by means of a running or developing balance, or an arrangement of beginning balance and items that permits the calculation of the amount claimed to be due.[47]

In other states, original liability does not form the basis for a suit, but the account itself forms the basis.[48]  However, in that situation the plaintiff still has to prove the elements of an action on the account: "(1) a statement of the account between the parties is balanced

and rendered to the debtor; (2) there is a meeting of the minds as to the correctness of the statement; and (3) the debtor admits liability."[49]

In still other states, a plaintiff may use an account to prove damages if there is liability, but not the underlying question of whether there is liability.[50]  In *Nelson v. First National Bank of Omaha*, the court held that "when the putative debtor was not aware of the account when the debt was incurred, the doctrine of account stated does not supply a legal basis for liability because the requisite element of mutual assent is lacking."[51]

Under any of these principles, there are documents beyond the account attached to the complaint that would be relevant.  These include an original written agreement (if there is one), communications between the creditor and debtor about the amount owed, evidence of payments made and evidence, such as e-mails, to support a claim that there was no assent to the account or original liability.

Even if there is some agreement between a creditor and debtor, which does not mean a creditor's claim of interest and other charges are valid.  In *Willaims v. Unifund CCR Partners Assignee of Citibank*, the court concluded that although "the parties had reached an agreement of some kind, their evidence is not sufficient to establish the terms of a valid contract," such as "the applicable interest rate or the method for determining the applicability and amount of finance charges."[52]  The Ohio Supreme Court said in *Rull v. Fan Co.*, "Vagueness of expression, indefiniteness and uncertainty as to any of the essential terms of an agreement, have often been held to prevent the creation of an enforceable contract."[53]  Similarly, in *Winchek v. American Express Travel Related Services Company, Inc.*, the Texas First District Court of Appeals said, "To be enforceable, a contract must be sufficiently certain to enable a court to determine the rights and responsibilities of the parties."[54]

Beyond proof of the formation of the contract and its terms, generally the plaintiff must prove the validity of any assignment on which it is suing, including the proof of consideration for the assignment and the scope of the assignment.[55]  For instance, in *Citibank (South Dakota), N.A. v. Martin,* the court said that "an assignee must tender proof of assignment of a particular account, or, if there were an oral assignment, evidence of consideration paid and delivery of the assignment."[56]  In *Munoz v. Pipestone Financial, L.L.C.,* although the debt collector

*Continued on Page 6*

ROGERS/GRIESER: _Continued from Page 5_

had obtained an assignment of account receivables, the court concluded, "Defendants have failed to demonstrate that, as a matter of law, Pipestone was assigned the rights to collect interest and attorney fees."[57]

As a result, debt buyers should obtain from the debt sellers the original contract between the creditor and debtor, relevant communications between the creditor and debtor before and after the formation of the contract, payment records, interest calculations, and any assignment from the debt seller to the debt buyer.  It does not make any difference that the debt buyer does not think these documents are helpful to its case, if they are reasonably likely to be relevant to the defenses of the debtor.

**3.  Issues and documents that may be relevant under state consumer protection statutes**

All states have one or more consumer protection statutes that are often called unfair or deceptive acts or practices (UDAP) statutes.[58] The Ohio Consumer Sales Practices Act (CSPA)[59] applies to many consumer transactions, including debt collection, both by the original lender and a third party collector, but only covers debt collection where the underlying debt arises from a consumer transaction.  Substantively, the Ohio CSPA prohibits any unfair, deceptive, or unconscionable acts whether they occur before, during, or after the transaction.[60]

In determining whether the conduct at issue in a case would come within the prohibitions of the applicable state's UDAP statute, the attorney representing the defendant should consider many issues that could make relevant a wide range of documents, including electronically stored information, beyond any transaction documents.  For instance, many courts have held that the failure of a party to disclose certain matters to the consumer – for example, problems with the product sold, or dangerous conditions in real estate – could violate the applicable UDAP statute.[61]  In this situation, documents held by the debt seller and debt buyer regarding what they knew about the product would be relevant, even though they never provided the documents to the debtor.[62]

The rule that a party cannot use evidence extrinsic to a (the parol evidence rule) often is not applicable with respect to UDAP claims involving fraudulent inducement.[63]  In _Wang v. Chevrolet_, the court rejected an argument that the parol evidence rule barred evidence of deceptive acts outside of the contract.  The court

explained: "[P]ermitting a parol evidence bar or defense under the instant circumstances would be tantamount to construing the written contract as constituting essentially a waiver of the protection of the act, which waiver is contrary to public policy."[64]  Therefore, a whole range of e-mail communications that might not be applicable in other contract cases could be relevant here.

Some state UDAP statutes require the plaintiff provide some showing of the defendant's intent that the consumer would rely on the action, or the defendant's knowledge.[65]  In _Totz v. Continental Du Page Accura_, for instance, in the court said that under an Illinois UDAP statute, "Continental is only liable for failure to disclose a material fact if it intended that the Totzes rely on the omission."[66]  The court added, "Circumstantial evidence may be used to establish the seller's intent in this regard."  This issue of intent and knowledge could open to discovery and the obligation to preserve to a wide range of documents beyond any transaction documents.

Another important statutory defense in collection cases can be the applicable state statute of limitations.  For example, Ohio has a fifteen-year statute of limitations on written contracts,[67] a six-year statute of limitations for oral contracts,[68] and if the underlying consumer transaction relates to the sale of goods, then the statue of limitations is four years.[69]  The various state UDAP statutes have a variety of statutes of limitations, which generally begin to run when the "reasonable person" would have been put on notice about the acts constituting the UDAP violation.[70]

To determine if a strong statute of limitations defense exists, it is important for the debt buyer to obtain and preserve not only the document creating the original debt, but account statements and payment records.  Not only would such information be important to the defense of the alleged debtor, but also many courts have held that "the filing of a lawsuit to collect a debt that is barred by the statute of limitations violates several subsections" of the FDCPA (discussed in section C of this article).  In other words, a collection suit filed after the statute of limitations had run could provide the defendant with an affirmative claim against the debt buyer.[71]

**4.  What issues and documents may be relevant under the federal Truth In Lending Act?[72]**

The federal Truth in Lending Act (TILA)[73] applies to both open end and closed end credit transactions.[74]

_Continued on Page  7_

**ROGERS/GRIESER:** *Continued from Page 6*

Closed end credit refers to one-time loans, usually mortgages or auto loans.[75]  Open end credit[76] is a revolving line of credit, most often typified by credit cards or store accounts.  TILA was enacted to promote informed use of consumer credit by requiring meaningful disclosures about credit terms, help the consumer avoid the uninformed use of credit and protect the consumer from inaccurate and unfair credit billing.[77]  It is a remedial statute that courts liberally construe in favor of borrowers.[78]

Under TILA, a consumer must receive certain documents at the time of origination of a closed end credit transaction specifying the applicable interest rate, payment schedule, fees, and duration of the loan.[79]  TILA requires specific disclosures about credit card terms and other open-end credit transactions.[80]  TILA also requires prompt crediting of payments and provides a system for consumers to dispute unauthorized charges.[81]

Violations of TILA can subject the original creditor to actual damages and twice the amount of any finance charges.[82]  Debt buyers may also be liable, but "only if the violation for which such action or proceeding is brought is apparent on the face of the disclosure statement, except where the assignment was involuntary."[83]

Under TILA, of course the initial disclosures made by the original provider of credit are relevant to whether or not the original provider violated TILA.  These disclosures would also be relevant to whether the debt buyer should be liable to the alleged debtor for violations of TILA and therefore would be crucial to potential counterclaims of the debtor.  Therefore, the debt buyer would have the obligation to ask for and, if they exist, collect and maintain those documents.[84]

**5.  Summary**

As set forth in sections B 2-4 above, there is a wide range of documents that the debt seller should have and that the debt buyer should ask for and collect from the debt seller.  For instance, in *In re Lozano*, the bankruptcy court concluded:

> [I]f the assignee of the original mortgagee, or the current loan servicer, can by custom or practice in the mortgage business informally request and obtain the original loan file, and any

related documents, including a payment history, I would conclude that such documents are within the control of the party to whom the discovery request is directed.[85]

If the debt buyer does not ask the debt seller for the documents, then in a collection case filed by the debt buyer against a debtor, dismissal of the case as a sanction may be appropriate.[86]  On the other hand, dismissal may not be appropriate if the original creditor/debt seller had destroyed those documents before the duty to preserve documents arose.[87]

Yet if the debt seller destroyed the underlying transaction documents before the obligation to preserve documents arose, that should not give the debt buyer a free pass to purchase the debt and proceed to try to collect from the person identified as the debtor.  If the debt buyer does not obtain the underlying documents, it is logical to conclude that the debt buyer is much more likely to make misstatements in its collection efforts than if it had obtained and reviewed the documents.  In the event of such misstatements, the next section discusses the possible affirmative claims the alleged debtor may be able to bring against the debt buyer under the Fair Debt Collection Practices Act (FDCPA).

**Claims Under The Fair Debt Collection Practices Act**

Part 1 of this section C summarizes some affirmative claims available against debt collectors under the FDCPA.[88]  Part 2 discusses the applicability of the FDCPA to lawyers who act as debt collectors.  Part 3 discusses the bona fide error defense, which requires that the debt collector – to avoid liability for misstatements – to maintain reasonable procedures to avoid misstatements.

**1.  Affirmative claims against abusive debt buyers**

The FDCPA[89] is a federal statute that Congress "enacted in 1977 in response to public perception of the use of unfair and abusive debt collection practices by many debt collectors," and the Sixth Circuit has characterized the FDCPA as "an extraordinarily broad statute."[90]  The FDCPA regulates communications between debt collectors and consumers and actions by debt collectors.[91]  The FDCPA applies to a consumer's personal debts, not her business debts.  The FDCPA defines "debt" as "any obligation or alleged obligation of a consumer to pay money arising out of a transaction

*Continued on Page 8*

ROGERS/GRIESER: *Continued from Page 7*

in which the money, property, insurance, or services which are the subject of the transaction are **primarily for personal, family, or household purposes,** whether or not such obligation has been reduced to judgment."[92]

A person is a "debt collector" if that person "uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, **or** who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another."[93] A debt collector does not include "(A) any officer or employee of a creditor while, in the name of the creditor, collecting debts for such creditor," but creditor "does not include any person to the extent that he receives an assignment or transfer of a **debt in default** solely for the purpose of facilitating collection of such debt for another."[94]

Among other things, the FDCPA prohibits (1) false and misleading representations by debt collectors and (2) unconscionable means of attempting to collect debts.[95] Specifically, 15 U.S.C. §1692e provides, "A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt." It gives a number of examples of prohibited acts, including: "(2) the false representation of (A) the character, amount or legal status of any debt; or (B) any … compensation which may be lawfully received by any debt collector for the collection of a debt."[96]

Unfair and unconscionable collection attempts are the focus of the prohibition in 15 U.S.C. §1692f. Specifically, §1692f (1) includes the following example as one of the unfair or unconscionable acts: the collection or attempted collection "of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law."[97]

A debt buyer's failure to have - at the time it files a complaint - all the documents it will need at trial to prove its case is not a violation of the FDCPA.[98] Yet a failure of a debt buyer[99] to acquire the applicable documents from the debt seller can make it difficult to defend against a subsequent FDCPA claim by the debtor. The decision of the District Court for the Middle District of Pennsylvania in *Gigli v. Palisades Collection, L.L.C.,* evidenced this point.[100]

In *Palisades Collection*, Palisades and its attorney had filed a complaint against Gigli for $4,705.14 plus interest for a credit card account allegedly originating with First USA Bank, N.A. and subsequently transferred first to Sherman Financial Group, LLC, then to Sherman Acquisition, and then to Palisades. After counsel for Gigli requested documentation substantiating the allegations in the complaint, Palisades voluntarily dismissed the complaint. Gigli then sued Palisades and its attorney for violation of the FDCPA, specifically 15 U.S.C. §§1692e and 1692f(1).[101]

Referring to the scope of §1692f(1), the court in *Palisades Collection* said, "Actual collection of such amounts … is not required, as §1692f(1) proscribes the attempted collection of unauthorized debts," as well as actual collection of unauthorized debts.[102] The court then rejected the argument of defendants that there was no violation of the FDCPA:

> Ms. Gigli's FDCPA claims are not based on Defendants' filing of a debt collection action, refusing to provide upon request substantiating documentation, and then dismissing the action. Rather, she has averred that the complaint filed in the underlying action falsely represented the character, amount, or status of a debt and sought to collect amounts not authorized by an agreement.[103]

The court noted that defendants had not produced the credit card agreement Gigli had requested (allegedly evidencing her agreement to pay interest) and that the counsel for Palisades had not reviewed the credit card agreement, but had instead relied on unidentified "client information" for the allegations in the complaint.[104]

The court concluded there were questions of fact surrounding whether there was an agreement authorizing the collection of the amount of interest claimed, since a jury "could **infer from their non-production** [the non-production of the credit card agreement and account records] **that no such documents ever existed**."[105] The court denied the motion for summary judgment of Palisades on plaintiff's FDCPA claim.

If Palisades had been correct about the credit card agreement, Palisades should have obtained from the debt seller the applicable credit card agreement when Palisades purchased the debt. Then Palisades could have pointed to the credit card agreement in support of its

*Continued on Page 9*

ROGERS/GRIESER: *Continued from Page 8*

claim for interest and defended against plaintiff's claims that the interest was unauthorized.

## 2. The FDCPA applies to lawyers who are acting as debt collectors

In *Heintz v. Jenkins*, the Supreme Court held that the FDCPA prohibitions apply to a lawyer who regularly tries to collect consumer debts, "even when that activity consists of litigation."[106] In spite of *Heintz*, lawyers sued under the FDCPA have frequently raised claims that they are not subject to suit. Indeed, "All circuits to consider the issue, except for the Eleventh, have recognized the general principle that the FDCPA applies to the litigation activities of attorneys who qualify as debt collectors under the statutory definition."[107]

Lawyers have been largely unsuccessful in claiming immunity from FDCPA claims.[108] In *Sayyed v. Wolpoff & Abramson*, for instance, the Fourth Circuit rejected the claims of the defendant law firm that absolute common law immunity protected the interrogatories and motion for summary judgment it had submitted.[109] The court suggested that "*all* litigation activities, *including* formal pleadings, are subject to the FDCPA, *except* to the limited extent that Congress exempted formal pleadings from the particular requirements of §1692e(11)."[110] The sole exemption in the FDCPA noted was the provision in §1692e(11) that formal pleadings did not need to disclose they were from a debt collector.[111] Then referring to the bona fide error defense as "a kind of qualified immunity to debt collectors," the court concluded, "It is clear that Congress meant not to incorporate common law immunities in this area, such as they may be, but to overwrite them, defining the scope of liability and immunity entirely by statute."[112]

More limited claims of immunity have also failed. In *Todd v. Weltman, Weinberg & Reis Co., L.P.A.*,[113] for instance, the debtor sued a law firm and one of its attorneys for an affidavit the attorney had signed in support of garnishing the wages of the debtor. Rejecting the defendants' claim of witness immunity, the Sixth Circuit concluded, "A private witness testifying as a complaining witness [such as the defendant attorney in *Todd*] has no immunity for her testimony."[114] Similarly, in *Gionis v. Javitch, Block & Rathbone, L.L.P.*, the Sixth Circuit said that "neither litigation immunity nor witness immunity shields it [the law firm representing the creditor] from liability under the Act" (the FDCPA).[115]

The court said the defendant "points to no authority purporting to extend witness immunity to those who merely attach affidavits,"[116] and agreed "immunity did not extend to complaining witnesses — those who help instigate the judicial process by swearing to tell the truth."[117]

Attorneys acting as debt collectors have also been unsuccessful in raising the U.S. Constitution as a bar to suits against them under the FDCPA. In *Hartman v. Great Seneca Financial Corp.*, the Sixth Circuit held that "the First Amendment does not shield lawyers engaged in litigation from FDCPA liability."[118] The Sixth Circuit also declined to affirm the district court's grant of summary judgment for the defendants on the arguments that the FDCPA was unconstitutional, violated their rights to substantive due process and violated the Commerce Clause of the U.S. Constitution.[119] Similarly, in *DeLawder v. Platinum Financial Services Corp.*, the court rejected the arguments of the creditor, its law firm, and its individual counsel that the application of the FDCPA to them violated their rights under the Tenth Amendment and Commerce Clause.[120]

The bona fide error defense in the FDCPA, discussed next, however, does provide an affirmative defense for lawyers and other debt collectors in the case of certain mistakes. However, this article argues that if a debt buyer does not obtain and review the underlying documents to a transaction, that debt buyer will not satisfy the bona fide error defense if it subsequently faces an FDCPA claim for misstatements made by the debt buyer in its collection efforts.

## 2. The bona fide error defense

The "bona fide error" defense of 15 U.S.C. §1692k(c) provides:

> A debt collector may not be held liable in any action brought under this subchapter if the debt collector shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error.

The defense is an affirmative defense for which the debt collector has the burden of proof.[121]

*Continued on Page 10*

9OGERS/GRIESER: *Continued from Page 9*

The court analyzed the bona fide error defense in *Seeger v. AFNI, Inc*., in which Cingular had been the original creditor, and AFNI had purchased Seeger's and other accounts from Cingular.[122]  Seeger claimed that defendant AFNI had violated the FDCPA by attempting to collect a collection fee that no agreement authorized and no law permitted..[123]  The court agreed, and concluded that plaintiffs were entitled to summary judgment, unless AFNI qualified for the bona fide error defense.[124]

The court in *Seeger* said there was a three part test the defendant must show to qualify for the bona fide error defense.  First, the alleged FDCPA violation was not an intentional violation.[125]  Second, the alleged FDCPA violation resulted from a "bona fide error," defined as an error made in good faith.  Third, that it "maintained procedures reasonably adapted to avoid any such error."[126]  Referring to the second element of the test, the court said that a violation of law could be a "bona fide error" if the action taken by the defendant was reasonable in light of applicable law.  It noted, however, that the bona fide error part of the defense "does not apply when a debt collector's actions are in plain contravention of existing case law."[127]

The court in *Seeger* explained the third element of the defense as follows:  "The final prong, the procedures component, involves a two-step inquiry: 'first, whether the debt collector 'maintained' – i.e., actually employed or implemented – procedures to avoid errors; and, second, whether the procedures were 'reasonably adapted' to avoid the specific error at issue.'"[128]  Similarly, in *Reichert v. National Credit Systems, Inc.,* the Ninth Circuit held, "To qualify for the bona fide error defense under the FDCPA, the debt collector has an affirmative obligation to maintain procedures designed to avoid discoverable errors, including, but not limited to, errors in calculation and itemization."[129]  In *Johnson v. Riddle*,[130] the Tenth Circuit said, "And the procedures prong, by the express language of the statute, must be '*reasonably* adapted to avoid' the error that occurred."

The court in *Seeger* concluded that AFNI did not qualify for the bona fide error defense, because AFNI had not maintained procedures reasonably adapted to avoid the specific errors at issue in the case.  Specifically, the court said, "A procedure 'reasonably adapted' to avoid this type of error, namely the interpretation of specific contracts, would **necessarily require the examination of the contracts at issue.**  Such being the case, AFNI's potential failure to read the specific contract provisions at issue indicates a lack of sufficient procedures adapted to avoiding errors in contract interpretation."[131]  Of course, if AFNI had obtained and reviewed the contracts at issue from Cingular, it might have avoided the suit.[132]

Other cases support the principal that in order to successfully use the bona fide error defense, the debt buyer should have received and reviewed the underlying documents, if those documents were relevant to the claims in the case.  For instance, a law firm successfully raised the bona fide error defense in *Taylor v. Luper, Sheriff & Neidenthal Co., L.P.A.*  The firm's success came in part because the head of the firm's collection department submitted an affidavit that included the following statement: "we are required to review the contract that forms the basis for the complaint to ensure that the amount sought in the complaint is expressly authorized by the contract…."[133]  In *Fox v. Citicorp Credit Services, Inc.,* the bona fide error defense was not successful at the summary judgment stage.  There, Citicorp "provided no indication of any procedure to ensure that all pertinent information would be expeditiously transmitted during a transfer of accounts from one office to another."[134]

The " mere assertion of good intent, absent a factual showing of actual safeguards reasonably adopted to avoid violations of the FDCPA, is insufficient" to satisfy the bona fide error defense.[135]  In *Werheim v. James M. Secrest, P.C.*,[136] the court ruled:

> Though … the draft foreclosure complaint was compared to the mortgage and note … the Defendant's evidence does not establish what person or persons reviewed and proofread the draft foreclosure complaint. …. If he did rely on others, their identities are unknown, as are the kind of education or training they may have had relevant to the error at issue and whether and to what extent they were supervised by Mr. Secrest.

A failure to obtain and review the underlying documents concerning the debt cannot be a procedure reasonably adapted to avoid an error in a subsequent collection attempt.

*Continued on Page 22*

Vol. 15 ♦ No. 3 & 4          THE CONSUMER ADVOCATE                                    11

# Lessons from Frank Lloyd Wright: Financial Foibles and Family Finances

### By Peter C. Alexander

One doesn't have to look too far these days to find families that are struggling to pay their bills, keep their homes and stay afloat financially. Often, they are engaged in a balancing act that requires discipline. The most successful families create family budgets, reconcile their checkbooks monthly, and live within their means. But we all know of people who aren't disciplined and who have considerable financial stresses in their lives. Noted American architect, Frank Lloyd Wright, was one of these people. Among his many idiosyncrasies was his utter disregard for all matters financial. An exploration of the money issues he faced could inform our understanding of how modern families find themselves in financial distress and, sometimes, in bankruptcy.

To gain a clearer understanding of Wright's financial situation, it is helpful to know more about his personal life. He was the son of a Methodist minister and a disciplined Welsh immigrant whose family farmed in southern Wisconsin, just west of Madison. Wright's maternal grandparents (the Lloyd-Jones family) instilled in their children and grandchildren traditional values like working hard, paying bills on time, and helping people in need. They lived simply, but they always had food, shelter, and clothing. In other words, Wright was raised with what most of us would call beloved "traditional American values." Wright's father, on the other hand, was an itinerant preacher, moving his family around the country as he found work. Pastor Wright was also a gifted musician and teacher, but he never found personal happiness or financial comfort. Early in the architect's life, his father left the family and his mother had to use her resourcefulness to make ends meet. She moved the children to southern Wisconsin to be raised in the land of the "God Almighty Joneses," as they were called by their neighbors.

Because of his childhood experiences, Wright should have had a clear idea of the differences between a grounded life and a life on the edge. His mother's people were models of financial virtue and their examples of how one must live should have been instructive. His father's life, by contrast, should have demonstrated that the lack of either financial planning or fiscal discipline could be personally devastating.

As he grew to adulthood, Wright became an architect, married, and had six children. As the stories are reported, he never had enough money to support his lifestyle. Wright's life became much more complicated when he began an affair with a neighbor/client's wife and decided to leave his own family. In his life, Wright would go on to marry two more women, adopt the child of his last wife, and father one more child. Wright struggled financially from his birth in 1867 until close to his death in 1959. In fact, his last wife, Olgivanna, confided to one of Wright's apprentices, (currently Frank Lloyd Wright Foundation Archivist) Bruce Brooks Pfeiffer, that it wasn't until his last big commission in the 1950s that she felt the couple finally had money.[1]

How could this architectural genius have failed so miserably at managing his finances? How could he have forgotten the lessons of his mother's family and ignored his father's bad example? The answers are not unique to Wright's time and, unfortunately, they still apply today. He didn't bother to think about money; he didn't think financial rules applied to him; he was adept at convincing people to invest in him; and he relied on others to bail him out of trouble. Perhaps a closer look at these issues will help educate consumers today.

**Thinking About Money**

Frank Lloyd Wright was a dreamer. He dreamt about shapes. He dreamt about colors. He dreamt about Nature, which he wrote with a capital "N" because he viewed it as his interpretation of God. He did not dream about money or bills or any of the other mundane issues that individuals and families in this country worry about every day. Wright had bigger issues in his life. He was obsessed with building affordable houses on a massive scale, houses that Wright believed would transform society into a happier, "more enlightened" society.[2] Wright decried city life. He frequently lectured about the "Disappearing City" and he welcomed the automobile as "eminently democratic."[3]

For decades, Wright sought to transform American society by creating a low-cost house that everyone could buy. He developed the "Usonian"[4] house as an affordable alternative to the Victorian and Queen Anne styles of the day. Wright intended to build Usonian houses throughout the country at a cost of $5,000 each. Not surprisingly, the architect went way over budget and the houses cost $10,000 each; very few were ever built.[5]

Another focus of Wright's attention was Japanese art, particularly woodblock prints, screen paintings and textiles mainly dating to the Edo period.[6] Wright's love of Japanese art would play a significant role in his financial life because the architect would often spend

*Continued on Page 12*

**ALEXANDER: Continued from Page 11**

whatever cash he had on the purchase of prints and screens and, when he needed cash quickly, he would frequently sell part of his collection. Author Donald Hoppen shares a revealing anecdote about Wright's introduction to the world of Japanese prints. He notes that Wright began collecting prints in 1905 when he and his wife visited Japan with another couple and that Wright had to borrow $5,000 from one of his draftsmen, Walter Burley Griffin, in order to make the trip. Wright spent the entire sum on prints and, upon his return, he was unable to repay Griffin. Hoppen then writes, "After an almighty row, Griffin settled for a range of Japanese prints. Like many artists, Wright was hopeless about money. Not surprisingly, as an artist, his consuming interest was art, not the prosaic world of trade."[7]

### Don't Worry, Be Happy

In his autobiography, Frank Lloyd Wright suggested that rules, such as paying one's bills as they become due, did not apply to him.[8] He once remarked, "Early in life I had to choose between honest arrogance and hypocritical humility. I chose the former and have seen no reason to change."[9]

Wright's self-confidence was likely the result of his mother's belief that her son was a genius who would make great contributions to the world. This is hardly a novel description of a son by a mother; however, Wright's mother seemed to be unrelenting in her assessment. In fact, she planned for him to become an architect from birth.

One of the classic stories about Wright and money was told by his son, John, in his memoir, *My Father Who Is on Earth*. John was working with his father in Chicago when the senior architect was building a major project in Chicago called the Midway Gardens. At some point, a sheriff appeared at the office and demanded payment of $1,500 for back rent. Wright had no money, but he told John to show the officer around the office and Wright slipped out. He sold some of his Japanese prints to a collector friend who happened to be in town and returned to the office with a $10,000 check. The sheriff and John accompanied Wright to the bank to cash the check. After paying the sheriff the back rent that was owed, Wright told his son that they would visit other creditors and pay other bills. However, as they began their adventure, they passed Marshall Field's, a Chicago department store. Wright went inside, saw a chair that interested him, and summoned the salesperson. In typical Wright form, the architect had purchased a dozen chairs and a dozen Chinese rugs and had them shipped up to his home in Wisconsin. Down the street in a music

store, he saw a piano that impressed him and he bought three of those. Son John wrote, "It had been a perfect day, he had succeeded in plunging himself in debt again and everything was normal once more."[10]

In 1927, when Wright's financial situation was at its darkest point, the Bank of Wisconsin took possession of "Taliesin," Wright's Wisconsin home, and close friend and client Darwin Martin rescued him. He came up with the idea to incorporate the architect's practice and to sell shares of stock in "Frank Lloyd Wright, Inc." and issued shares in the corporation against Wright's future earnings (even though the architect had no work at the time).[11] The investors, which included Martin, Wright's sisters Jane Porter and Maginel Barney, client Queene Coonley, and Professor Ferdinand Schevill, among others, redeemed Taliesin from bank foreclosure and made Mr. Wright an employee of the company.[12] Wright didn't really concern himself with the details or the corporate formalities that had to be observed. Indeed, a January, 1928 letter from Wright, Inc. President Schevill to the shareholders indicates that Wright wanted the Articles of Incorporation to be amended to permit him to apply his share of corporate earnings to the purchase of the stock of the corporation "by whomsoever owned, as he may desire."[13]

### The Great Convincer

Frank Lloyd Wright was part artist, part engineer, part genius, and part flim-flam man. There was no doubt that Wright's residences, particularly his Usonian designs, were changing the lives of everyday people. There was little argument that some of his commercial designs, like the Johnson Wax Headquarters in Racine Wisconsin, were redefining the workspace in dramatic and exciting ways. Wright is credited with inspiring the Prairie School of architecture and being among the first to use recessed lighting in residential construction. He designed not only structures but also windows, furniture, accessories, lighting, and clothing. His imagination seemed to have no limit. "In the end, he showed not just what to live in, but more importantly he influenced the very nature of how we lived."[14]

Behind some of his more famous buildings one finds innovations that are nothing short of architectural genius. Fallingwater, the vacation home of Pittsburgh department store magnate Edgar Kauffman, Sr., involved the use a series of cantilevered decks to mimic the waterfall over which the famous house was built. The Guggenheim Museum in New York City took its inspiration from a ziggurat, a Mesopotamian pyramidal temple, which Wright cleverly inverted to give museum visitors a unique and breathtaking space within which to view art. Taliesin West, his winter home in Arizona, used

Continued on Page 13

ALEXANDER: *Continued from Page 12*

local materials and eschewed the use of glass windows to blur the lines between indoor space and outdoor space and create an outstanding example of what Wright called "organic architecture."

Wright knew that he had talent; in fact, he remarked in his later life that he had so many ideas that he just couldn't complete his drawings fast enough.[15] Unfortunately, Wright wanted everyone to know he had talent and he was a relentless self-promoter. He was confident and had an impactful rhetorical style that not only impressed listeners, but also drew them into his world. His lectures earned him legions of admirers. After all, he was giving the world not just a new architecture but also a new vocabulary.

Wright believed that the more traditional architecture of his day was too confining and interfered with daily living. Most houses were of the Queen Anne and Victorian styles, boxes with many interior walls to break up the larger space into small rooms. Wright sought to "break the box" and was one of the first architects to develop what we now know as the "open floor plan." His designs were unlike anything else in town. If you happened upon a Wright-designed home in a neighborhood, you would know it. It was memorable then and it remains so today.

More important than know what to say, Wright also knew just when to pull the correct strings with certain individuals. When he first met with Hib Johnson, the CEO of the Johnson Wax Company, the pair did not see eye to eye on many things. In fact, Johnson wrote "He insulted me about everything, and I insulted him, but he did a better job. I showed him pictures of the old office, and he said it was awful. I came back from Spring Green [Wright's home in Wisconsin] and said, 'If that guy can talk like that he must have something.'"[16]

At one point in his relationship with Hib Johnson, Wright was building an administrative building as well as a sprawling residence for him. Wright felt it necessary to write Johnson a letter to justify his architectural fees. Again, Wright's way with words helped to overcome any concerns Johnson might have had with his puckish architect. He wrote:

> You seem to feel you've paid your old architect an awful lot and the work costs an awful lot more…No architect creating anything worth naming as creative work ever made or ever can make any money on what he does…I have, as you know, given my personal attention to every little matter of minutest detail in both buildings. To me, neither structure is just a building. Each one is a life in itself, one for the

life that is your business life, and one for your personal life.[17]

Wright's letter prompted a response from Johnson in which the client scolded the architect for his loose accounting practices and cost projections, but then enclosed a check for $3,100.[18] Similarly, when Wright believed that Fallingwater client Edgar Kaufmann was not being cooperative enough, Wright exclaimed, "Fallingwater is too good for you; you don't deserve it!"[19] This tough talk seemed to keep Kaufmann in the fold.

## The Kindness of (Friends and) Strangers

The great actress, Vivian Leigh, uttered the famous words as Blanche DuBois in *A Streetcar Named Desire*, "Whoever you are, I have always depended on the kindness of strangers." Frank Lloyd Wright shared that belief. His network of supporters involved complex inter-personal relationships, but his benefactors included more clients and friends than strangers. The banks were not his friends and with good reason. Wright was not a good credit risk. Instead, he used his charm, intellect, and reputation to convince those close to him that they *had* to help prop him up financially or else his entire body of work would suffer. Wright's letter exchanges with clients and friends reveal just how deeply some of his clients believed in the architect and his message. Wright's strongest financial supporters included Buffalo businessman Darwin D. Martin, Pittsburgh businessman Edgar Kaufmann, Sr., California client Aline Barnsdall, and Johnson Wax CEO Herbert "Hib" Johnson.[20]

### Darwin D. Martin

Mr. Wright had a 32-year friendship with Darwin D. Martin, chief executive of the Larkin Co., a huge manufacturing and retail giant based in Buffalo at the turn of the Twentieth Century.[21] Their relationship began as architect and client, but grew into a complicated friendship. The two men corresponded from 1903, when Martin first requested Wright's services, until Martin's death in 1935. During their friendship, Wright built three homes for Martin and his wife as well as the Larkin Soap Company's administration building, Wright's first major public commission. Martin was probably the most important player in Wright's financial life.

Martin, a very wealthy businessman, was charmed by the charismatic architect, and would and did do almost anything Wright needed in order to support Wright's work. Martin's support was in sharp contrast to the feelings of his wife, Isabelle, who was not as smitten with Mr. Wright as her husband. According to columnist Anthony Chase, Martin's other contributions to Wright's

Continued on Page 14

ALEXANDER: *Continued from Page 13*

success included:

•Helping Wright obtain commissions for homes for two other Larkin Company executives, William R. Heath (1905) and Walter V. Davidson (1912).

•Loaning Wright thousands of dollars and paying him thousands of dollars for Japanese prints Wright often sold off to cover debts.

•Buying the mortgage on Wright's original home and studio in Oak Park, Ill., in 1912 so Wright could support his first wife and their six children after a scandalous affair in which Wright abandoned them and ran off to Europe with a neighbor's wife. Martin subsequently learned that Wright had already sold the mortgage to another client!

•Editing Wright's autobiography in the 1920s, sales of which helped Wright recapture attention and pay off some debts.

•Helping bail Wright out of jail in 1926 when he was arrested for violating the Mann Act after leaving his second wife for Olgivanna Hinzenberg, who would later become his third wife.

•Contributing $10,000—the most of any of Wright's friends or clients—toward incorporating Wright to pay off his numerous debts.[22]

Sadly, Martin's fortune disappeared in the stock market crash of 1929. He was so destitute that, when Wright's autobiography was published, Martin didn't even have the six dollars to purchase a copy. Wright wrote to Martin and promised him one of the six free copies that Wright had been given by the publisher, but this was only a small repayment of the more than $70,000 that Wright had "borrowed" from Martin over the years.[23]

### Edgar Kaufman, Sr.

Edgar Kaufmann found a kindred spirit in Frank Lloyd Wright. Edgar Kaufmann, Jr., one of Wright's apprentices, said that his father and Wright were "both outgoing, winning venturesome men and Father quickly felt the power of Wright's genius."[24] The senior Kaufmann and his wife were immediately under Mr. Wright's spell and, as author Brendan Gill writes, "to do so was, of course, inevitably to spend money."[25]

During their long relationship, Kaufmann asked Wright to design a planetarium complex for downtown Pittsburgh, a new office for Mr. Kaufmann, and Kaufmann's famous summer residence, Fallingwater. In addition, Mr. Kaufmann provided Wright with funds to help underwrite his ambitious "Broadacre City" community planning project.[26] "These commissions amounted to a first installment on the several hundred thousand dollars that Wright was eventually to cost Kaufmann."[27]

Kaufmann and Wright remained good friends until Kaufmann's death in 1955 and Kaufmann never seemed to mind that Fallingwater was a very costly project. The house cost $155,000 in 1937, although the original budget was $30,000, and Wright was paid $8,000 for the job.[28]

### Aline Barnsdall

Aline Barnsdall inherited a very large fortune from her father.  An interesting character, she supported many radical causes, was friends with anarchist Emma Goldman, and was under FBI surveillance for 24 years. She was an ardent feminist and a single mother (at a time when that was unheard of) as well as a devotee and producer of experimental theatre.[29]  Wright used a new method of construction (textile block) to create a one-of-a-kind house for Ms. Barnsdall in the center of Hollywood that Wright named "Hollyhock House." Barnsdall and Wright did not work well together and, predictably, Wright paid little attention to Ms. Barnsdall's requirements. Writer Cheryl Johnson provides more detail about the Barnsdall-Wright relationship. She notes:

Without Aline Barnsdall, Frank Lloyd Wright might never have come to California. Yet with Frank Lloyd Wright, Aline, like many others, had a stormy relationship. Kindred spirits in many ways, it was Barnsdall who reached out and bankrolled Frank Lloyd Wright after his notoriety killed his domestic practice. She was enormously generous, supportive and patient, while Wright was consumed with his personal travails and the construction of the monumental Imperial Hotel in Tokyo. And while Barnsdall thought that Wright was brilliant, she despised the Hollyhock House Wright finally constructed for her.

Aline's father, Theodore Barnsdall, was the largest independent oil producer of his time in the United States. Aline would travel extensively with her father throughout Europe, where she studied theater, her real passion in life that landed her in Chicago in 1913. A pioneering, avant garde theater troupe was located in the same building as Frank Lloyd Wright, and they met shortly after his Taliesin disaster. Aline's family fortune allowed her to indulge the extravagance as well as the frustrations of dealing with Frank Lloyd Wright.[30]

The construction of Hollyhock House was a typical Wright production, with costs running well

*Continued on Page 29*

# Preacquired Account Marketing

## By Prentiss Cox

A fundamental problem for consumer advocates is that the worst conduct often is perpetrated by those with few or hidden resources. Civil law tends to flail when the harm is wrought by a scammer, corporate or individual, who fades away when the costs of doing business become too much.

But what if such a practice is run by a sizeable company in cooperation with some of the nation's largest financial institutions and retailers? That situation exists in the form of preacquired account marketing. NASDAQ size companies, through affiliation with large banks and retailers, have been able to maintain for more than a decade a practice that has resulted in tens of millions of American consumers charged $100 or more each year for services they do not want and for which they do not even know they are paying. It is known as preacquired account marketing.

### The Preacquired Account Marketing Scheme

Here is how it works. Banks enter contracts with marketing companies, which I'll call "preacquired sellers." These sellers obtain the contractual right to charge bank customers' accounts without the customers providing their account numbers to the seller. Preacquired sellers use the internet, telemarketing and direct mail to solicit bank customers to accept a free trial offer for a membership club or an insurance policy. If the preacquired seller determines the bank customer consented, and the customer does not cancel the free trial in time, the preacquired seller tells the bank to charge the customer's account. The banks keep a share of the money.

Credit card, checking and mortgage accounts all are commonly drained by preacquired marketing. One of these preacquired sellers lists its affinity partners (the financial institutions selling the right to charge its customers' accounts) as including "18 of the top 20 U.S. credit card issuers, 17 of the top 20 U.S. debit card issuers, 5 of the top 5 U.S. mortgage companies."

Preacquired marketing arrangements also result from agreements between preacquired sellers and large retailers. The retailer obtains account information, typically a credit card number, from its customer and then sells to the preacquired account marketer the right to charge that credit card account if the preacquired seller determines that the customer consented to a free trial offer and failed to cancel.

Budget Car Rental, for example, has had an arrangement with preacquired seller Trilegiant that allows Trilegiant to market free trial offers to customers who provide account information to Budget. Trilegiant has sent to Budget customers a check for $9.25 as part of a solicitation for a "risk-free" offer in a discount buying club. In less prominent type in the middle of a paragraph in the back of the solicitation is the following: "When you cash or deposit the enclosed check, we will automatically extend your membership for an additional eleven months following your thirty-day trial and bill the $119.99 annual fee to the card you have on file with Budget for a membership in Everyday Values unless you call 1-877-880-1825 to cancel during the thirty-day trial period and owe nothing." Got it?

### The Deception Problem

Seasoned consumer advocates will not have a hard time seeing the potential for deception with this form of marketing. Consumers signal assent to an account charge by providing the account number to the seller when they are ready to accept a charge to the account. Preacquired marketing circumvents this shorthand method for consent to the charge, attenuates the decision-making process through use of a negative option free trial offer, and often confuses the identity of the seller by prominently featuring the bank or retail partner in the solicitation. Elderly account holders and non-English speakers may have an especially hard time deciphering this form of solicitation and account charge.

But that leaves some consumers who do understand how the process works. And the actual terms of the transaction are disclosed, even if there is a strong argument that the solicitation as a whole remains deceptive.

The deception problem with preacquired account marketing comes into stark focus when you change the angle of analysis from the experience of the individual

Continued on Page 16

**COX:** *Continued from Page 15*

consumer to the aggregate effect of the marketing program.   Mounting evidence shows this marketing scheme works as a giant sorting system to weed out vulnerable consumers unaware that their accounts have been charged.

Surveys of consumers charged through preacquired marketing show that virtually all of them are unaware of the services they allegedly agreed to purchase and unaware their accounts were charged.

● The Iowa Attorney General sued Vertrue, a preacquired seller, in 2006.  As part of the investigation, the Attorney General surveyed consumers that Vertrue had identified as paying for one of its membership programs. Of the 88 club members who returned surveys, 59 (or 67%) were unaware of the membership and stated that the charge was totally unauthorized, 24 (or 27.3%) stated that they were aware of the club but they never used it and believed they had already cancelled,  6 (or 6.8%) stated generally that the charges were "unauthorized," and 3 (or 3.4%) gave unclear answers that indicated some awareness of the club but dissatisfaction with the service, including one member who "felt coerced" into paying for the membership.

● In 2004, Illinois Attorney General Lisa Madigan surveyed by telephone customers of a national bank that had cashed "live check" direct mail offers for a free trial offer in membership programs solicited under a preacquired account marketing arrangement.  Of the 56 bank customers who were listed as active members of a membership program, 37 indicated no awareness that they were club members.  None of the 56 customers stated that they were both aware of the charge and intended to sign up for the program by cashing the live check.

● When the Minnesota Attorney General sued the mortgage subsidiary of Fleet National Bank in 2001 for preacquired marketing, he presented evidence that Fleet's own customer service agents overwhelmingly objected to these charges, calling them "unethical," "a scam," and "a fraud" based on their conservations with homeowners whose mortgage accounts were charged through preacquired marketing.

### Regulatory Failure (Again)

The primary regulator for national banks is the OCC, the Office of Comptroller of the Currency.   The OCC not only has failed to stop national bank profiting from preacquired account marketing, it has facilitated national bank participation in these marketing schemes.

National banks are limited to engaging in banking activity.  The OCC issued rulings defining agreements with preacquired sellers as an ancillary banking activity; specifically, as a form of finder's fee.

When the Congress passed the Gramm Leach Bliley Act in 1999, it hurriedly added Title V in response to public outcry over the revelation that U. S. Bancorp had shared with preacquired sellers actual account numbers and financial information about its customers.  Section 502(d) in Title V of the GLBA states: "A financial institution shall not disclose, other than to a consumer reporting agency, an account number or similar form of access number or access code for a credit card account, deposit account, or transaction account of a consumer to any nonaffiliated third party for use in telemarketing, direct mail marketing, or other marketing through electronic mail to the consumer."

On first read, this provision seems to prohibit entirely preacquired marketing agreements between financial institutions and preacquired sellers. Unfortunately, the OCC, along with other federal banking regulators and the FTC, completely neutered the effect of the law by passing Regulation P, which allows banks to share encrypted account information. *See, e.g.,* 12 C.F.R. § 40.12.  The result is that preacquired account marketing continued virtually unchanged.  The bank provides customer contact information and an encrypted account number.  When the preacquired seller determines the consumer consented, it so informs the financial institution, which then decrypts the account number and charges the customer's account.

### Lessons for the CFPA Debate

Not surprisingly, the head of the OCC, Comptroller of the Currency John Dugan, opposes giving the proposed Consumer Financial Protection Agency and state attorneys general the power to enforce consumer protection laws against banks.  He recently stated to Congress that consumer protection "should stay with the bank regulators, where it works well."

It makes one wonder what lax consumer protection would look like in the view of the OCC.  Preacquired

*Continued on Page 35*

# NACA Bestows Awards at Annual Meeting in Philadelphia

## George Gombossy

George Gombossy was the first investigative consumer columnist in the Hartford Courant's history, and unfortunately, probably its last, as he was fired  on Aug. 14, 2009 after refusing to "be nice" to the papers' major advertisers.  For over three years, Mr. Gombossy served as the advocate for Connecticut's consumers, working with thousands of readers who sent him complaints and tips. His Watchdog columns resulted in more than a dozen state investigations and improved customer service at many local and regional companies. He continues to rattle the chain of big business with his www.CtWatchdog.com website.





## Janet Varnell

Since being introduced to NACA, Janet has contributed in many ways, including her service on the Board of Directors, her advocacy for NACA in the legal community, and her efforts to make new NACA members feel welcomed into our community.

One of Janet's signal contributions was showing NACA members (and, to some degree, NACA itself) that it's okay to make money as a consumer lawyer, focusing on the undeniable fact that we all have to pay the rent in order to do the good that we do.

## Dennis Herrera

The Los Angeles Times describes the City Attorney's office of Dennis Herrera and his staff as the most effective public law office in the country. Its members are incentivized to do public interest litigation like the NAF case, and are trying to get other public law offices to do the same.   A full year before Minnesota filed suit against the NAF, San Francisco filed suit making the same allegations of a corrupt system.  It was a trail-breaking suit that faced almost insurmountable legal obstacles, and was met by motion after motion.

Dennis Herrera and his staff have beat back the toughest legal issues, such as arbitral immunity, in their strong efforts to get compensation for all affected California citizens.

The award was accepted by Kathleen Morris, pictured here.



# *Home Pages*

## Dear NACA members:

As another year comes to an end, I find myself reflecting on all that we've accomplished this year and on how far we still have to go. I want to take this opportunity to share some of my thoughts with you about our country and our organization, and encourage you to talk with me about how we, NACA, can better serve you and the consumers we've collectively devoted our careers to helping.

As a nation, we began 2009 with great hope that we finally had a U.S. government in place that would be dedicated and focused on the interests of consumers over the big financial service and corporate interests that broke our economy. And at times that was the case. We saw Congress pass an actual consumer protection law that prohibited some (but not nearly enough) of the abusive credit card company practices that have crippled our neighbors and our families with unrelenting debt. We saw the Federal Reserve wake up from its deep slumber to actually issue regulations that improved consumer protection. We saw the National Arbitration Forum, the symbol of all that is wrong with forced arbitration, disappear in a despicable cloud of their own making. And we saw new leadership take over at the Federal Trade Commission that I believe take their mandate to protect consumers (and not commercial interests) seriously.

But we also saw too many things remain unchanged or even get worse. Our government's effort to stem the tide of foreclosures has been inadequate at best, cynical at its worst. An effort to change our nation's bankruptcy laws to help families rebuild their lives and save their homes went nowhere because of the enormous greed and the ridiculous power that banks still have – despite all that they have destroyed – and the unwillingness of this administration and our elected Representatives to take them on. A modest effort to create an agency responsible for protecting consumers, the Consumer Financial Protection Agency is bogged down in Congress and filled with exemptions for car dealers (car dealers?!?) and credit insurance, and threats to use the statute to preempt good state consumer protection laws. And while we've inched closer to its passage, the Arbitration Fairness Act is still not the law of the land.

What we've seen in 2009, reminds us of what we already knew; trusting our government's "good intentions" won't get us nearly far enough. If we want good consumer policy and good consumer protection laws, it will be up to us and our clients to make it happen. That's a central part of NACA's mission – and what we've started to do and will continue to work on in 2010.

NACA's focus in 2009 was on building. We've worked to build our capacity to effect change, by adding a second legislative staff person, Ellen Taverna, who is  dedicated to working on the issues that most impact our members and their clients. We've built a new internal infrastructure so that we can better understand and meet your  needs as attorneys working to protect consumers. We've expanded our ability to offer web trainings and improved our services and databases to make the practice of consumer law a little more affordable and efficient. But we haven't done nearly enough, and that's what our goal will be in 2010.

For those of you who attended the Consumer

Rights Conference, you hopefully completed our membership survey that gave us a much better idea of what we're doing right, what we're failing to do and what you need to make your practice more successful (You can find some of the most important results of this survey here). Because of your responses, NACA has decided to hire a Membership and Business Development Director who will be directly responsible for meeting your needs as attorneys. It's my great hope, in 2010, with this new person on our staff, we will be able to meet the needs you've told us about and offer you new member benefits and services that will enhance and increase your success as attorneys dedicated to representing consumers.

We've set that as a goal, and next year at this time, you and I will be able to see if we've met our promise. I have every intention that we do just that.

Until I talk with you again, have a wonderful holiday season and keep fighting for your clients and for all of us.



*Ira*

### Top 10 Requested New NACA ListsServs

Banking and Credit - 39%

Bankruptcy - 30.7%

Best Legal Service Practices - 23.2%

New To Consumer Law - 23.2%

Best Small Business Practices - 22.4%

Garnishment - 17%

Landlord/Tenant Issues - 14.9%

Legislative Issues - 14.9%

Forced Arbitration 14.5%

Insurance Issues - 10.8%

### Member Recommendations for New NACA Benefits

Group health benefits/insurance

Access to more CLE approved training

Legal Document Databases (In addition to the FDCPA and Foreclosure databases)

Additional Webinars covering a range of topics

Supplies/services geared towards the small business owner

Addition of several new member ListServs

Travel discounts

Website hosting and design discounts

Mentorship Program

## Frontline News

## Missouri Supreme Court Decision Eliminates Voluntary Payment as Defense to UDAP Claims

Does it make any sense at all that a company should be able to keep illegal profits by arguing that the consumers didn't do a good job of catching the company cheating?

If you are a NACA member, I think I can guess your answer. But, until a few months ago, in the State of Missouri, a "cheaters prosper" rule seemed to be on the books. A cable company, accused of adding on charges for unsolicited merchandise, boldly asserted that since the customers could have caught the charge on their bill, but paid instead, the company should keep the money. The company pushed this argument despite a regulation that made billing for unsolicited merchandise an unfair practice. The company cited to the "voluntary payment doctrine" ("VPD") for support. The trial court dismissed the consumer class action and the intermediate court affirmed. Things looked bleak, and there were very few decisions on point anywhere in the country that could help. Our firm began to receive emails from consumer attorneys around the country who were worried that the voluntary payment doctrine was experiencing a renaissance among defense attorneys, and we worried that things were not as fair in Missouri as we had hoped.

Fortunately, after a long fight, in one of the very few state supreme court decisions addressing this issue, the Missouri Supreme Court overruled the trial court and held that the "voluntary payment doctrine" may not be raised as a defense to any action based on the Missouri UDAP statute (Missouri Merchandising Practice Act – Missouri Revised Statute 407.010 *et seq.*). In *Huch v. Charter Communications, Inc.*, 290 S.W.3d 721 (Mo. 2009), the Court issued a resounding affirmation that the protections of the Missouri UDAP statutes are sacrosanct and that an old doctrine of "equity" could not be employed to work injustice.

### A Closer Look

Plaintiffs filed a class action petition alleging that Charter Communications billed consumers about $3 per month for paper pamphlets called "Cable Guides" that had not been requested by the customers. Missouri Revised Statute §407.200 gives consumers the right to refuse to accept delivery of merchandise they didn't order, to treat it as a gift and to refuse payment. A regulation by the Missouri Attorney General (15 CSR 60-8.060.1) provides that it is an unfair practice for any seller to "charge or attempt to collect payment from consumers, for any merchandise which the consumer has not ordered or solicited."

Nonetheless, Charter filed a motion to dismiss, arguing that the voluntary payment doctrine prohibited recovery. The voluntary payment doctrine, which arose at common law in many states, dates back to England's common law. In most states, the doctrine provides that absent fraud or duress, a party who makes a payment with full knowledge of the facts cannot maintain a suit to recover that payment.

Ironically, before Charter's motion to dismiss could be heard, the trial judge, a Charter customer, had to go home and check his bill to see if he was a class member. After he closely examined his bill and determined that he was not getting charged for the cable guide, he issued an order dismissing the entire case, holding that every customer is deemed to know what is on their bill.

Plaintiffs appealed, arguing that it would ridiculous to apply an equitable rule such as the VPD to reach the inequitable result of allowing a company to keep illegal profit. Plaintiffs also asserted that because the VPD does not apply to fraud, it should never apply to a consumer fraud statutes. Finally, Plaintiffs asserted that as a matter of public policy, allowing companies to profit from *per se* illegal billing for unsolicited merchandise would only encourage more businesses to tack on charges, knowing that they could never face liability to the thousands, or hundreds of thousands, who paid the charges without discovering them.

On appeal, the Missouri Court of Appeals-Eastern District, upheld the trial court's decision. Plaintiffs sought transfer to the Missouri Supreme Court. The Court accepted transfer and ordered the appellate decision withdrawn. Plaintiffs' counsel immediately contacted the National Association of Consumer Advocates, the National Consumer Law Center and Gateway Legal Services to obtain their support for this high priority case. Alicia Campbell, now of Campbell Law LLC, in St. Louis, was the primary drafter of the amicus brief filed on behalf of NACA, NCLC and

## Frontline News

Gateway Legal Services.  The Missouri Attorney General also filed an amicus brief.

At oral argument, the Missouri Supreme Court was openly skeptical of the idea that consumers could be expected to identify illegal charges on their bills while companies could not be responsible for putting them there.  The Court questioned the equity of allowing a company to retain what would amount to illegal profit simply because consumers did not notice the illegal charge and protest.  Ultimately, in a sweeping and unanimous decision, the Missouri Supreme Court held that the voluntary payment defense is technically a form of waiver, and that rights under the MPA cannot be waived because this would undermine the legislative intent behind the Act.   The Court explained that

> "[h]aving enacted paternalistic legislation designed to protect those who could not otherwise protect themselves, the Missouri legislature would not want the protections of Chapter 407 waived by those deemed in need of protection."

The VPD has rarely been explored in the consumer fraud context.  As such, the Missouri Supreme Court's careful analysis and unambiguous decision to protect consumers by promoting equity over an antiquated doctrine can be expected to be influential in cases around the country.

The case was briefed by **John Campbell** and **Erich Vieth** of the Simon Law Firm, P.C. and argued at the Missouri Supreme Court by John Campbell.  John and Erich are proud to be members of NACA. In recognition of the importance of the case, the readership of the statewide newspaper *Missouri Lawyers' Weekly* recently voted *Huch* as Missouri's "Best Appellate Win" over the past twelve months.



*John Campbell*



*Erich Vieth*

## Tobacco II Case Reaffirms Importance of Class Actions

From **The Sturdevant Law Firm**, in *In re Tobacco II Cases*, 46 Cal. 4th 298 (2009), the California Supreme Court reaffirms the importance of class actions and holds that because there is no evidence that the drafters of Proposition 64 intended to change the ability and right to bring a class action under California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.* ("UCL"), only the class representatives need show that they lost money or property.   The decision reaffirms the holding in *Californians for Disability Rights v. Mervyn's, LLC*, 39 Cal. 4th 223 (2006), which found that Proposition 64 was only intended to make procedural changes to the UCL and that Proposition 64 can not be used as a hook to make substantive changes to the law. The decision relies on the ballot summaries and arguments to show that the only abuse intended to be addressed by Proposition 64 was the frivolous lawsuits brought by unscrupulous lawyers and recognizes that there is a complete absence of references to class actions in the ballot materials. The decision thus narrows the impact of Proposition 64 to its intended purpose of limiting lawsuits brought by those who had not suffered loss of money or property.

Defendants had argued that the standing requirements must be applied to all absent class members, not based on Proposition 64, but under general class action law principles. The *Tobacco II* decision rejects this argument and strongly reaffirms well-established rules of class actions procedures that recognizes that the standing requirement is only imposed on the class representative and not on absent class members.

On the second issue of whether or not actual reliance must be pled or shown by a party bringing a UCL claim, the Court finds that reliance is required.  Significantly, the Court explains in specific detail that pleading reliance does not create the huge burden that defendants typically argue it does.  It knocks defendant's responsive arguments about actual reliance out of the water before they even have the chance to make them. Reliance, for example, does not require demonstrating that the individual was harmed by watching one specific commercial with the misleading material, or that the only way the person was harmed was from the

*Continued on Page 30*

ROGERS/GRIESER: *Continued from Page 10*

## Conclusion

When a debt buyer is interested in purchasing defaulted debt, the debt buyer knows or should know that it has an obligation to acquire with the debt the underlying documents that would likely be relevant to the defenses and any claims of the alleged debtor.[137] The debt buyer cannot circumvent its duty to preserve documents by only asking for obtaining documents that will help it collect.[138] If the debt buyer does not obtain those documents but proceeds to acquire the debts, then the debt buyer should stand in the shoes of the debt seller.

If the debt seller had, but did not provide, the underlying documents, sanctions against the debt buyer may be appropriate.[139] In any case, if because of its failure to obtain the underlying documents the debt buyer makes misstatements in its collection activities, the debtor should have an affirmative claim under the FDCPA against the debt buyer.  <u>In light of the generally recognized obligation to preserve documents when litigation is likely, the reasonable procedures necessary to prevail under the bona fide error  defense should be demanding and obtaining the underlying documents from the debt seller or not acquiring the debt</u>.

The courts should consider a debt buyer who attempts to collect a debt without obtaining the relevant underlying documents an abusive debt collector subject to sanction by the courts.  The courts should consider such debt collectors who, because of their failure to obtain relevant documents, make misstatements in their collection efforts to be abusive debt collectors subject to liability under the FDCPA.

## BIO

### Douglas Rogers

(1.)  Douglas L. Rogers is a 1971 graduate of Yale Law School, was a staff attorney with the Legal Aid Society of Cleveland from 1971-1975, was Director of the Ohio Legal Rights Service from 1975-1980 and was Director of the Columbus Legal Aid Society from 1980-1982.  From 1982-1986 he was an associate, and from 1987 -2008 he was a partner, with Vorys, Sater Seymour and Pease LLP.  He is the author of a number of articles, including "A Search for Balance in the Discovery of ESI Since December 1, 2006," 14 Rich. J. L & Tech. 8 http://law.richmond.edu/jolt/v14i3/articles8.pdf (Spring 2008).  He is currently working at Ohio State Legal Services Association.



### Elizabeth Grieser

(2.)  Elizabeth Grieser received her BA from Washington University in St. Louis, and graduated from the Ohio State Moritz College of Law in 2007.  For the past two years, Elizabeth has been working as an Equal Justice Works fellow for the Ohio State Legal Services Association working on consumer law issues affecting Southeastern Ohio.



## Endnotes

3.   Lauren Goldberg, "*Dealing in Debt: The High-stakes World of Debt Collection After FDCPA,*" 79 S. Cal. L. Rev. 711, 728 (2006)(hereafter *Goldberg*)

4.   Robert M. Hunt, "Collecting Consumer Debt In America,"  2 Business Review (2007) 11, 12 (hereafter *Hunt*).

5.   See Federal Trade Commission, "*Collecting Consumer Debts — The Challenges of Change*" (February 2009) (hereafter "Collecting Consumer Debts"), at 15.  The FTC has said that "Credit card debt constitutes about 90% of all debt sold today."  *Id.* at 13.

6.   B. Conway, "Collection Agencies Get Pesky," 6/24/09 New York Times.

7.   See V.J. Haneman, "*The Ethical Exploitation of the Unrepresented Consumer,*" 73 Missouri Law Review 707, 713 (2008)("After a period of continued non-payment, the unpaid accounts are categorized as worthless assets to the credit grantor.  To be entitled to a bad-debt deduction under the Internal Revenue Code, the credit grantor must 'charge-off' the portion of any debt that becomes worthless.  To satisfy this requirement, the credit grantor must remove the debt form the assets on its balance sheet.")

8.   "*Collecting Consumer Debts*," *supra,* n. 5 at 22 ("A leading association of debt buyers, DBA International…, acknowledged that it is common  for a debt buyer to receive only a computerized summary of the creditor's business records when it purchases a portfolio…") http://www.ftc.gov/bcp/workshops/debtcollection/dcwr.pdf, visited  3/31/09; and *Goldberg*, *supra* n. 3 at  745 "One former debt collection attorney admits that the companies usually do not have the documentation required to support their suits").

9.   *Debt Buyers' Association v. Snow*, 481 F.Supp.2d 1, 4 (D.D.C. 2006).

10.  *Id.*

11.  "Everything You Need To Know About Defending Suits By Debt Buyers,"

12 J.Consumer & Com.L. 115, 117 (Spring 2009).  In addition to ownership of the debt, the "debt buyer must also prove that the seller owned the debt," and the "debt buyer must present this proof for each transfer in the chain of ownership."  *Id.*

12.  S. Glover, "Has The Flood Of Debt Collection Lawsuits Swept Away Minnesotans' Due Process Rights?", 35 Wm. Mitchell L. Review 1115, 1125 (2009).

13.  *See, e.g., Deere v. Javitch, Block and Rathbone L.L.P.*, 413 F.Supp.2d 886, 888 (S.D. Ohio 2006)("Deere, represented by counsel, filed a motion for a more definite statement of Melville's claim…On April 20, 2005, Melville voluntarily dismissed its complaint without prejudice"); *Delawder v. Platinum Financial Services Corp.*, 443 F.Supp.2d 942, 945 (S.D.Ohio 2005)("Delawder … sought discovery from Defendants concerning the alleged debt….Defendants voluntarily dismissed the Ironton case"); *Harvey v. Great

*Continued on Page 23*

**ROGERS/GRIESER: *Continued from Page 22***

*Seneca Financial Corp.*, 453 F.3d 324, 326 (6th cir. 2006)(("Harvey filed a motion to compel, at which point [Seneca and Javitch] dismissed the complaint."); *Williams v. Javitch, Block & Rathbone, L.L.P.*, 480 F.Supp. 1016, 1019(S.D. Ohio 2007)("The matter was assigned a trial date, and Palisades then dismissed the complaint without prejudice"); *Gigli v. Palisades Collection*, 2008 WL 3853295, *4 (M.D. Pa. 2008)("counsel sought a copy of the credit card agreement….on June 22, 2005,…an attorney [for the plaintiff]…notified the state court that Palisades was voluntarily dismissing without prejudice its action."); *Miller v. Javitch, Block & Rathbone*, 561 F.3d 588, 591 (6th Cir. 2009)("'JBR then voluntarily dismissed the suit, as large volume collection firms often do when met with resistance."); and *Hartman v. Great Seneca Financial Corp.*, 569 F.3d 606, 610 (6th Cir. 2009)( "Hartman and Rice answered the complaints against them and served discovery. Great Seneca then dismissed the state-court actions against Hartman and Rice without prejudice.").  Of course, there is nothing wrong simply with dismissing a case upon receiving a discovery request.  *See, e.g., Deere v. Javitch, Block and Rathbone LLP*, 413 F.Supp.2d 886, 890 (S.D.Ohio 2006).

14.  "The consumer debtor … is almost always unrepresented and unlikely to know much, if anything about the statute of limitations or how to employ it in defense of the claim, even if it were understood." *Haneman, supra* n. 7 at 709.

15.  R.M. Hynes, "Broke But Not Bankrupt: Consumer Debt Collection In State Courts," 60 Fla.L.Rev. 1, 61  (January 2008).

16.  *See, e.g., Haneman, supra* n. 7 at 742. Haneman adds that "the ethical rules of the present code cannot continue to justify the actions of the attorneys who exploit unrepresented consumers, and the American bar must be held accountable for the exercise of sound ethical judgment."  *Id.*

17.  *See, e.g.,* D. Loonin and E. Renuart, "The Life and Debt Cycle: The Growing Debt Burdens of Older Consumers and Related Policy Recommendations," 44 Harv.J. on Legis. 167, 178 (Winter 2007)("Predatory lenders find fuel for their lending primarily through investors and Wall Street. The capital flows to lenders through 'securitization,' the process of pooling loans and transferring them to an assignee, which holds them and then issues certificates for sale to investors, oversees the servicing, and pays investors…. It is very difficult to hold anyone responsible.")

18.  *See Goodman v. Praxair Services, Inc.*, ___F.Supp.2d___, 2009 WL 1955805, **12-23 (D.Md., 2009); *Consolidated Aluminum Corp. v. Alcoa, Inc.*, 244 F.R.D. 335, 339-343 & 347-348 (M.D.La. 2006); *Kronish v. U.S.*, 150 F.3d 112, 126-127 (2nd Cir. 1998), overruled on other grounds, *Rotella v. Wood*, 528 U.S. 549 (2000); *The Sedona Conference Commentary on Legal Holds, TheTrigger & The Process* (August 2007 Public Comment Version) at www.thesedonaconference.org;  Thomas Y. Allman, *Managing Preservation Obligations After the 2006 Federal E-Discovery Amendments*, 13 Rich.J.L.Tech. 9 (2007); and Douglas L. Rogers, *"A Search for Balance in the Discovery of ESI Since December 1, 2006,"* 14 Rich. J. L & Tech. 8, ¶¶5-6, http://law.richmond.edu/jolt/v14i3/articles8.pdf (Spring 2008).

19.  220 F.R.D. 212, 218 (S.D.N.Y. 2003).  This is only one in a series of decisions issued by Judge Scheindlin in a landmark case cited by courts throughout the country on the law pertaining to the preservation and production of electronically stored information.  *See also*, 217 F.R.D. 309 (S.D.N.Y. 2003); 216 F.R.D. 280 (S.D.N.Y. 2003); and 229 F.R.D. 422 (S.D.N.Y. 2004).

20.  See also, *Kronish v. U.S.*, 150 F.3d, 112, 126-7 (2d Cir. 1998); *Housing Rights Center v. Sterling*, 2005 WL 3320739 (C.D. Calif. 2007) ; *Watson v. Ford Motor Co.* , 2007 WL 4216975 (6th Dist.); and *Loukinas v. Roto-Rooter Services Co.*, 167 Ohio App. 3d 559 (1st Dist. 2006).

21.  67 Ohio St.3d 28, 29 (1993), 1993-Ohio-229.  Ohio courts have also recognized the duty of parties in litigation to preserve documents, in addition to an affirmative claim of spoliation in the complaint.  See, e.g., *Simeone v. Girard City Board of Education*, 171 Ohio App.3d 633, 649 (11th Dist. 2007) ; *Watson v. Ford Motor Co.* , 2007 WL 4216975 (6th Dist.); and *Loukinas v. Roto-Rooter Services Co.*, 167 Ohio App. 3d 559 (1st Dist. 2006).

22.  *See, e.g., Oldenkamp v. United American Ins. Co.,* 2008 WL 4682226, *2 (N.D.Okla. 2008); *Doe v. Norwalk Community College*, 248 F.R.D. 372, 375-

382 (D.Conn.); *Google v. American Blind & Wallpaper Factory, Inc.*, 2007 WL 1848665 (N.D. Calif.); *Kemper Mortgage, Inc. v. Russell*, 2006 WL 2319858 (S.D.Ohio); *Zubulake v. UBS  Warburg LLC*, 217 F.R.D. 309 (S.D.N.Y. 2003); 216 F.R.D. 280 (S.D.N.Y. 2003); 220 F.R.D. 212 (S.D.N.Y. 2003); 229 F.R.D. 422 (S.D.N.Y. 2004); and *Kronish v. U.S.,* 150 F.3d 112, 126 (2d Cir. 1998).

23.  2007 WL 3231431, *4 (D.Kan.)(Emphasis added).

24.  *Id.*, citing *Zubulake v. UBS Warburg*, 229 F.R.D.422, 431 (S.D.N.Y. 2004)

25.  *Silvestri v. General Motors Corp.,* 271 F.3d 583, 590-595 (4th Cir. 2001).

26.  *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 439-440 (S.D.N.Y. 2004), *Qualcomm, Inc. v. Broadcom Corp.*, 2008 WL 66932, **9-13 & 20  (S.D.Calif. 2008), *vacated in part*, 2008 WL 638108; *Doe v. Norwalk Community College*, 248 F.R.D. 372, 383 (D.Conn. 2007)(adverse inference for destruction of contents of electronic mailboxes and hard drive); In *re September 11th Liability Insurance Coverage Cases*, 243 F.R.D. 114, 116 & 132 (S.D.N.Y. 2007); *J.P.Morgan Chase Bank v. Neovi, Inc.*, 2007 WL 1989752, **1 & 11 (S.D.Ohio 2007); *Claredi Corp. v. Seebeyond Techs. Corp.*, 2007 WL 735018, *4 (E.D.Mo. 2007); *Housing Rights Center v. Sterling*, 2005 WL 3320739, *9 (DC.D.Calif.)(adverse inference for destruction of evidence); and *Bratka v. Anheuser-Busch Co., Inc*., 164 F.R.D. 448 (S.D.Ohio 1995)(default judgment against defendant for failure to produce evidence during discovery).

27.  *In re NTL Securities Litigation*, 244 F.R.D. 179, 195 (S.D.N.Y.), aff'd Gordon Partners v. Blumental, 2007 WL 1518632 (S.D.N.Y. 2007), quoting *Bank of New York v. Meridien Biao Bank Tanzania Ltd*., 171 F.R.D. 135, 146-147 (S.D.N.Y. 1997).

28.  Id. at *18.

29.  1999 WL 639703 (S.D.N.Y.).

30.  *Id.* at *4.  As a result of the failure to take steps to preserve, the court dismissed plaintiff's claim of design defect and approved an adverse inference instruction on the manufacturing defect claim. *Id.* at *6. See also *Rutgerswerke AG v. Abex Corp.*, 2002 WL 1203836, **13-14 (S.D.N.Y.)(at the time *Rutgerswerke* had started to draft affidavits in preparation for filing an indemnification claim against *Abex*, so Rutgerswerk had an obligation to preserve evidence helpful to Abex); );  and *Innis Arden Gold Club v. Pitney Bowes, Inc*., 257 F.R.D. 334, 341 (2009 D.Conn.)(plaintiff violated its duty to preserve soil samples it had taken when it was contemplating CERCLA litigation against Pitney Bowes).

31.  255 F.R.D. 135, 148-150 (D.Del. 2009).  The court noted the evidence that Rambus representatives had discussed "building a case against potential litigation targets, including Micron, Fujitsu, Samsung, and Hyundai" and that "Rambus would …[n]eed to litigate against someone…"  *Id.* at 139-140.

32.  *Id.* at 147 (¶36), 150 (¶55) and 151 (¶57).

33.  271 F.3d 583 (4th Cir. 2-001).

34.  *Id.* at 591.

35.  *Id.*  Accord, *King v. American Power Conversion Corp.*, 181 Fed.Appx. 373, 377-378 (4th Cir. 2006).

36.  2007 WL 1119196 (N.D.Calif. 2007).

37.  The court concluded it would be premature to determine the precise content of the adverse inference instruction at the time of the decision.  *Id.* at *2.  An example of an adverse inference instruction is an instruction by the judge that a jury could find that the documents destroyed were harmful to the party causing or allowing destruction.  See D.L. Rogers, "A Search for Balance in the Discovery of ESI Since December 1, 2006," 14 Rich. J. L & Tech. at ¶6, http://law.richmond.edu/jolt/v14i3/articles8.pdf  (Spring 2008).  Different circuits have imposed different standards for the imposition of an adverse inference.  *See, e.g., Jandreau v. Nicholson*,492 F.3d 1372, 1375  (Fed. Cir.

*Continued on Page 24*

**ROGERS/GRIESER:** *Continued from Page 23*

2007); *Morris v. Union Pacific Railroad*, 373 F.3d 896, 900-903 (8th Cir. 2004), and *Residential Funding Corp. v. De George Financial Corp.*, 306 F.3d 99, 107-109 (2d Cir. 2002).

38.  2007 WL 1119196  at *1.

39.  See *In re Flag Telecom Holdings, Ltd. Securities Litigation*, 236 F.R.D. 177, 180 and authorities cited therein (S.D.N.Y. 2006)("'If the producing party has the legal right or the practical ability to obtain the documents, then it is deemed to have 'control,' even if the documents are actually in the possession of a non-party.' *Riddell Sports, Inc. v. Brooks*, 158 F.R.D. 555, 558 (S.D.N.Y. 1994)").  *See also*, *City of Seattle v. Professional Basketball Club, LLC*, 2008 WL 539809, *1 (W.D.Wash. 2008)("A legal right is evaluated in light of the facts of each case, but central to each case is the relationship between the person having actual possession of the document and the party or the transaction at issue.")

40.  171 F.R.D. 135 (S.D.N.Y. 1997).

41.  *Id.* at 146 and 148.

42.  One Ohio attorney representing debt collection companies has alleged, "As the assignee of the original creditor, Plaintiff need not acquire nor maintain in its possession all records of the credit card account history, in order to possess the right to recover on an assigned credit card debt. *See Cincinnati ex rel. Ritter v. Cincinnati Reds, L.L.C.*, 150 Ohio App.3d 728, 739-740 (Ohio Ct. App. 2002)."  However, *Ritter* does not stand for proposition that an assignee has no obligation to preserve evidence relevant to the claims and defenses of the parties at the time it receives the assignment.  In Ritter, plaintiff sued defendant on a contract, and defendant assigned the contract to third party, who modified the contract.  The court simply ruled that the third party stands in the shoes of the assignor and had a right as assignee to modify the contract and settle the rent dispute.  *See Ritter*, 150 Ohio App.3d 728, 739, 782 N.E.2d 1225, 1234 (Ohio App. 1 Dist. 2002)

43.  *Collecting Consumer Debts, supra* n. 5 at  22.

44.  *AMF, Inc. v. MRAVEC* (Ohio App. 8 Dist. 1981), 2 Ohio App.3d 29, 31, 440 N.E.2d 600, 603.  Accord, *Arthur v. Parenteau* (Ohio App. 3 Dist. 1995), 102 Ohio App.3d 302, 304, 657 N.E.2d 284, 285, citing *AMF*.  The account attached to the complaint does not need to be admissible into evidence at trial.  Slack v. Cropper (Ohio App. 11 Dist. ), 143 Ohio App.3d 74,79,  757 N.E.2d 404, 408, 2001-Ohio-8894.

45.  *American Security Service, Inc. v. Baumann* (Ohio App. 10 Dist. 1972), 32 Ohio App.2d 237, 242, 289 N.E.2d 373, 377.  See also, *AMF*, 2 Ohio App.3d at 31, 440 N.E.2d at 603.   In *American Security Service*, the court also explained, "In Ohio, actions on an account are not limited to book accounts."  32 Ohio App.2d at 245, 379.

46.  *American Security Service*, 32 Ohio App.2d at 245, 289 N.E.2d at 378.  See also *Dykeman v. Johnson* (1910), 83 Ohio St. 126, 93 N.E. 626 (syllabus)("in an action on an account….The legal effect of such an answer [a denial], taken as a whole, is merely to deny the cause of action asserted by plaintiff in his petition, and the burden of proof upon the issues thus joined rests with the plaintiff…").

47.  *Great Seneca Financial v. Felty* (Ohio App. 1 Dist. 2006), 170 Ohio App.3d 737, 869 N.E.2d 30, 2006-Ohio-6618, ¶6.

48.  *Ayers v. Calvalry SVP I, LLC*, 876 So.2d 474, 478 (Ala. Civ.App. 2003)("an account stated is not founded on the original liability, but on the defendant's admission that a definite sum is due in the nature of a new promise, express or implied" ), quoting *Mobile Rug & Shade Cop. V. Daniel*, 424 So.2d 1332, 1333 (Ala.Civ.App. 1983), in turn quoting *Martin v. Stoltenborg*, 273 Ala. 456, 459 (1962).

49.  *Ayers v. Calvalry SVP I, LLC*, 876 So.2d at 477.  *See also, Morrison v. Citibank (South Dakota), N.A.*, 2008 WL 553284, *1 (Tex.App.-Forth

Worth("common law cause of action on account stated where (1) transactions between the parties give rise to indebtedness of one to the other; (2) an agreement, express or implied, between the parties fixes an amount due; and (3) the one to be charged makes a promise, express or implied, to pay the indebtedness.").

50.  *Dreyer Medical Clinic, S.C. v. Corral*, 227 Ill.App.3d 221, 226-227, 591 N.E.2d 111 (App.Ct.Ill., 2nd Dist. 1992)("an account stated is merely a form of proving damages for the breach of a promise to pay on a contract. Here the trial court found that plaintiff failed to prove any liability of defendants, and, consequently, plaintiff could not establish an account stated.")

51.  2004 WL 2711032, *2 (Minn.App.).

52.  264 S.W.3d 231, 236 (Texas 1st Dist.Ct.App. 2007).

53.  (1997), 79 Ohio St.3d 374, 376, 683 E.E.2d 337, 339, quoting 1 *Corbin on Contracts* (Rev.Ed. 1993) 525, Section 4.1.  See also, *Levy v. Memorial Hospital* (Ohio App. 12 Dist.), 2007 WL 4555196, 2007-Ohio-7077, ¶40.

54.  232 S.W.3d 197, 202 (Texas 1st Dist.Ct.App. 2007).

55.  *Midwestern Health Management, Inc. v. Walker*, 208 S.W.3d 295, 298 (Mo.Ct.Apps. 2006)("where a plaintiff sues on an account accruing to another in his own right, proofof an assignment of the account is essential to recovery"); *Great Seneca Financial v. Felty* (Ohio App. 1 Dist. 2006), 170 Ohio App.3d 737, 869 N.E.2d 30, 2006-Ohio-6618, ¶¶11 & 17; *Zwick & Zwick v. Suburban Construction Co*, (Ohio App. 8 Dist. 1956), 103 Ohio App. 83, 84, 134 N.E.2d 733, 734 ("general rule is that an assignee of a claim must allege and prove the assignment"); and *Aetna Casualty & Surety Co. v. Hensgen* (1970), 22 Ohio St.2d 83, 90, 258 N.E.2d 237, 242.

56.  11 Misc.3d 219, 226, 807 N.Y.S.2d 284 (Civ.Ct., N.Y. 2005).  See also *Great Seneca Financial Corp. v. LeAnna*, 2006 WL 2536275, * 2 (Conn.Super.).

57.  397 F.Supp.2d 1129, 1131-1132 (D.Minn. 2005).

58.  For a comprehensive discussion of UDAP statutes and issues surrounding these statutes, see C.L.Carter et al, *Unfair And Deceptive Acts and Practices*, National Consumer Law Center (Seventh Edition").  This publication includes a state by state analysis of state UDAP statutes at 1033-1054 and notes,  "There is an issue as to whether consumers, or only business competitors, can bring actions under the nine UDAP statutes patterned after the Uniform Deceptive Trade Practices Act (UDTPA).  These statutes provide only a private injunctive remedy, without an explicit private damage remedy."  *Id.* at §12.2.3.

59.  O.R.C. §1345.01 et seq.

60.  O.R.C. §1345.02(A).  In *Delawder v. Platinum Financial Services Corp.*, 443 F.Supp.2d 942, 953 (S.D.Ohio 2005), 189 Fed.Appx. 369, 2006 WL 1749617 (6 Cir. 2006)(dismissing appeal for lack of jurisdiction), *cert. denied* 549 U.S. 1116 (2007), 2007 WL 1245848, *2 (S.D.Ohio 2007)(denying motion to reconsider of defendants), the district court ruled, "Given the OCSPA's purpose to protect consumers from deceptive acts and practices, and Ohio courts' recognition that debt collection falls within the OCSPA's ambit, the Court believes Ohio courts would recognize a cause of action under Section 1345.02(B)(10) for all deceptive debt collection practices, including a supplier's deceptive lawsuit to collect a debt. This is also consistent with some courts' holdings that a violation of the FDCPA is automatically also a violation of Section 1345.02 or 1345.03. *See, e.g., Becker v. Montgomery, Lynch*, No. 1:02CV874, 2003 WL 23335929, at *2 (N.D.Ohio 2003)."  In *Blevins v. Hudson & Keyse, Inc.*, 395 F.Supp.2d 655, 661 (S.D.Ohio 2004), the court said, "The OCSPA generally prohibits unfair and deceptive statements or conduct in connection with defined consumer transactions….applies to debt collectors….has also been applied to litigation and to attorneys.").

61.  *See, e.g., Atlass v. Mercedes-Benz USA, L.L.C.* 2007 WL 2892803, **6&7 (D.N.J. 2007);  *Hess v. Chase Manhattan Bank*, 220 S.W.3d 758, 765-768 (Mo. 2007); *Benik v. Hatcher*, 358 Md. 507, 531, 750 A2d 10 (2000); *Connick v.

*Continued on Page 25*

**ROGERS/GRIESER:** *Continued from Page 24*

*Suzuki Motor Co.*, 174 Ill.2d 482, 505, 675 N.E.2d 584 (Ill. App.Ct. 1997); and *Strawn v. Canuso*, 140 N.J. 43, 61, 657 A.2d 420 (N.J. 1995)

62.  The general rule is that an assignee takes the rights of the assignor, but those rights are subject to any defenses the obligor has against the assignor. *See, e.g., Mason, Iver & York v. Black*, 97 Cal.Rptr.3d 522, 533 (Ct.App., 5th Dist. 2009); *ISRA Vision AG v. Burton Industries, Inc.*, 2009 WL 2487065, * 9 (E.D.Mich.); and *Lorrain Ready Mixed Concrete & Builders Supply, Inc.*, 1984 WL 6146, * 1 (Ohio App. 9 Dist.).  It is beyond the scope of this article to analyze whether an obligor would have the right to bring an affirmative state UDAP claim against the debt buyer for actions of the debt seller, but the general rule that an obligor has the right to use as a defense to a claim of an assignee any defenses the obligor would have against the assignor should allow the obligor to use as a defense a state UDAP claim against the debt seller up to the amount of the debt buyer's claim.

63.  *See, e.g., Baker v. Sunbelt Business Brokers, 2008 WL 668608, *6 (Ct.App. Minn.)* ;*Harmouche v. Shum*, 2007 WL 2220989, *2, n.3 (S.D.Texas); *Rock v. Voshell*, 2006 WL 1409734, *8 (E.D. Pa.); *Wang v. Massey Chevrolet*, 97 Cal.App.4th 856, 867-870, 118 Cal.Rptr.2d 770 (2002). *Cf., William v. Spitzer Autoworld Canton, L.L.C.*, 2009 WL 2341833, 2009 -Ohio- 3554, ¶16, in which the Ohio  Supreme Court held, "Because the parol evidence rule is substantive in nature and not limited in application to contract claims, we conclude that it also applies to statutory causes of action such as the CSPA."

64.  *Wang*, 97 Cal.App. 4th at 870.

65.  See C.L.Carter et al, *Unfair And Deceptive Acts and Practices*, National Consumer Law Center (Seventh Edition) §§4.2.4.2 - 4.2.5.2.

66.  236 Ill.App.3d 891, 903,  602 N.E.2d 1374 (Ill.App.2 Dist. 1992).

67.  O.R. C. §2305.06.

68.  O.R.C. §2305.07.

69.  O.R.C. §1302.98(A)

70.  See C.L.Carter et al, *Unfair And Deceptive Acts and Practices*, National Consumer Law Center (Seventh Edition) §12.3.2.1.

71.  See, e.g., *Deere v. Javitch, Block and Rathbone LLP*, 413 F.Supp.2d 886, 891 (S.D.Ohio. 2006)("Filing a complaint to collect a debt that has been extinguished by the passage of time clearly falls within Section 1692e(2), prohibiting false representations about the character or legal status of any debt. It may also violate Section 1692f, which prohibits "unfair or unconscionable" methods of debt collection."); *Goins v. JBC & Assoc.*, 352 F.Supp.2d 262, 272 (D.Conn. 2005) ("Although a debt collector may seek to collect on a time-barred debt, that debt collector may not threaten litigation where such suit would be improper…. As the statute of limitations would be a complete defense to any suit, however, the threat to bring suit under such circumstances can at best be described as a "misleading" representation, in violation of § 1692e."); *Shorty v. Capital One Bank*, 90 F.Supp.2d 1330, 1331-1332 (D.N.M. 2000)(" Having determined that the legal status of a debt includes whether the debt is time-barred, the next issue is whether the debt validation notice is false, deceptive or misleading by not notifying Plaintiff that his debt was time-barred. …. Since the debt validation notice in this case does not threaten a lawsuit or any further collection action, fails to affect any substantive rights the debtor might have, and follows the language of § 1692g, I cannot find that as a matter of law it is deceptive"); and *Kimber v. Fed.Fin. Corp.*, 668 F.Supp. 1480, 1487 (M.D.Ala. 1987)(" a debt collector's filing of a lawsuit on a debt that appears to be time-barred, without the debt collector having first determined after a reasonable inquiry that that limitations period has been or should be tolled, is an unfair and unconscionable means of collecting the debt.").

72.  There are many other common law issues, state statutes and federal statutes that may be applicable, including the Fair Debt Collection Practices Act discussed in section C of this article.  The purpose of parts B2, 3 and 4 is simply to give examples of the range of documents that could be relevant to defendants in debt collection litigation.

73.  15 U.S.C. §1601 et seq.

74.  See: 12 C.F.R. §§226.5-226.16, pertaining to open-end credit; and 12 C.F.R. §§226.17-226.24, pertaining to closed-end credit.  All of these sections are part of Regulation Z, promulgated pursuant to §105 of the TILA, 15 U.S.C. §1604.  When this article refers to TILA, it includes Regulation Z.

75.  12 C.F.R. §226.2(a)(10) simply defines "closed-end credit" as "Consumer credit other than open-end credit as defined in this section."  12 C.F.R. §226.2(a)(12) defines "consumer credit" as "credit offered or extended to a consumer primarily for personal, family or household purposes."
12 C.F.R. §226.2(a)(11) defines "consumer" as "a cardholder or a natural person to whom consumer credit is offered or extended. However, for purposes of rescission under §§ 226.15 and 226.23, the term also includes a natural person in whose principal dwelling a security interest is or will be retained or acquired, if that person's ownership interest in the dwelling is or will be subject to the security interest."

76.  12 C.F.R. §226.2a(20).

77.  15 U.S.C §1601(a)

78.  *See, e.g., Bragg v. Bill Heard Chevrolet, Inc.*, 374 F.3d 1060, 1065 (11th Cir.2004); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 621 (6th Cir. 2002); *Ramdan v. Chase Manhattan Corp.*, 156 F.3d 499, 522 (3d Cir. 1998); *Bizier v. Globe Fin. Servs., Inc.*, 654 F.2d 1, 3 (1st Cir. 1991);, ; *McGowan v. King, Inc.*, 569 F.2d 845, 848 (5th Cir. 1978); and *N.C. Freed Co., Inc. v. Board of Governors of the Federal Reserve System*, 473 F.2d 1210, 1214 (2nd Cir. 1973).

79.  See 12 C.F.R. §§226.17-226.20.

80.  12 C.F.R. §§226.5-226.9.

81.  12 C.F.R. §§226.10 and 226.13.

82.  15 U.S.C §1640.  In addition, a debtor may have the right to rescind the transaction in certain situations. 12 C.F.R. §§226.15 and  226.23.

83.  15 U.S.C. §1641(a). 1641(a) continues, "For the purpose of this section, a violation apparent on the face of the disclosure statement includes, but is not limited to (1) a disclosure which can be determined to be incomplete or inaccurate from the face of the disclosure statement or other documents assigned, or (2) a disclosure which does not use the terms required to be used by this subchapter."

84.  In theory a debt buyer could contract with the debt seller to maintain the documents.  However, the debt buyer may not want to take the risk of hoping the debt seller would comply with that contractual obligation or explaining to a court why the documents no longer existed, if the debt seller did not comply with its obligations.

85.  392 B.R. 48, 56 (S.D.N.Y. 2008), citing generally 7-34 *Moore's Federal Practice-Civil* §34.14.  Although in *Lozano* the court denied the defendant's motion to compel the production of the loan manuals of the originator and documents regarding the originator's use of mortgage brokers in general, the court noted that "Saxon and Wells Fargo appear to acknowledge that they have and will produce copies of Fremont's [the loan originator] loan files…"  Also, it appears that the loan in question was transferred by the originator to the trustee before there was any default or reasonable likelihood of litigation. *See also Ice Corp. v. Hamilton Sundstrand Corp.*, 245 F.R.D. 513, 521 (D.Kan. 2007)("an express agreement allowing for the 'copying' of documents between a party and a third-party is not a prerequisite for the court to find that the party 'controls' the said documents. … and that defendants possess the 'the *practical ability* to obtain the documents from [Artus], irrespective of legal entitlements to the documents.'  …. defendants have failed to persuade the court that they could not simply ask, or employ their 'right or ability to influence', Artus for copies of the designs. Here, the court has every reason to believe that these designs can be " *obtained easily*" from Artus"); and *Goodman v. Praxair Services, Inc.*, 2009 WL 1955805, **15-17 and n. 10.

*Continued on Page 26*

**ROGERS/GRIESER:** *Continued from Page 25*

86. *See supra*, notes 25 & 26.

87. If the debt had been sold a number of times, of course, the original creditor may be far earlier in the chain of title, but the basic analysis would not change.

88. Of course, as in all litigation, only good faith claims should be made. 15 U.S.C. 1692k(a)(3) provides: "(3) in the case of any successful action to enforce the foregoing liability, the costs of the action, together with a reasonable attorney's fee as determined by the court. On a finding by the court that an action under this section was brought in bad faith and for the purpose of harassment, the court may award to the defendant attorney's fees reasonable in relation to the work expended and costs."

89. 15 U.S.C. §1692 et seq.

90. *Frey v. Gangwish*, 970 F.2d 1516, 1518 & 1521 (6th Cir. 1992). In *Barany-Snyder v. Weiner*, 539 F.3d 327, 333 (6th Cir. 2008), the court said, "Courts use the 'least sophisticated consumer' standard, an objective test, when assessing whether particular conduct violates the FDCPA. …. This standard ensures 'that the FDCPA protects all consumers, the gullible as well as the shrewd.' …. Nonetheless, the standard 'also prevents liability for bizarre or idiosyncratic interpretations of collection notices by preserving a quotient of reasonableness and presuming a basic level of understanding and willingness to read with care." (quotation marks and citations omitted).

91. Under 15 U.S.C. §1692a, "The term 'communication' means the conveying of information regarding a debt directly or indirectly to any person through any medium." For a general discussion of the FDCPA, see E. Griffith, *"Fair Debt Collection Practices Act—Reconciling the interests of consumers and debt collectors"*, 28 Hofstra L.Rev. 1 (1999); E. Griffith, *"The Challenge of Communicating with the Consumer and Validating the Debt Under the Fair Debt Collection Practices Act,"* 55 U.Kan.L.Rev. 61 (October 2006); and J. Hobbs et al, *Fair Debt Collection*, National Consumer Law Center (Sixth Edition).

92. 15 U.S.C. §1692a(5)(Emphasis added).

93. 15 U.S.C. §1692a(6)(Emphasis added). Subsection (6) continues, "Notwithstanding the exclusion provided by clause (F) of the last sentence of this paragraph, the term includes any creditor who, in the process of collecting his own debts, uses any name other than his own which would indicate that a third person is collecting or attempting to collect such debts. For the purpose of section 1692f(6) of this title, such term also includes any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the enforcement of security interests. The term does not include— (A) any officer or employee of a creditor while, in the name of the creditor, collecting debts for such creditor; (B) any person while acting as a debt collector for another person, both of whom are related by common ownership or affiliated by corporate control, if the person acting as a debt collector does so only for persons to whom it is so related or affiliated and if the principal business of such person is not the collection of debts; (C) any officer or employee of the United States or any State to the extent that collecting or attempting to collect any debt is in the performance of his official duties**;** (D) any person while serving or attempting to serve legal process on any other person in connection with the judicial enforcement of any debt; (E) any nonprofit organization which, at the request of consumers, performs bona fide consumer credit counseling and assists consumers in the liquidation of their debts by receiving payments from such consumers and distributing such amounts to creditors; and (F) any person collecting or attempting to collect any debt owed or due or asserted to be owed or due another to the extent such activity (i) is incidental to a bona fide fiduciary obligation or a bona fide escrow arrangement; (ii) concerns a debt which was originated by such person; (iii) concerns a debt which was not in default at the time it was obtained by such person; or (iv) concerns a debt obtained by such person as a secured party in a commercial credit transaction involving the creditor. For a detailed discussion of who the FDCPA covers and who it exempts from the definition of "debt collector," see J. Hobbs et al, *Fair Debt Collection*, National Consumer Law Center (Sixth Edition), Chapter 4.

94. 15 U.S.C. §1692a(4)(Emphasis added).

95. *See, e.g.,* the following FDCPA cases involving §§1692e and/or 1692f: *Erickson v. Johnson*, 2006 WL 453201 (D.Minn.); *Shula v. Lawent*, 359 F.3d 489 (7th Cir. 2004); *Magrin v. Unifund*, 2002 WL 31804268 (9th Cir. 2002); and *Kojetin v. C.U.Recovery, Inc.,* 212 F.3d 1318 (8th Cir. 2000). *See also* Hobbs et al, *Fair Debt Collection*, National Consumer Law Center (Sixth Edition), Appendix K, of an extensive summary of FDCPA cases. The website for the National Consumer Law Center is found at http://www.consumerlaw.org.

96. §1692e contains a number of other examples (which sometimes overlap) of what the FDCPA treats as false or misleading representations, while making it clear (in the second sentence of §1692e) that the specific list does not limit the application of the general prohibition in §1692e against false or misleading representations. §1692e(10) provides the following specific example of a violation of 1992e: "The use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer." *See DeLawder v. Platinum Financial Services Corp.*, 443 F.Supp.2d 942, 948 (S.D. Ohio 2005), appeal dismissed 189 Fed.Appx. 369 (6th Cir. 2006), cert. denied 549 U.S. 1116 (2007), reconsideration denied 2007 WL 1245848(S.D.Ohio), citing *Gearing v. Check Brokerage Corp.*, 233 F.3d 469, (7th Cir. 2000) for "finding violation of Section 1692e(10) where debt collector filed complaint to collect debt with attached affidavit falsely claiming collector was subrogee of original creditor."

97. The specific example in 15 U.S.C. §1692f(1) is "The collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law." However, in *Sandlin v. Shapiro & Fishman*, 919 F.Supp. 1564, 1568 (M.D.Fla. 1996), the District Court noted the first sentence in 15 U.S.C. §1692f (A debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt") and concluded that §1692f(1) "plainly states that an 'attempt to collect' an unauthorized debt is as forbidden as the actual collection would be. This is the plain reading of the statute, and it is the meaning that accomplishes the goals of Congress, because it fulfills their purpose of protecting the debtor from unfair collection o practices,. Including attempted collection of unauthorized debts." *See also, Egge v. Healthspan Services Co.,* 2001 WL 881720, *1 (D. Minn.)("it is a violation of § 1692f to attempt to '[collect] of any amount ... unless such amount is expressly authorized by the agreement creating the debt or permitted by law.'") The second sentence of §1692f makes clear that the specific examples enumerated do not limit the application of the general prohibition against unfair and unconscionable collection attempts

98. In *Harvey v. Great Seneca Financial Corp*., 453 F.3d 324, 330-331 (6th Cir. 2006), the Sixth Circuit said, "Courts have therefore dismissed claims filed pursuant to § 1692d [prohibiting "any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt"] as a matter of law if the facts alleged do not have the natural consequence of harassing or abusing a debtor. .... Even when viewed from the perspective of an unsophisticated consumer, the filing of a debt-collection lawsuit without the immediate means of proving the debt does not have the natural consequence of harassing, abusing, or oppressing a debtor. …. We therefore find no error in the district court's dismissal of Harvey's claim under 15 U.S.C. § 1692d." Similarly, in *Hill v. Javitch, Block & Rathbone, LLP*, 574 F.Supp.2d 819, 824 (S.D.Ohio 2008), the court held that "Javitch did not violate the FDCPA by not having documentation in hand supporting its claim when it filed suit against Scipio Hill."

99. Not all persons who buy debts from original creditors will necessarily be "debt collectors" within the meaning of the FDCPA. If the debt is not in default, then the debt buyer may not be a debt collector. *See Federal Trade Commission v. Check Investors, Inc.*, 502 F.3d 159, 174 (3rd Cir. 2007)("Congress has directed us to focus on whether a debt was in default when acquired to determine the status of 'creditor' vs. 'debt collector.'"). However, since typically debt buyers purchase debts that are in default, for the sake of analysis of affirmative FDCPA claims regarding debt buyers, this article assumes that the debt buyers who purchase consumer debt are debt collectors within the meaning of the FDCPA.

*Continued on Page 27*

ROGERS/GRIESER: *Continued from Page 26*

100.  2008 WL 3853295, **1 & 3 (M.D.Pa. 2008).  The decision in *Harvey* v. *Great Seneca Financial Corp.* is not inconsistent with the decision in *Gigli.*  In *Harvey*, the Sixth Circuit noted, "Harvey did "not allege that [Seneca and Javitch] attached a false document to the ... complaint, or even that [their] claims regarding the debt were false."  *Id.* at 331.  The Sixth Circuit also noted, "Harvey did not allege in her complaint that Seneca and Javitch failed to undertake a reasonable investigation into whether or not Harvey's debt existed; rather, she essentially focused on the contention that Seneca and Javitch did not presently possess the means of proving that debt."  *Id.* at 333.

101.  2008 WL 3853295 at *4.

102.  *Id.* at *5.  15 U.S.C. §1692g(a) provides in part, "Within five days after the initial communication with a consumer in connection with the collection of any debt, a debt collector shall … send the consumer a written notice containing … (4) a statement that if the consumer notifies the debt collector in writing within the thirty-day period that the debt, or any portion thereof, is disputed, the debt collector will obtain verification of the debt or a copy of a judgment against the consumer and a copy of such verification or judgment will be mailed to the consumer by the debt collector…"  The court said, "the fact that the debt collector provided the consumer written notice complying with § 1692g(a) and/or the consumer never disputed the debt has no bearing on the debt collector's liability under the FDCPA" for attempted collection of unauthorized debts, citing *Williams v. Edelman*, 408 F.Supp.2d 1261, 1270 (S.D.Fla.2005) and *Burdett v. Harrah's Kan. Casino Corp.*, 294 F.Supp.2d 1215, 1226-27 (D.Kan.2003), reconsideration denied, 311 F.Supp.2d 1166 (D.Kan. 2004).

103.  *Id.* at *8.

104.  *Id.*

105.  *Id.* at *9 (Emphasis added).

106.  514 U.S. 291, 292 & 299 (1995).

107.  *Sayyed v. Wolpoff & Abramson.* 485 F.3d 226, 232 (4th Cir. 2007), citing *Goldman v. Cohen*, 445 F.3d 152, 155 (2nd Cir. 2006); *Todd v. Weltman, Weinberg & Reis Co., L.P.A.*, 434 F.3d 432, 446 (6th Cir. 2006), *cert. denied* 549 U.S. 886 (2006); *Piper v. Portnoff Law Assocs., Ltd.*, 396 F.3d 227, 232 (3d Cir. 2005); *Thomas v. Law Firm of Simpson & Cybak*, 392 F.3d 914, 917 (7th Cir. 2004)(en banc); *Johnson v. Riddle*, 305 F.3d 1107, 1117 (10th Cir. 2002); and *Addison v. Brand*, 105 F.3d 223, 224, n. 1 (th Cir. 1997).  The court in *Sayyed* also cited the contrasting case of *Vega v. McKay*, 351 F.3d 1334, 1337 (11th Cir. 2003), in which the Eleventh Circuit concluded that "it seems far more consistent with the purpose of the Act that the term 'communication' as used does not include a 'legal action or pleading.'"  In *Acosta v. Campbell*, 309 Fed.Appx. 315, 319 (2009), pet. For cert. filed 77 U.S.L.W. 3619 (April 28, 2009), the Eleventh Circuit said in a footnote, "Petitioner argues *Vega* should be overturned because it undermines the consumer rights under FDCPA when creditors attach FDCPA notices to the complaint or summons, but *Vega* is binding authority that can be overruled only by the Court sitting *en banc*."  In what at first glance might appear to be a contradictory statement, the court in *Guerrero v. RJM Acquisitions LLC*, 499 F.3d 926,  (9th Cir. 2007) said, "All but one published federal decision to have given reasoned consideration to the question has determined that communications to a debtor's attorney are not actionable under the Act. *See, e.g., Kropelnicki v. Siegel*, 290 F.3d 118, 127-28 (2d Cir.2002)…."  However, in *Guerrero*, the court said, "We hold that communications directed solely to a debtor's attorney are not actionable under the Act."  499 F.3d at 934.  Similarly, in the one appellate decision cited by the court in *Guerrero* on this point, *Kropelnicki*, the court said, "Where an attorney is interposed as an intermediary between a debt collector and a consumer, we assume the attorney, rather than the FDCPA, will protect the consumer from a debt collector's fraudulent or harassing behavior.  However, this is not an issue on which we need to rule today."  There does appear to be a conflict, however, among circuits on whether a communication from one attorney to another attorney can violate the FDCPA. Compare, *e.g., Sayyed and Guerrero.*, 290 F.3d at 128.  *Guerrero* and *Kropelnicki* are not inconsistent with holding an attorney liable for misstatements in letters to debtors or in complaints before an attorney for the debtor had entered an appearance for the debtor.

108.  In addition to the cases discussed here, see J. Hobbs et al, *Fair Debt Collection*, National Consumer Law Center (Sixth Edition), §§4.6.9, 7.4.6 and 7.5..

109.  485 F.3d 226, 229 (4th Cir. 2007).

110.  *Id.* at 231.

111.  *Id.*  15 U.S.C. §1692e provides in relevant part:  "A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section: …. (11) The failure to disclose in the initial written communication with the consumer and, in addition, if the initial communication with the consumer is oral, in that initial oral communication, that the debt collector is attempting to collect a debt and that any information obtained will be used for that purpose, and the failure to disclose in subsequent communications that the communication is from a debt collector, except that this paragraph shall not apply to a formal pleading made in connection with a legal action."

112.  *Id.* at 233.  The court in *Sayyed*, at 234-235,  did state, "We express no opinion on whether witness immunity would apply to affidavits executed by a debt collector, because that issue is not raised by this case," but the court also cited, at 234,  "*Todd v. Weltman, Weinberg & Reis Co., L.P.A.*, 434 F.3d 432, 444 (6th Cir. 2006)(law firm as complaining witness enjoyed no witness immunity from FDCPA for affidavit commencing garnishment proceeding)."  See also, *Jordan v. Thomas & Thomas*, 2007 WL 2838474, **7 and 11, n. 10 (S.D.Ohio 2007)("Defendants are not protected from this suit under the doctrine of absolute witness immunity;" and "several courts, including this one, have recognized claims under section 1692e arising from a debt collector's false statement in a complaint or attachment of a false affidavit to a complaint").

113.  434 F.3d 432 (6th Cir. 2006).

114.  *Id.* at 444.  The court suggested that the FDCPA did not abrogate the common law immunity of witnesses who were not complaining witnesses.  *Id.* at 439 and 444.

115.  238 Fed.Appx. 24, 26 (6th Cir. 2007), *cert. denied* 128 S.Ct. 1259 (2008)

116.  *Id.* at 27, citing *Heintz v. Jenkins.*

117.  *Id.*  In *Kelly v. Great Seneca Financial Corp.*, 447 F.3d 944, 949 (6th Cir. 2006), *cert. denied* 549 U.S. 1078 (2006) the Sixth Circuit said in dicta, "We are also unpersuaded by the arguments of Seneca [the creditor] and Javitch [the law firm] that advocacy immunity protects them from suit…."

118.  569 F.3d 606, 616 (6th Cir. 2009).

119.  *Id.* at 616-617

120.  443 F.Supp.2d 942, 951 (S.D.Ohio 2005), *appeal dismissed*, 189 Fed.Appx. 369 (6th Cir. 2006), *cert. denied* 549 U.S. 1116 (2007).  The district court also rejected the defenses it characterized "as an amalgam of the doctrines of witness immunity, the litigation privilege, judicial immunity, and immunity under the First Amendment right to petition."  *Id.* at 949.  Subsequently the defendants moved for reconsideration of the court's decision on immunity.  The court said, "Defendants have now deluged the Court with motions and related pleadings in which they do nothing more than relentlessly offer refurbished versions of previously rejected arguments and point to insignificant distinctions of fact in an attempt to distinguish the growing body of case law in this Circuit denying immunity to defendants in similar FDCPA cases.  …. Contrary to Defendants' apparent belief, this is not the only case currently pending before this Court, and the Court has not the time to devote endless hours to entertain arguments that it has already soundly rejected. Accordingly, the Court strongly cautions Defendants to exercise restraint as this case proceeds."  2007 WL 1245848, *2 (S.D.Ohio).

121.  *Reichert v. National Credit Systems, Inc.*, 531 F.3d 1002, 1006 (9th Cir. 2008).  *See also Johnson v. Riddle*, 443 F.3d 723, 727 (10th Cir. 2006).

*Continued on Page 28*

**ROGERS/GRIESER: _Continued from Page 27_**

122.  2007 WL 1598618, *2 (E.D.Wisc. 2007), aff'd 548 F.3d 1107 (7th Cir. 2008)..

123.  2007 WL 1598618 at *16.

124.  _Id._ at *22.

125.  This part of the defense — "not an intentional violation" – probably does not require the communication to be unintentional, but instead only requires the communication not to be an intentional violation. _Jerman v. Carlisle, McNellie , Rini, Kramer & Ulrich LPA_, 538 F.3d 469, 477 (6th Cir. 2008), _cert. granted_ 129 S.Ct. 2863 (2009). _See also, Johnson v. Riddle_, 443 F.3d 723, 728-729 (10th Cir. 2006), referring to the first element as a subjective test and the second and third elements as an objective test, but acknowledging the unsettled nature of case law on this element. _Cf._, Baker v. G.C. Services Corp., 677 F.2d 775, 779 (9th Cir. 1982).

126.  2007 WL 1598618  at *23.  _See also Johnson v. Riddle_, 443 F.3d 723, 727-727-728 (10th Cir. 2006); and _Jerman v. Carlisle, McNellie , Rini, Kramer & Ulrich LPA_, 538 F.3d 469, 476-477 (6th Cir. 2008)

127.  2007 WL 1598618 at *24.  In _Johnson v. Riddle_, 443 F.3d 723, 729 (10th Cir. 2006), the Tenth Circuit said that the "bona fide" element "serves to impose an objective standard of reasonableness upon the asserted unintentional violation," quoting _Johnson v. Riddle_, 296 F.Supp.2d 1283, 1288 (D.Utah 2003).  In _Jerman v. Carlisle, McNellie , Rini, Kramer & Ulrich LPA_, 538 F.3d 469, 473-476 (6th Cir. 2008), the Sixth  Circuit discussed the split among circuits on whether the bona fide error defense only applies to mistake of fact or also applies to mistakes of law and agreed with the Tenth Circuit in _Johnson_ that the bona fide error defense also covered errors of law.  ).  In _Jerman_, on June 29, 2009, the Supreme Court granted cert. on the following issue pertaining to the bona fide error defense: "Whether a debt collector's legal error qualifies for the bona fide error defense under the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692."  See, http://origin.www.supremecourtus.gov/qp/08-01200qp.pdf, accessed August 25, 2009.

128.  2007 WL 1598618 at *23, quoting _Johnson v. Riddle_, 443 F.3d 723, 729 (10th  Cir. 2006) and citing  _Jenkins v. Heintz_, 124 F.3d 824, 834, 835 (7th Cir. 1997).

129.  _Reichert_ 531 F.3d 1002, 1007 (9th Cir. 2008).  The Ninth circuit added that this "would include errors in claiming collection expenses of the creditor that could not legitimately be part of the debt owed by the debtor."  In _Reichert_ a letter sent by National Credit Systems, Inc. to the debtor before any litigation added a $225 attorneys' fees charge to the amount claimed to be owed.  NCS conceded that the attorney's fees had not been authorized, but relied on the bona fide error defense.  _Id._ at 1006-1007.  The court rejected the defense and said, "If the bona fide error defense is to have any meaning in the context of a strict liability statute, then a showing of " procedures reasonably adapted to avoid any such error" must require more than a mere assertion to that effect. The procedures themselves must be explained, along with the manner in which they were adapted to avoid the error."  _Id._ at 1007.  The court ruled that defendant had not shown it qualified for the bona fide error defense and affirmed the grant of summary judgment for the debtor.  _Id._  The court also noted, "The fact that the creditor provided accurate information in the past cannot, in and of itself, establish that reliance in the present case was reasonable and act as a substitute for the maintenance of adequate procedures to avoid future mistakes_."  Id._

130.  443  F3d 723, 729  (10th Cir. 2003).

131.  2007 WL 1598618  at *25  (Emphasis added).

132.  On appeal, AFNI appeared to focus its bona fide error defense on the argument that there had been a bona fide error of law.  Noting the split among circuits, the Seventh Circuit said that it did not have to decide whether the bona fide error defense applied to errors of law, because in any case AFNI did not qualify, since AFNI had not maintained reasonable procedures to avoid a violation. _Seeger v. AFNI, Inc._, 548 F.3d at 1114.   The court noted that the

AFNI procedure "addresses only compliance with the FDCPA, not with Wisconsin law or individual contracts. AFNI never consulted an attorney in Wisconsin on state law issues, nor did it ask a Wisconsin governmental agency whether it was entitled to charge a collection fee as the owner of the debt."  _Id._ Among other things, without reviewing the individual contract,  "AFNI's steps do not amount to reasonable procedures, as the statute uses that term."  _Id._

133.  74 F.Supp.2d 761, 766 (S.D.Ohio 1999)

134.  15 F.3d 1507,  1514 (9th Cir. 1994).  The Ninth Circuit noted that "the arrival of the hard-copy account file was delayed during the February 1990 transfer of accounts from San Mateo to Albuquerque."  _Id._ In _Fox_, Citibank had issued a credit card  to the Foxes and referred the matter for collection to Citicorp Credit Services.  _Id._ at 1510.

135.  _Oglesby v. Rotche_, 1993 WL 460841, *9 (N.D.Ill.).  _See also, Axtell Collections U.S.A., Inc_., 2002 WL 32595276, *3  (D.Ariz.)( " the ability of the debt collector to rely 'on the representation and implied warranty from its client that the amount was due under either the lease or the law' _presupposes_ the existence and maintenance of procedural safeguards, as discussed above, that are reasonably adopted to avoid any error.").  There is authority for the proposition that it is not necessary for a debt collector to conduct an independent investigation of the claims in order to satisfy the bona fide error defense.  _See, e.g., Smith v. Transworld Systems, Inc_., 953 F.2d 1025, 1032 (6th Cir. 1992); and _Hyman v. Tate_, 362 F.3d 965, 968 (7th Cir. 2004).  These cases involved the basis for an initial collection letter and not the basis for filing a complaint in court.  In any case, looking at the underlying documents concerning the alleged debt would not be an independent investigation within the meaning of _Smith_ or _Hyman_.  In _Jenkins v. Heintz_, 124 F.3d 824 (7th Cir. 1997), the Seventh Circuit indicated the type of investigation not required by the FDCPA was an investigation going beyond reviewing the basic documents. The court said that the FDCPA  "does not say that the collector's status as an attorney should add a requirement of independent legal analysis for each aspect of the creditor's claim, including a potential defense arising out of a somewhat arcane subject matter like force placed insurance."  _Id._ at 833-834.  Similarly, in _Bell v. Bowman, Heintz, Boscia & Vician, P.C._ , 370 F.Supp.2d 805, 812 at n. 13 (S.D.Ind. 2005), the court distinguished _Smith_, _Hyman_ and _Jenkins_ on the grounds that "Plaintiff has produced evidence suggesting that Bowman Heintz knew or should have known that the consumer debt information uploaded by Platinum was incomplete."  An absence of the underlying documents would alert the debt buyer that the debt information was incomplete, so the debt buyer should not be able to rely on a mere affidavit of the debt seller in that situation.

136.  2002 WL 31427515, *5  (S.D.Ind.).

137.  See _Haneman, supra_ n. 7 at 716 ("Debt buyers are relying more heavily upon legal actions than ever before, often maintaining nationwide networks of attorneys to whom accounts are referred an by whom lawsuits are filed and remedies pursued"); and _Goldberg, supra_ n. 3  at  730 ("the most successful [debt collection] companies employ an army of in-house and consulting lawyers who are ready to file complaints at a company's request.  Moreover, ample evidence suggests that collection companies strongly encourage their agents to refer cases to lawyers to collect debts").

138.  _See, e.g., Benton v. Dlorah, Inc_ ■

National Association of Consumer Advocates
1730 Rhode Island Avenue, NW
Suite 710
Washington, DC 20036
202-452-1989
202-452-0099 - Fax
www.naca.net

ALEXANDER: *Continued from Page 14*

beyond predictions and construction supervision being left in questionable hands. Cheryl Johnson continues:

Construction began on what was to be the Hollyhock House with Wright's son, Lloyd, who had no formal training, designated as the supervisor in his father's absence in Tokyo. Though Aline told Wright she wanted the house to cost no more than $30,000, the building permit estimated the cost would be $50,000, while the actual cost (like all of Frank Lloyd Wright's projects) came in between $125,000 and $150,000. When things got too out of hand, Wright induced Rudolph Schindler to come to Los Angeles to take over from his son, Lloyd Wright, who would go on to become a prominent architect in his own right.[31]

### Herbert "Hib" Johnson

Hib Johnson was the very successful CEO of the S.C. Johnson Wax Company in Racine, Wisconsin. Author Brendan Gill described the Johnson-Wright relationship in very familiar terms. "Again, we are in the presence of a superb client, who, again in the position of believing himself to be a hard-headed businessman, becomes infatuated (there is no other word) with Wright the architect and then—reluctantly, wondering what will become of him but helpless not to find out—infatuated with Wright the man. It was the fate that had befallen Kaufmann, as it had befallen Darwin D. Martin many years earlier."[32]

The Johnson Wax project was plagued by cost overruns and constant architectural and engineering changes. This was not a new phenomenon. "It was [Wright's] lifelong practice to do so, and it cost his clients—Martin, Barnsdall, Kaufmann, Johnson, and scores of others—sums that would eventually total many millions of dollars, and yet they contrived to forgive him as, with the passing of time, irritated incredulity was transmuted into admiration.[33] Johnson's budget for his corporate administration building was $200,000 and Wright's completed structure cost nearly $3 million![34]

### Lessons Learned

Frank Lloyd Wright is best remembered as an architectural icon of the Twentieth Century. His inspired creations appear from hillsides, city streets and wooded lots all over the world. He pushed the limits of engineering and often challenged zoning commissions and clients to think about building structures in radically new ways. His legacy is the collection of remarkable homes, office buildings, and public accommodations that remain standing today.

Wright is also known for his inability to pay his bills and to live within his means. He regularly ignored his financial obligations and left to others the burden of ensuring that money was available to satisfy a growing list of creditors. The list of those negatively affected by the architect's persistent penury included his first wife and their six children, numerous clients-turned-investors, and the local banks that mortgaged his property.

Like many people today, Frank Lloyd Wright didn't worry about the details of finances. He considered himself too important to be bothered with mundane chores like paying ones bills. He was certain that, on some level, everything would just take care of itself. Just beneath the surface, however, it is clear that he was able to create his wonderful masterpieces because friends, colleagues, and clients were often paying his bills and running interference on his behalf with creditors.

Most people today try to live modestly and do not have a network of friends and colleagues who can pay their bills for them. Most people cannot count on their customers or clients to remain silent as they run over-budget and the cost of a new home or commercial building soars to the heavens. Most people survive by being disciplined and by following the sound consumer principles of living within one's means and being an educated borrower or buyer. America's greatest architect was, admittedly, not "most people" and his financial missteps remind us that money matters are serious business…even for the best and brightest among us.

### BIO



Peter C. Alexander is a Professor of Law at the Southern Illinois University School of Law in Carbondale, Illinois. He joined the SIU faculty in 2003, and served as its Dean from 2003 until 2009. Prior to joining the Southern Illinois faculty, Professor Alexander was on the faculty of The Dickinson School of Law of The Pennsylvania State University for eleven years. Before the joining the Penn State Dickinson faculty, Dean Alexander was in private practice in Champaign, Illinois for seven years.

Professor Alexander also served as a law clerk to the Hon. Larry L. Lessen, U.S. Bankruptcy Judge for the Central District of Illinois, and the Hon. Harold A. Baker, U.S. District Judge for the Central District of Illinois. Dean Alexander teaches in the areas of bankruptcy law, evidence, and trial practice. He is a member of the American Bar Association and the Illinois State Bar Association and a Fellow of the American College of Bankruptcy and American Bar Foundation.

*Continued on Page 30*

ALEXANDER: *Continued from Page 29*

## Endnotes

1. Interview with Bruce Brooks Pfeiffer, Frank Lloyd Wright Foundation Archivist, in Scottsdale, AZ (March 15-16, 2006).

2. *See* http://www.pbs.org/flw/buildings/usonia/index.html.

3. *Id.* Wright ultimately created a visual form of his model community, which he called Broadacre City. Pittsburgh department store mogul (and Wright client and friend), Edgar Kaufmann, was instrumental in funding the Broadacre City model.

4. "Unsonian" was a variation of Wright's name for his utopian society called "Usonia," which was an acronym for "United States of North America." *See generally*, MERYLE SEACREST, FRANK LLOYD WRIGHT: A BIOGRAPHY 448 (Univ. of Chicago Press 1992) (1998). The on-line encyclopedia, Wikipedia, credits American writer James Duff Law with coining the term. "In a miscellaneous collection titled *Here and There in Two Hemispheres* (1903), Law quoted a letter of his own (dated 18 June 1903) that begins 'We of the United States, in justice to Canadians and Mexicans, have no right to use the title "Americans" when referring to matters pertaining exclusively to ourselves.' He went on to acknowledge that some author had proposed 'Usona,' but that he preferred 'Usonia.'" The quote appears at http://en.wikipedia.org/wiki/Usonia.

5. http://www.pbs.org/flw/buildings/usonia/index.html.

6. The Edo Period was from 1600-1868. *See* the Worldtrade.com web-site at http://www.wordtrade.com/arts/architecture/japanesearchitectureR.htm.

7. DONALD W. HOPPEN, THE SEVEN AGES OF FRANK LLOYD WRIGHT: THE CREATIVE PROCESS 29 (Dover Publications, Inc. 1993) (1998).

8. "We two [Wright and his wife] had a joint bank account. Drew checks until they began to come back N.S.F.-in red. Then we knew the money was gone. Never mind! The first of the month was only two weeks off. There would be some more." FRANK LLOYD WRIGHT, AUTOBIOGRAPHY 112 (The Frank Lloyd Wright Foundation 1943) (1998). Wright also wrote, "So long as we had the luxuries, the necessities could pretty well take care of themselves so far as we were concerned." *Id.* at 118.

9. Quote located at http://thinkexist.com/quotes/frank_lloyd_wright.

10. JOHN LLOYD WRIGHT, MY FATHER WHO IS ON EARTH 76-78 (1946) (S.I.U. Press 1994).

11. *See* HOPPEN, *supra* note 7, at 59.

12. HERBERT MUSCHAMP, MAN ABOUT TOWN: FRANK LLOYD WRIGHT IN NEW YORK CITY 74 (M.I.T. Press 1983).

13. Letter "To the Subscribers of Frank Lloyd Wright, Inc." from President Ferdinand Schevill, dated January 19, 1928, a copy of which is on file with the author.

14. Frank Lloyd Wright biography as published at http://www.cmgww.com/historic/flw/bio.html.

15. "Why, I just shake the buildings out of my sleeves." *See* http://www.cmgww.com/historic/flw/quotes.html.

16. BRENDAN GILL, MANY MASKS: A LIFE OF FRANK LLOYD WRIGHT 358-59 (DeCapo Press 1987) (1988).

17. *Id.* at 368.

18 *Id.* at 369.

19. HOPPEN, *supra* note 7 at 102.

20. Mr. Wright owed much of his success to another group of individuals who helped manage his business, financial and legal affairs. They included Wright Apprentice and Secretary Gene Masselink, attorney Philip F. LaFollette, Olgivanna Wright, and Illinois client Francis Little.

21. *See* http://www.musicalfare.com/news/January7article.php.

22. *See* article by Mr. Chase at http://www.buffalospree.com/archives/2004_03/0304renewingwright.html.

23 This information is supplied by Wikipedia, the online encyclopedia, at http://en.wikipedia.org/wiki/Darwin_D._Martin#Downfall_and_Death.

24. GILL, *supra* note 4, at 343-44.

25. *Id.* at 344.

26. *Id.*

27. *Id.*

28. *See* Matthew L. Wald, *Rescuing a World-Famous but Fragile House*, N.Y. Times, September 2, 2001, as reprinted at http://www.plinia.net/browser/browser-fallwater.html.

29. Information taken from http://mykindred.com/cloud/TX/getperson.php?personID=I54984&tree=mykindred01.

30. Information taken from http://www.discoverhollywood.com/pagemanager/templates/content.asp?articleid=87&zoneid=5.

31. Id.

32. GILL, supra note 16, at 355.

33. Id. at 367.

34. Id. at 359, 370. ∎

---

FRONTLINE NEWS: *Continued from Page 21*

misleading/deceptive statements. Also, the Court recognizes an important presumption that reliance is presumed where the misrepresentation is material. Additionally, the Court holds that harm does not need to be the only or even the primary cause of the harm. Additionally, the standard that the court recognizes for showing reliance is not 100%, but only by showing that "in all reasonable probability" the plaintiff would not have acted, but for the deceptive statement.

Since the *Tobacco II* decision, at least one court has already recognized that *Tobacco II* "sets out a liberal approach to the reliance inquiry." *See Plascencia v. Lending 1st Mortgage*, —- F.R.D. —-, 2009 WL 69732, at *10 (N.D. Cal. Aug. 21, 2009). ∎

# A Voice for the Poor Is Silenced

### By Michael Powell
*City Room, The New York Times*

Rick Wagner, a legal services lawyer, died September 21, 2009, apparently of a heart attack, bringing to a sudden end a lifetime of service to the poorest New Yorkers.

Mr. Wagner's passing represents loss for those who live in the straitened precincts of East New York and Brownsville, Brooklyn, and faint hope for the goniffs - Yiddish for scoundrels and Mr. Wagner's favorite insult - whom he pursued to the end of the world or the New York City line, whichever came first.

Round-bellied and bearded, Mr. Wagner, who was 65, grew up in the Five Towns region of Long Island and served as litigation director for Brooklyn Legal Services Corporation A in East New York. Settling in an abandoned bank branch, he commandeered the former president's office as his lair, and his legal files piled as high as floodwater sandbags around his desk. He rescued a portrait of George Washington from a garbage pile and gave it an honored place on the wall, explaining that the bewigged fellow was "the first revolutionary."

An inventive lawyer who took himself not too seriously, he possessed a Ph.D. in sardonic insult and aphorism. Confronting a dim-witted prosecutor, he inquired if the lawyer needed a GPS device to find his backside. Of a particularly exotic form of mortgage fraud, he noted with just a touch of admiration that "larceny is the mother of invention."

Alas, much of Mr. Wagner's most inventive, not to mention joyful, verbal handiwork remains unprintable in The New York Times.

Except to take a breath, he rarely stopped talking. He once asked this reporter to quote one of his younger colleagues, who had labored hard on a particular case. His request was difficult to honor as Mr. Wagner rattled on for most of the interview and kept everyone, including his client, laughing.

Mr. Wagner was of a generation that viewed radical social change as challenge and obligation, not to mention worth a chuckle. After graduating from New York Law School, he found a home in William M.

Kunstler's radical nest, the Center for Constitutional Rights, before founding his own left-wing firm. "We were going to be a progressive legal collective, but our political standards lowered as our fees increased," he told City Limits magazine a decade back. "It's hard to say no to a heroin dealer who drops 75 grand on your desk."

Nonetheless, Mr. Wagner took a pay cut and left to work for legal services in 1985. With a colleague, Jim Provost, he pioneered the use of civil racketeering laws in East New York. Their first targets were the landlords of a large development who certified every month to HUD that their decrepit federally subsidized apartments were in decent and sanitary condition. Because the owners sent these transparently fraudulent certifications more than once through the mail, and deposited the federal subsidies into their bank accounts, the legal services lawyers argued that the landlords fit the federal definition of racketeers. That meant the owners could be sued for triple damages.

The landlords experienced a come to God moment and turned the deed over to the tenants in 1995.

Of late, Mr. Wagner reasoned that the Federal Reserve and Treasury were doing a splendid job of looking out for the bankers, so he took up the legal cudgel to protect impoverished homeowners from foreclosure. He and a colleague convinced the F.D.I.C. to substantially write down a mortgage for an elderly client, he waged a decade-long civil battle against a particularly unrepentant house flipper, and grew so frustrated with the inaction of the Brooklyn district attorney in combating mortgage fraud that he took to traveling around Brooklyn on weekends, showing up at forums to challenge prosecutors.

One Saturday last winter, he cornered a wincing deputy prosecutor before a crowd in a church basement in Flatlands. "Most of the con artists perpetrating frauds continue to have a better chance of being kidnapped by Somali pirates than of being prosecuted by your office," Mr. Wagner noted to hoots of applause.

Weeks later, the district attorney, Charles J. Hynes, announced with some fanfare the arrest of a low-level ring of swindlers, not least a man who had impersonated

Copyright © [September 22, 2009] The New York Times Company. Reprinted with permission

Continued on Page 35

## NACA Continues to Grow

**New NACA Members Since July 1, 2009**

| | | | |
|---|---|---|---|
| David | Guin | Birmingham | AL |
| Rhonda | Hood | Birmingham | AL |
| Wesley | Phillips | Birmingham | AL |
| Camille | Edmison-Wilhelmi | Pine Bluff | AR |
| Allan | Cory | Santa Rosa | CA |
| Leora | Freedman | Los Angeles | CA |
| Crystal | Sims | Santa Ana | CA |
| Donny | Brand | Long Beach | CA |
| Russell | Handy | San Marcus | CA |
| Mark | Potter | San Marcus | CA |
| Alexander | Spellman | Long Beach | CA |
| Brian | Levine | Encino | CA |
| Virginia | Lopez | Escondido | CA |
| Robert | Williams | Tustin | CA |
| Zachary | McCready | Santa Ana | CA |
| Christine | Holdeman | Santa Clara | CA |
| John | Mlnarik | Santa Clara | CA |
| Marc | Zimmerman | Aliso Viejo | CA |
| Constance | Hsiao | El Monte | CA |
| Alysson | Snow | San Diego | CA |
| Patrick | Dunlevy | Los Angeles | CA |
| Arthur | Stockton | Fountain Valley | CA |
| Walter | Hackett | Diamond Bar | CA |
| Kenneth | Barrows | Denver | CO |
| Sarah | Parady | Denver | CO |
| Linda | Tirelli | Stamford | CT |
| Aida | Arus | Hartford | CT |
| Theresa | DeGray | Guilford | CT |
| Angela | Troccoli | Dayville | CT |
| Claire | Prestel | Washington | DC |
| Allison | Zieve | Washington | DC |
| Melanie | Hirsch | Washington | DC |
| Matthew | Wessler | Washington | DC |
| Kate | Shumaker | Wilmington | DE |
| Daniel | Tam | Tampa | FL |
| Scott | Kuhn | Fort Myers | FL |
| Michael | Ziegler | Jacksonville | FL |
| Timothy | Owens | Tampa | FL |
| James | Woodruff, II | Jacksonville | FL |
| Marilyn | Gantt | Jacksonville | FL |
| Joseph | Brien | Hollywood | FL |
| Pamela | Fields | Sarasota | FL |
| Brian | Mitchell | Ocala | FL |
| Wayne | Kramer | Ft. Lauderdale | FL |
| Ian | Leavengood | St. Petersburg | FL |
| Kristin | Stewart | Pensacola | FL |
| Russell | Rein | Pensacola | FL |
| Marteal | Lamb | Jacksonville | FL |
| Allison | Singer | Tampa | FL |
| J. David | Davila | Lake Mary | FL |
| Todd | Wincek | Chicago | IL |
| Debby | Knoblock | East St. Louis | IL |
| Roger | Zamparo, Jr. | Chicago | IL |
| Timothy | Deffet | Chicago | IL |
| Dana | Luetzelschwab | Indianapolis | IN |
| Charles | Kugler | Kansas City | KS |
| Ranie | Thompson | New Orleans | LA |
| Mildred | Phillips | Dedham | MA |
| Josef | Culik | Rockport | MA |
| Arielle | Cohen | Boston | MA |
| Pamela | Kogut | Concord | MA |
| Bret | Thompson | Cambridge | MA |
| Leah | Plunkett | Boston | MA |
| Stephen | Sturgeon | Rockville | MD |
| Michelle | McLean | Grand Rapids | MI |
| Melissa | Sprague | Saginaw | MI |
| David | Knoester | Allendale | MI |
| Brea | Buettner-Stanchfield | Minneapolis | MN |
| Anne | Hansen | St Louis Park | MN |
| Todd | Murray | Minneapolis | MN |
| Susan | Coler | Minneapolis | MN |
| Lynn | Travis | St. Louis | MO |
| Douglass | Noland | Liberty | MO |
| Noah | Wood | Kansas City | MO |
| Timothy | McCurdy | St. Louis | MO |
| Steven | White | Union | MO |
| Craig | Janak | Cary | NC |
| Carol | Zanoni | Raleigh | NC |
| Donald | Coomes | Apex | NC |
| Frances | Tomes | E. Brunswick | NJ |
| Philip | Stern | Morristown | NJ |
| Lawrence | Hersh | Rutherford | NJ |
| Elliot | Gardner | North Brunswick | NJ |
| Jorge | Sanchez | Las Vegas | NV |
| Jennifer | Quintana | Queens | NY |
| Tashi | Lhewa | Kew Gardens | NY |
| Laurie | Izutsu-Keener | Brooklyn | NY |
| Jennifer | Light | Brooklyn | NY |
| Peter | Lane | New York | NY |
| Jenny | Braun-Friedman | Kew Gardens | NY |
| Abel | Pierre | New York | NY |
| James | Murtha | Babylon | NY |
| Seth | Andrews | Amherst | NY |
| Persis | Yu | Rochester | NY |
| Wendy | Dolce | New York | NY |
| Justin | Haines | Bronx | NY |
| Maxim | Maximov | Brooklyn | NY |
| Robert | Brooks, II | Cleveland | OH |
| Kathryn | Buerger | Cincinnati | OH |
| Hazel | Remesch | Cleveland | OH |
| Allen | Schulman, Jr. | Canton | OH |
| Michelle | Pierro | Columbus | OH |
| George | Smith, Jr. | Maumee | OH |
| Jeffrey | Schoenberger | Cincinnati | OH |
| Jeff | Woodworth | Cincinnati | OH |
| Carrie | McNeer | Moore | OK |
| Richard | Glasgow | Oklahoma City | OK |
| Shannon | Sims | Portland | OR |
| Margaret | Schuetz | Pittsburgh | PA |
| Kristin | Sabatini | Scranton | PA |
| Derek | Braslow | Conshohocken | PA |
| Gordon | Brown | Media | PA |
| Rodney | Pillsbury | Greenville | SC |
| Julie | Johnson | Dallas | TX |
| Aaron | Haas | San Antonio | TX |
| Heather | Godwin | Austin | TX |
| David | Benford | Garland | TX |
| Patrick | Funiciello | North Richland Hills | TX |
| Grant | Gurley | Marshall | TX |
| Roslyn | Jackson | Houston | TX |
| Ericka | Moore | Houston | TX |
| Dipti | Pidikiti-Smith | Alexandria | VA |
| Douglas | Wilson | Seattle | WA |
| Jeffrey | Fehr | Wenatchee | WA |
| Antoinette | Davis | Seattle | WA |
| Frank | Malone | Spokane | WA |
| Nicholas | Toman | Milwaukee | WI |
| Nathan | Fetty | Clarksburg | WV |

# NACA MEMBERSHIP RENEWAL

### (For Use by Current or Former NACA Members Only)

I wish to renew my membership with the National Association of Consumer Advocates ("NACA").

I am admitted to the Bar in the following jurisdictions (Applicable to NACA Attorney Members) :

_____

_____.


1. Have you ever been suspended or disbarred by any Bar that has licensed you to practice?

    ☐ No ☐ Yes (If yes, please attach a full explanation.)

2. Law School Student: (please attach a copy of Student ID)

    Year of Graduation _____

    School _____

3. Please describe your practice setting: (Check only one)

    ☐  Legal Services Attorney or Law Student

    ☐  Public Interest Attorney (including AGs & Law Professors)

    ☐  PrivateAttorney (1-2 years as NACA member)

    ☐  PrivateAttorney (3-5 years as NACA member)

    ☐  PrivateAttorney (6+ years as NACA member)

My primary substantive areas of practice/employment are:_____

_____


Neither I nor my employer nor anyone in my firm represents business or commercial clients,[1]  except as follows (Use additional paper if necessary): _____

_____

_____


   1-The term "business or commercial client" includes for example, but is not limited to, automobile dealers or repair shops, credit card companies, credit repair agencies, credit reporting agencies, debt collectors and repossession companies, home improvement contractors, financial institutions, mortgage banks or brokers, realtors, time share providers, and retailers. It does not include government entities.


# NACA MEMBERSHIP PLEDGE

By my signature below, I pledge:

1.  I am committed to advancing the cause of just treatment for and ethical representation of consumers.

2.  I will not, so long as I am a NACA member, perform services for any business or commercial client (as defined in the application for membership above) on a matter where that client's interests are adverse to the interests of a consumer or consumers.  I also do not have any present intention or expectation of doing so in the future.

3.  If there are any material changes in work done by me or my firm or employer which could be adverse to the interests of consumers, I will immediately provide NACA with a full written explanation.

4.  I will abide by all listserv rules relating to confidentiality of communications on any email listserv administered by NACA or the National Consumer Law Center.  This portion of the pledge shall remain binding on me permanently, even if I resign from NACA or my membership is suspended or revoked.

Date:_____    _____

                                             (Signature)

                                             _____

                                           (Printed Name)

### NACA'S ANNUAL MEMBERSHIP PERIOD IS JULY 1 THROUGH JUNE 30

# CREDIT CARD AUTHORIZATION

I have attached check payment or authorize annual NACA membership dues to be charged to my MC, VISA, or AMEX account in the amount of _____ for the level of membership checked below.

☐ Private Attorney Member (1-2 years as NACA member)    $150      ☐ Public Interest Attorneys (incl. AGs & Law Professors)   $100
☐ Private Attorney Member (3-5 years as NACA member)    $200      ☐ Legal Services and Law Students    $50
☐ Private Attorney Member (6+ years as NACA member)    $250

---

A contribution to NACA makes our collective call for consumer justice all the stronger! At your time of renewal, please consider a contribution to NACA's Leadership Circle to support the vital training and resource initiatives that strengthen our community.

☐ Platinum Membership, $25,000            ☐ Benefactor Membership, $1,500
☐ Gold Membership, 10,000                ☐ Patron Membership, $1,000
☐ Silver Membership, $5,000             ☐ Advocate Membership, $500
☐ Bronze Membership, $2,500

---

MC____VISA___AMEX Card No. _____    Expires:_____

Your signature (for charges only): _____

 

I understand that NACA will review my membership renewal and in doing so, it will rely on my signature on this Application and on the attached Membership Pledge.  I also understand NACA will determine in its sole discretion whether membership will be made available to me.  I further understand that membership in NACA does not by itself entitle me to participate in any email listserv administered by NACA or the National Consumer Law Center, that the moderator of a listserv may impose terms or conditions for participation in a listserv beyond NACA membership and that I accept the decision of the moderator of a listserv as to whether I may participate in the listserv.  I also understand and agree that NACA may at any time after I become a member, in its sole discretion, suspend or revoke my membership, subject to NACA's established procedures.

(Please complete, sign and return this Application and Pledge with payment, by mail or fax.  NACA cannot accept or consider your application until you have carefully read, signed and returned the attached Membership Pledge.)

Signature of Applicant:_____    Date: _____

Printed Full Name:  _____

Employer:_____    Email:_____

Billing Address: _____

City, State _____    Zip: _____

Phone: _____    Fax: _____

### NACA'S ANNUAL MEMBERSHIP PERIOD IS JULY 1 THROUGH JUNE 30

**COX:** *Continued from Page 16*

account marketing is yet another situation in which bank regulators work in the interests of banks rather than their customers.   It is a stark example of the need for a powerful and effective CFPA.

A draft article on the subject of pre-acquired account marketing can be downloaded at: http://ssrn.com/abstract=1460963 and the article will be published in Volume 47, Issue 2 of the Harvard Journal on Legislation. ∎

**BIO**



Prentiss Cox is an Associate Professor of Clinical Law at the University of Minnesota Law School and previously was the Manager of the Consumer Enforcement Division at the Minnesota Attorney General's Office.

**RICK WAGNER:** *Continued from Page 31*

his own mother. Mr. Wagner was not overly impressed.

"Here's your headline," Mr. Wagner said. " 'D.A. Accuses Man of Not Being His Own Mother: Charles Hynes is guardedly optimistic that the gynecological evidence will sustain his accusation.' "

We reporters are not supposed to draw too close to our sources, which is a good rule of thumb. But that cannot inoculate against respect, or a good laugh. Mr. Wagner summoned both. He probably could have made a golden pile in criminal or corporate law.

He chose a different path. ∎

---

# *Upcoming Events*

### 2010 Fair Debt Collection Training Conference

Jacksonville, Florida
March 5-6, 2010
go to www.nclc.org to register

### 2010 NACA Auto Fraud Conference

Chicago, Illinois
May 14-16, 2010
more information coming soon to
www.naca.net

*Look for more details, coming soon!*

---

# NACA 2010 Board of Directors

**Lynn Drysdale/ Co-Chair**

**Seth Lesser/ Co-Chair**

**Robert Murphy/ Secretary**

**Will Ogburn/ Treasurer**

**Dwain Alexander II**

**Leonard Bennett**

**Daniel Blinn**

**James Fishman**

**DeVonna Joy**

**Michael Kinkley**

**Ian Lyngklip**

**Jim Sturdevant**

# *Legislative Update*

### By Cora Ganzglass

As the days become shorter and a winter chill begins to blow, I am forced to reflect on the battles we have won and lost on Capitol Hill in 2009.  It has been a year of momentum building around consumer protection issues on the Hill.  The Obama Administration was sworn in during one of the worst financial crisis since the Great Depression and they turned to NACA, your organization, and other national organizations for input on how to get the nation back on track.  Unlike the past decade, consumer protection groups are being called upon, listened to, and employed to begin to effect the change necessary to build a fair and just consumer marketplace.

Change is slow however in the wacky world of Washington, DC.  Despite having a relatively sympathetic Administration that has made consumer protection a priority, the banking industry's sway in the halls of Congress remains incredibly powerful.  The Chamber of Commerce, American Bankers Association and other industry groups have pulled out all the stops to ensure that the status quo that brought us the present financial crisis, remains.  In the third quarter of 2009, the Chamber of Commerce has spent a whopping $34,690,000 on lobbying.  In our fight to pass the Consumer Financial Protection Agency there are 25 industry lobbyists for our every one (1547 industry lobbyists to every 58 consumer protection lobbyists).  However, we have truth on our side and consequently, despite the odds, we are slowly making progress.

Sometimes our wins are big.  For example, this year we won the Credit CARD Act, which is the first real credit card reform to occur in the past 30 years.  Other times our accomplishments are more modest and can be noted by the ever growing awareness of Congress on consumer protection issues.  Today, whether or not to create the Consumer Financial Protection Agency (CFPA), an independent agency whose sole mission is to protect consumers is at the forefront of the debate. So is the issue of forced arbitration, abusive overdraft fees, and predatory lending.  Just a year ago little of these conversations were taking place.

So 2010 expects to be an exciting year for consumer protection legislation.  As we continue to grow in strength, so will our accomplishments.  Stay tuned for regular legislative updates and for my calls to you and your clients to help in our collective effort.

---

*Tax Deductible Disclosure: In accordance with section 6033 (e) of the Internal Revenue Code, membership dues for the National Association of Consumer Advocates, Inc. a 501(c)(6) organization, are tax deductible as business expenses, however, for 2009 an estimated 59% of membership dues have been used for lobbying activities and are not tax deductible.*

---



**National Association of Consumer Advocates**
1730 Rhode Island Ave., NW, Suite 710
Washington, DC 20036